ACCEPTED
03-14-00738-CV
5659032
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/12/2015 2:19:36 PM
JEFFREY D. KYLE
CLERK

**Oral Argument Requested**

**No. 3-14-00738-CV**

**In The Court of Appeals For The Third District of Texas at Austin**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/12/2015 2:19:36 PM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| **Elness, Swenson, Graham Architects, Inc.,** *Appellant and Cross-Appellee,* | § § § § § | **From the 200th District Court** |
| **v.** | § § | |
| **RLJII-C Austin Air, LP, RLJ II-C Austin Air Lessee, LP and RJL Lodging Fund II Acquisitions, LLC,** *Appellees and Cross-Appellants.* | § § § § § § | **Of Travis County, Texas** |

**UNOPPOSED MOTION TO AMEND APPELLEES'
BRIEF TO CORRECT SENTENCE FRAGMENT**

Appellees and Cross-Appellants, RLJII-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RJL Lodging Fund II Acquisitions, LLC, respectfully move for leave to amend their Appellees' Brief filed in this cause on June 11, 2015. To demonstrate why leave to amend should be granted, Appellees and Cross-Appellants respectfully show as follows:

**I. Nature of the Correction**

Leave to amend is sought to correct the omission of ten words from the first sentence fragment of the third paragraph of the Summary of Argument on page 5

1

of the Appellees' Brief. That fragment reads, "acquired during its history that does not address the issue here: whether RLJ satisfied Chapter 38." It should have read, "The Architect's argument relies on the general patina Chapter 38 acquired during its history that does not address the issue here: whether RLJ satisfied Chapter 38." No other alterations than the necessary correction to the word count in the certificate of compliance and correction of the date on the certificate of service will be made to the Amended Appellees' Brief, a true and correct copy of which is attached as Exhibit "A" to this motion.

## II. Explanation of the Cause of the Need to Amend

The omission making this motion necessary was the result of an error that occurred during the final preparation of the brief. Using Microsoft Word, the last version of the summary of argument was pasted in its entirety into the Appellees' Brief. In the process of doing so, the omitted phrase was deleted. Because the document was copied and pasted in its entirety, it was anticipated that the summary of argument appeared in the brief as it had appeared in the source document. That it did not so appear was not detected until after Appellees' Brief was filed.

## III. Not Opposed by Counsel for Appellant, Cross-Appellee.

On Friday, June 12, 2015, counsel for the parties to this appeal conferred concerning this motion to amend. Counsel for Appellant and Cross-Appellee is not opposed to the relief this motion requests.

2

## IV. Relief Requested

For the foregoing reasons, Appellees and Cross-Appellants request that this motion be granted and that the court accept for filing Amended Appellees' Brief tendered this day for filing in this cause. Appellees and Cross-Appellants further request any other relief to which this motion may entitle them.

Respectfully submitted,

MUNSCH HARDT KOPF & HARR PC

/s/Michael W. Huddleston
Michael W. Huddleston
State Bar No. 10148415
J. Stephen Gibson
State Bar No. 07866000
3800 Ross Tower
500 North Akard Street
Dallas, TX 75201
(214) 855-7500 Main Tel.
(214) 855-7584 Main Fax
mhuddleston@munsch.com
sgibson@munsch.com

3

MHDocs 6179368_1 12690.2

Benton T. Wheatley
State Bar No. 24015171
Tracy McCreight
State Bar No. 24037064
Munsch Hardt Kopf & Harr, P.C.
401 Congress Avenue, Suite 3050
Austin, TX 78701
(512) 391-6100 Main Tel.
(512) 391-6149 Main Fax
bwheatley@munsch.com
tmccreight@munsch.com

**Attorneys For Appellees and
Cross- Appellants**

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the foregoing document

upon counsel listed below on this 12th day of June, 2015 by e-file:

Weston M. Davis
Gregory N. Ziegler
Steven R. Baggett
Macdonald Devin, P.C.
1201 Elm Street
3800 Renaissance Tower
Dallas, TX 75270

*/s/ Michael W. Huddleston*
Michael W. Huddleston

MHDocs 6179368_1 12690.2

# EXHIBIT A

In The Court of Appeals For The
Third District of Texas

| | | |
|---|---|---|
| **Elness, Swenson, Graham Architects, Inc.,** *Appellant and Cross-Appellee,* | § § § § | From the 200th District Court |
| **v.** | § § | |
| **RLJII-C Austin Air, LP, RLJ II-C Austin Air Lessee, LP and RJL Lodging Fund II Acquisitions, LLC,** *Appellees and Cross-Appellants.* | § § § § § | Of Travis County, Texas |

## APPELLEES' AMENDED BRIEF

**MUNSCH, HARDT, KOPF
& HARR, P.C.**

**Michael W. Huddleston**
State Bar No: 10148415
**J. Stephen Gibson**
State Bar No: 07866000
3800 Ross Tower
500 North Akard Street
Dallas, Texas 75201
214-855-7500 telephone
214-855-7584 facsimile

**Benton T. Wheatley**
State Bar No. 24015171
**Tracy McCreight**
State Bar No. 24037064
401 Congress Avenue
Suite 3050
Austin, TX 78701
512-391-6100 telephone
512-391-6149 facsimile

**ATTORNEYS FOR APPELLEES,
CROSS-APPELLANTS**

# IDENTITY OF PARTIES AND COUNSEL

The undersigned counsel of record, pursuant to Texas Rule of Appellate Procedure 38.2, certifies that the following persons have an interest in the outcome of this case:

| | |
|---|---|
| Appellant, Cross-Appellee:<br>Appellant's, Cross-Appellee's<br>Counsel on Appeal: | Elness, Swenson, Graham Architects, Inc.<br>Weston M. Davis<br>Gregory N. Ziegler<br>Steven R. Baggett<br>Macdonald Devin, P.C.<br>1201 Elm Street<br>3800 Renaissance Tower<br>Dallas, TX 75270 |
| Appellant, Cross-Appellee's<br>Counsel at Trial: | Weston M. Davis<br>Gregory N. Ziegler<br>Matthew Mumm<br>Macdonald Devin, P.C.<br>1201 Elm Street<br>3800 Renaissance Tower<br>Dallas, TX 75270 |
| Appellees, Cross-Appellants: | RLJ II-C Austin Air, LP<br>RLJ II-C Austin Air Lessee, LP<br>RLJ Lodging Fund II Acquisitions, LLC |
| Appellees', Cross-Appellants'<br>Counsel on Appeal: | Michael W. Huddleston<br>J. Stephen Gibson<br>Munsch Hardt Kopf & Harr, P.C.<br>3800 Ross Tower<br>500 North Akard Street<br>Dallas, Texas 75201 |

i

Appellees', Cross-Appellants'
Counsel at Trial:

Benton T. Wheatley
Tracy McCreight
Munsch Hardt Kopf & Harr, P.C.
401 Congress Avenue
Suite 3050
Austin, TX 78701

By: _/s/ Michael W. Huddleston_

Attorney for Appellees, Cross-Appellants

ii

## STATEMENT CONCERNING ORAL ARGUMENT

Appellees and Cross-Appellants respectfully request oral argument in this case. Appellees and Cross-Appellants respectfully submit that oral argument will help the Court in evaluating the issues necessary to the resolution of this appeal.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................i

STATEMENT CONCERNING ORAL ARGUMENT............................................ iii

TABLE OF CONTENTS................................................................................iv

INDEX OF AUTHORITIES................................................................................ viii

I.     STATEMENT OF THE CASE ................................................................1

II.    ISSUES PRESENTED ................................................................3

III.   STATEMENT OF FACTS................................................................4

IV.   SUMMARY OF ARGUMENT................................................................5

V.    ARGUMENT AND AUTHORITIES ................................................8

      A.    The Trial Court Correctly Awarded RLJ Its Attorney's Fees..............8

           1.    Chapter 38 Does Not Require a Judgment for Damages............8

               a.    The "Judgment" Requirement Was Eliminated by the 1977 Amendment to Chapter 38's Predecessor..................................................9

               b.    The Texas Supreme Court and This Court Have Rejected Any Such Requirement. ..........................9

               c.    The Architect's Cases Do Not Say Otherwise. ................................................11

           2.    Chapter 38 Only Requires a Valid Claim Timely Presented and Unpaid for Thirty Days. .........................................12

               a.    The Architect Ignores Proper Statutory Interpretation..................................................12

               b.    The Architect Attempts to Add Words to Chapter 38 By Misapplication of Cases. ........................13

           3.    Chapter 38 Only Requires a Valid Claim Timely Presented and Unpaid for Thirty Days. .........................................15

               a.    A "Valid Claim" Is Required.........................................15

                    1)    "In [A]ddition [T]o" Does Not Imply a "Valid Claim" Requires a Judgment Awarding Damages. .................................................15

                    2)    A Verdict Awarding Damages Is Enough To Have a "Valid Claim." ........................16

               b.    Chapter 38 Requires the Valid Claim to Remain Unpaid 30 Days After Presentment. .................17

4. RLJ Met All the Statutory Requirements for Recovering Its Attorney's Fees. ...................................21
    a. RLJ Had a Valid Claim. ...................................21
    b. The Just Amount Owing Was Not Timely Tendered. ...................................22
5. The Trial Court's Reasoning Agreed With the Legislature's...23

B. RLJ Was Assigned the Contract and the Cause of Action and Had Standing to Sue. ...................................24
    1. RLJ Owned Both the Architectural Contract Rights and Causes of Action of Action for Its Breach. ...................................25
        a. Ausaircourt Assigned the Contract to RLJ Under the PSA and the Cause of Action By Assignment of "Intangible Assets." ...................................25
    2. The Intangibles Assignment Transferred the Contract Cause of Action. ...................................26
        a. "Intangible Assets" Included Contract Cause of Action. ...................................27
        b. The Architect's Argument Ignores Context and the Residuary Clause's Purpose. ...................................28
    3. The Intangibles Assignment was "Express." ...................................31
    4. The Supplemental Clarification May Be Considered and Removes Any Doubt That RLJ Was Assigned the Architectural Contract and the Cause of Action For Its Breach. ...................................34
    5. Alternatively, The PSA Transferred The Contract Cause of Action When It Transferred the Contract. ...................................36
    6. The Architectural Contract Was Validly Assigned to RLJ. ...................................36

C. The Contract Was Admissible and Authenticated. ...................................39

D. The Trial Court Did Not Err in Submitting the Contractual Liability Issue Concerning Structural Engineering and The Architect's Complaints Have Not Been Preserved For Review. ...................................41
    1. The Architect Waived Its Complaint By Failing to Specially Except to the Omission of Vicarious or Respondeat Superior Allegations. ...................................41
    2. The Architect Waived Its Complaint By Failing to File a Verified Denial of Liability in the Capacity Sued. ...................................43

3. The Architect Failed to Preserve Its Charge Complaint By Objecting On Different Grounds Than Those Now Urged. .....44

4. Vicarious or Respondeat Superior Liability Is Not Required When Responsibility Exists Under a Contract. ........................44

  a. *Ryan* Decided Tort, Not Contractual, Duty Under a Now-Rejected Liability Theory.........................44

  b. The Contract Defines Contractual Duties.......................45

5. The Architect Waived Any Complaint About the Duty Submitted By Failing to Request Any Question, Definition or Instruction. ...................................................................................46

6. *Ryan* Only Addressed the Architect's Direct, Not Vicarious, Tort Liability. ........................................................................46

7. Architect's Reasoning Permits It All the Contractual Benefits Free of Burden and Risk. ........................................................47

8. Illegality Is Not an Issue Due to The Architect's Failure to Plead It and Statutory Authorization for Architects Performing Structural Engineering Services..................................................48

  a. Any Illegality Was Waived Because It Is Not Apparent And The Architect Did Not Affirmatively Plead It.......................................................49

  b. *Seaview Hospital* Does Not Say An Architect Cannot Provide Structural Engineering Services. ...................................................50

E. The Evidence of Diminution in Value Was Legally Sufficient..........50

 1. The Evidence Is Legally Sufficient If It Provides More Than a Scintilla of Factual Support. .....................................................51

 2. Hornsby's Testimony Was Well-Founded Based on Well-Accepted Standards and Methodologies...................................52

 3. The Architect's Complaints Are Meritless. ............................54

  a. The Evidence Supported the Answer to the Question Asked, and the Architect Waived Its Valuation Date Complaint. .........................................54

  b. The Jury Was Provided With Actual Performance Data. ........................................................58

  c. There Was Legally Sufficient Evidence to Support the Jury's Verdict and Any Allocation of Damages. .................................................60

1) The Architect Erroneously Assumes Jury Must Have Implicitly Found Others Breached. .....................................60

2) Evidence of Unsegregated Damages Is Legally Sufficient Evidence of Segregated Damages. ............................61

3) Testimony Segregating Damages Is Not Required. ....................................62

d. Comparable Sales Were a Vouchsafe, Not the Basis for Valuations...............................63

e. There Was No Recovery For "Stigma" Damages and No Double Recovery. ..............................65

f. Lost Profits Were Not a Separate Element of Recovery, But Were Only Used As Necessary for the Texas Supreme Court's Approved Method of Valuing Property Producing Income...........................................66

VI. CONCLUSION AND PRAYER ..................................................67

CERTIFICATE OF COMPLIANCE ...................................................70

CERTIFICATE OF SERVICE ...................................................71

APPENDIX ...................................................72

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*A.D. Willis Co. v. Metal Bldg. Components, Inc.*,
No. 03-99-00574-CV, 2000 WL 1508500
(Tex. App.—Austin Oct. 12, 2000, pet. denied) .............................. 10, 12, 15-16

*Adams v. Great American Lloyd's Ins.*,
891 S.W.2d 769 (Tex. App.—Austin 1995, no writ) ........................................27

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. E Court, Inc.*,
No. 03-02-00714-CV, 2003 WL 21025030
(Tex. App.—Austin May 8, 2003, no pet.).........................................................27

*Alaniz v. Jones & Neuse, Inc.*,
907 S.W.2d 450 (Tex. 1995) .............................................................................42

*Am. Multi-Cinema, Inc. v. Hegar*,
No. 03-14-00397-CV, 2015 WL 1967877
(Tex. App.—Austin Apr. 30, 2015, no pet. h.)..................................................28

*Associated Press v. Hicks Broad. Corp.*,
No. C14-93-00066-CV, 1993 WL 495114
(Tex. App.—Houston [14th Dist.] Dec. 2, 1993, no writ) .......................... 40-41

*Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*,
948 S.W.2d 293 (Tex. 1997) .............................................................................10

*Austin Road Co. v. Pope*,
147 Tex. 430, 216 S.W.2d 563 (1949) ..............................................................20

*Avanti Servs. Inc. v. Questor Drilling, Inc.*,
No. 01-86-00741-CV, 1987 WL 8352
(Tex. App.—Houston [1st Dist.] Mar. 26, 1987, no writ)..................................43

*Baroid Equipment, Inc. v. Odeco Drilling, Inc.*,
184 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ...................35

*Barraza v.Koliba*,
933 S.W.2d 164 (Tex. App.—San Antonio 1996, writ denied)........................54

*Barry v. Jackson*,
309 S.W.3d 135 (Tex. App.—Austin 2010, no pet.)....................................56-58

*Bechtel Corp. v. CITGO Products Pipeline Co.*,
271 S.W.3d 898 (Tex. App.—Austin 2008, no pet.)...........................................62

*Beech Aircraft Corp. v. Jinkins*,
739 S.W.2d 19 (Tex. 1987).................................................................................20

*Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*,
881 P.2d 986 (Wash. 1994) ...........................................................................37-38

*Binion v. Brinkley*,
No. 2-09-121-CV, 2010 WL 396385
(Tex. App.—Houston [14th Dist.] Feb. 4, 2010) ................................................62

*Blizzard v. Nationwide Mut. Fire Ins. Co.*,
756 S.W.2d 801 (Tex. App.—Dallas 1988, no writ)....................................12, 20

*BMC Software Belgium, N.V. v. Marchand*,
83 S.W.3d 789 (Tex. 2002)................................................................................23

*Boerschig v. Southwestern Holdings, Inc.*,
322 S.W.3d 752 (Tex. App.—El Paso 2010, no pet.) .........................................30

*Brooks v. Chevron USA Inc.*,
No. 13-05-029-CV, 2006 WL 1431227
(Tex. App.—Corpus Christi May 25, 2006, pet. denied)(mem. op.) ............32-33

*Browne v. King*,
196 S.W. 884 (Tex. Civ. App. 1917) *aff'd*,
111 Tex. 330, 235 S.W. 522 (1921) ...................................................................27

*Buccaneer Homes of Ala., Inc. v. Pelis*,
43 S.W.3d 586 (Tex. App.—Houston [1st Dist.] 2001, no pet.).........................20

*Buckner Glass & Mirror Inc. v. T.A. Pritchard Co.*,
697 S.W.2d 712 (Tex. App.—Corpus Christi 1985, no writ) .........................8, 22

*Burroughs Wellcome Co. v. Crye*,
907 S.W.2d 497 (Tex.1995)................................................................................51

*Butler v. Joseph's Wine Shop, Inc.*,
  633 S.W.2d 926
  (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.)...................................43

*C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*,
  295 S.W.3d 748 (Tex. App.—Austin 2009, no pet.).........................................21

*C& H Nationwide, Inc. v. Thompson*,
  903 S.W.2d 315 (Tex. 1994) ............................................................................23

*CBI NA-CON, Inc. v. UOP Inc.*,
  961 S.W.2d 336
  (Tex. App.—Houston [1st Dist.] 1997, pet. denied) ........................................45

*Cedar Point Apartments v. Cedar Point Inv. Corp.*,
  693 F.2d 748 (8th Cir.), *cert. denied*, 461 U.S. 914 (1983) .............................38

*Ceramic Tile Int'l Inc. v. Balusek*,
  137 S.W.3d 722 (Tex. App.—San Antonio 2004, no pet.) ...............................32

*City of Harlingen v. Sharboneau*,
  48 S.W.3d 177 (Tex. 2001)....................................................................52, 55, 66

*City of Keller v. Wilson*,
  168 S.W.3d 802 (Tex.2005)...........................................................................51, 60

*City of Rockwall v. Hughes*,
  246 S.W.3d 621 (Tex. 2008) ........................................................................ 13-14

*Coffin v. Douglas*,
  61 Tex. 406 (1884)(available at 1884 WL 8785) ......................................... 29-30

*Collin Cnty. v. Hixon Family P'ship, Ltd.*,
  365 S.W.3d 860 (Tex. App.—Dallas 2012, pet. denied)...................................64

*Commercial Structures and Interiors, Inc. v. Liberty Educ. Ministries, Inc.*,
  192 S.W.3d 827 (Tex. 2006) ........................................................................26, 34

*Cook v. Exxon Corp.*,
  145 S.W.3d 776 (Tex. App.—Texarkana 2004, no pet.)...................................32

*D Design Holdings, L.P. v. MMP Corp.*,
  339 S.W.3d. 195 (Tex. App.—Dallas 2011, no pet.) ........................................36

x

*De La Rosa v. Kaples*,
  812 S.W.2d 432 (Tex. App.—San Antonio 1991, writ denied) .......................... 16

*Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*,
  154 S.W.3d 634
  (Tex. App—Houston [14th Dist.] 2004, pet. abated) ...................................... 17

*Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*,
  294 S.W.3d 164 (Tex. 2009) ....................................................................... 27

*Effel v. McGarry*,
  339 S.W.3d 789 (Tex. App.—Dallas 2011, pet. denied) .................................. 36

*Ellis County State Bank v. Keever*,
  888 S.W.2d 790 (Tex. 1994) ...................................................................... 23

331 S.W.3d at 420, 424-25 ........................................................................... 31

*Enriquez v. K & D Development & Construction, Inc.*,
  567 S.W.2d 40
  (Tex. Civ. App.—El Paso 1978, writ ref'd n.r.e.) ............................................. 8

*Exxon Corp. v. Emerald Oil & Gas Co., L.C.*,
  331 S.W.3d 419, 424-25 (Tex. 2010) ....................................................... 31, 33

*Exxon Corp. v. Pluff*,
  94 S.W.3d 22 (Tex. App.—Tyler 2002, pet. denied) .................................. 31-32

*Farrar v. Hobby*,
  506 U.S. 103 (1992) ................................................................................... 14

*Fire Ins. Exchg. v. Sullivan*,
  192 S.W.3d 99
  (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ................................ 12, 20

*Folgers Architects Ltd. v. Kerns*,
  612 N.W.2d 539 (Neb. App. 2000) .............................................................. 37

*Ford v. Robertson*,
  739 S.W.2d 3 (Tenn. Ct. App. 1987) ........................................................... 37

*Gallagher v. Southern Source Packaging, LLC*,
  564 F.Supp.2d 503 (E.D.N.C. 2008) ............................................................ 38

*Geis v. Colina Del Rio, LP,*
    362 S.W.3d 100 (Tex. App.—San Antonio 2011, pet. denied)...........................49

*Getzschman v. Miller Chem. Co.,*
    232 Neb. 885, 443 N.W.2d 260 (1989) ...............................................................45

*Gips v. Red Robin Corp.,*
    366 S.W.2d 853
    (Tex. Civ. App.—Houston 1963, writ ref'd n.r.e)................................................38

*Grapevine Excavation, Inc. v. Maryland Lloyds,*
    35 S.W.3d 1 (Tex. 2000)......................................................................................13

*Green Int'l, Inc. v. Solis,*
    951 S.W.2d 384 (Tex. 1997) .......................................................................*passim*

*Green v. H. E. Butt Found.,*
    217 F.2d 553 (5th Cir. 1954) ...............................................................................28

*Guirey, Srnka & Arnold, Architects v. Phoenix,*
    9 Ariz. App. 70, 449 P.2d 306 (1969) .................................................................45

*Gulf Ins. Co. v. Cunningham,*
    A14-91-00799-CV, 1993 WL 136039
    (Tex. App.—Houston [14th Dist.] Apr. 29, 1993, writ denied)..........................57

*Gulf States Utilities Co. v. Low,*
    79 S.W.3d 561 (Tex. 2002).................................................................................59

*Hagins v. E-Z Mart Stores, Inc.,*
    128 S.W.3d 383 (Tex. App.—Texarkana 2004, no pet.)......................................62

*Halliburton, Inc. v. Admin. Review Bd.,*
    771 F.3d 254 (5th Cir. 2014) ...............................................................................30

*Hamra v. Gulden,*
    898 S.W.2d 16 (Tex. App.—Dallas 1995, writ dism'd w.o.j.)............................20

*Haubold v. Medical Carbon Research Inst., LLC,*
    No. 03-11-00115-CV, 2014 WL 1018008
    (Tex. App.—Austin Mar. 14, 2014, no pet.)(mem. op.) ........................ 11-12, 16

*Horton v. Robinson*,
   776 S.W.2d 260 (Tex. App.—El Paso 1989, no writ) ........................................43

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
   389 S.W.3d 583 (Tex. App.—Houston [14th Dist.] 2012),
   *rev'd on other grounds*, 443 S.W.3d 820 (Tex. 2014) ................................65

*Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*,
   443 S.W.3d 820 (Tex. 2014) ........................................................................52

*Hubacek v. Ennis State Bank*,
   159 Tex. 166, 317 S.W.2d 30 (1958) ..........................................................34

*Ian Martin, Inc. v. Greenspoint Bank*,
   01-87-00631-CV, 1988 WL 45423 ..............................................................33

*Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*,
   245 S.W.3d 1 (Tex. App.—Waco 2007, pet. denied) ..................................20

*In re Cooper*,
   242 B.R. 767 (Bankr. S.D. Ga. 1999) ........................................................38

*In re First State Bancorporation*,
   498 B.R. 322 (Bankr. D.N.M. 2013) ..........................................................27

*In re Fleckenstein*,
   589 S.W.2d 788 (Tex. Civ. App.—El Paso 1979, no writ) ........................28

*In re Grotjohn*,
   No. 03-47055DML, 2005 WL 6441386
   (Bankr. N.D. Tex. July 19, 2005) ..............................................................28

*In re Malacara*,
   223 S.W.3d 600 (Tex. App.—Amarillo 2007, no pet.) ..............................28

*In re Scott*,
   157 B.R. 297 (Bankr. W.D. Tex. 1993),
   *withdrawn per settlement*, 162 B.R. 1004
   (Bankr. W.D. Tex. Jan. 21, 1994) ..............................................................28

*Intercontinental Group P'ship v. KB Home Lone Star, L.P.*,
   295 S.W.3d 650 (Tex. 2009) ................................................................11, 14

*Interstate Contracting Corp. v. City of Dallas*,
    135 S.W.3d 605 (Tex. 2004) ........................................................48

*Jakab v. Gran Villa Townhouses Homeowners Ass'n, Inc.*,
    149 S.W.3d 863 (Tex. App.—Dallas 2004, no pet.) ...........................14

*Jones v. Kelley*,
    614 S.W.2d 95 (Tex.1981)................................................. 14, 16-17

*Karol v. Presido Enterprises, Inc.*,
    622 S.W.2d 638 (Tex. App.—Austin 1981, no writ) ..........................22

*Kelly v. Northwest Community Hospital*,
    66 Ill.App.3d 679, 23 Ill.Dec. 466, 384 N.E.2d 102 (1978)..............45

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) .......................................................30

*Kleas v. Clark, Thomas & Winters, P.C.*,
    No. 03-12-00755-CV, 2013 WL 4516120
    (Tex. App.—Austin Aug. 21, 2013, pet. denied) ........................21, 12

*La Tierra de Simmons Familia, Ltd. v. Main Event Entm't, LP*,
    No. 03-10-00503-CV, 2012 WL 753184
    (Tex. App.—Austin Mar. 9, 2012, pet. denied)................................32

*Lay v. Aetna Ins. Co.*,
    599 S.W.2d 683 (Tex. App.—Austin 1980, writ ref'd n.r.e.)............27

*Lee v. City of Houston*,
    807 S.W.2d 290 (Tex. 1991) .........................................................9

*Leggett v. Brinson*,
    817 S.W.2d 154 (Tex. App.—El Paso 1991, no writ)......................43

*Leland v. Brandal*,
    257 S.W.3d 204 (Tex. 2008) .......................................................13

*Lewis v. Adams*,
    979 S.W.2d 831
    (Tex. App.—Houston [14th Dist.] 1998, no pet)..............................34

*Lippincott v. Whisenhunt*,
58 Tex. Sup. Ct. J. 705, 2015 WL 1967025
(Tex. Apr. 27, 2015)(per curiam) ................................................................12

*Mack Trucks, Inc. v. Tamez*,
206 S.W.3d 572 (Tex. 2006) .....................................................................59

*Mancorp, Inc. v. Culpepper*,
802 S.W.2d 226 (Tex.1990)........................................................................51

*Manges v. Mustang Oil Tool Co.*,
658 S.W.2d 725
(Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.) ...................................17

*Marange v. Marshall*,
402 S.W.2d 236
(Tex. Civ. App.—Corpus Christi 1966, writ ref'd n.r.e.) .................................47

*Martini v. Tatum*,
776 S.W.2d 666 (Tex. App.—Amarillo 1989, writ denied)..............................16

*MBM Fin. Corp. v. Woodlands Operating Co.*,
292 S.W.3d 660 (Tex. 2009) .............................................................11, 16

*McGalliard v. Kuhlmann*,
722 S.W.2d 694 (Tex.1986).......................................................................60

*McGinty v. Hennen*,
372 S.W.3d 625 (Tex. 2012) ...............................................................54, 56

*McKinley v. Drozd*,
685 S.W.2d 7 (Tex. 1985)....................................................................*passim*

*Merrell Dow Pharm., Inc. v. Havner*,
953 S.W.2d 706 (Tex. 1997) .....................................................................57

*Methodist Hosps. v. Corporate Communicators, Inc.*,
806 S.W.2d 879 (Tex. App.-Dallas 1991, writ denied)....................................40

*Minn. Mining & Mfg. Co. v. Nishika Ltd.*,
953 S.W.2d 733 (Tex. 1997) ...................................................................61-62

*Missouri-Kansas-Texas R. Co. v. City of Dallas*,
623 S.W.2d 296 (Tex. 1981) ...................................................................51

*Montgomery Ward & Co. v. Scharrenbeck*,
146 Tex. 153, 204 S.W.2d 508 (1947) ......................................................42

*Moundsview ISD v. Buetow & Assoc.*,
253 N.W.2d 836 (Minn.1977) ...................................................................45

*Mueller v. All-Temp Refrig., Inc.*,
2014 Ohio 2718..........................................................................................32

*Mustang Pipeline Co. v. Driver Pipeline Co.*,
134 S.W.3d 195 (Tex. 2004) .....................................................................11

*Naylor v. Stiegler*,
613 S.W.2d 546 (Tex. Civ. App.—Fort Worth 1981, no writ) .................57

*O and B Farms, Inc. v. Black*,
300 S.W.3d 418
(Tex. App.—Houston [14th Dist.] 2009, pet. denied)................................51

*Office of Pub. Util. Counsel v. P.U.C.*,
878 S.W.2d 598 (Tex. 1994) .....................................................................40

*Orix Credit Alliance, Inc. v. Omnibank, N.A.*,
858 S.W.2d 586 (Tex. App. 1993).............................................................33

*Osborne v. Jauregui, Inc.*,
252 S.W.3d 70 (Tex. App.—Austin 2008, pet. denied) ...................*passim*

*Osterberg v. Peca*,
12 S.W.3d 31 (Tex. 2000)..........................................................................54

*Owen v. CNA Insurance/Continental Cas. Co.*,
167 N.J. 450, , 771 A.2d 1208 (N.J. Super. 2001) ...................................38

*Owen v. Vibrasonic Exploration, Inc.*,
694 S.W.2d 421
(Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.)................................33

*Pagosa Oil & Gas LLC v. Marrs & Smith Ptnrs.*,
323 S.W.3d 203 (Tex. App.—El Paso 2010, pet. denied)................................37

*Park v. Escalera Ranch Owners' Ass'n, Inc.*,
   No. 03-12-00314-CV, 2015 WL 737424
   (Tex. App.—Austin Feb. 13, 2015, no pet. h.)....................................................49

*Parkway Co. v. Woodruff*,
   901 S.W.2d 434 (Tex. 1995) ..................................................................66

*Peissel v. Peissel*,
   620 S.W.2d 796
   (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ) ......................................19

*Perez v. Baker Packers*,
   694 S.W.2d 138
   (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.)................................10

*Petsch v. Slator*,
   573 S.W.2d 849 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.) .....................30

*Phillips v. Estate of Poulin*,
   No. 03-05-00099-CV, 2007 WL 2980180
   (Tex. App.—Austin Oct. 12, 2007, no pet.) .......................................................23

*Phillips v. Phillips*,
   820 S.W.2d 785 (Tex.1991)...................................................................49

*Pilgrim's Pride Corp. v. Smoak*,
   134 S.W.3d 880 (Tex. App.—Texarkana 2004, pet. denied)............................63

*Playskool, Inc. v. Elsa Benson, Inc.*,
   147 Ill. App. 3d 292, 497 N.E.2d 1199 (1986)................................................47

*Precision Homes, Inc. v. Cooper*,
   671 S.W.2d 924
   (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.)........................... 65-66

*Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*,
   345 S.W.3d 537 (Tex. App.—San Antonio 2011, no pet.) ...............................48

*Provident Life & Acc. Ins. Co. v. Knott*,
   128 S.W.3d 211 (Tex. 2003) ................................................................34

*Rasmusson v. LBC PetroUnited, Inc.*,
  124 S.W.3d 283
  (Tex. App.—Houston [14th Dist.] 2003, pet. denied)....................................14, 16

*Reuben H. Donnelley Corp. v. McKinnon*,
  688 S.W.2d 612 (Tex. App.—Corpus Christi 1985, writ ref'd).........................38

*Richey v. Stop N Go Markets of Tex.*,
  654 S.W.2d 430 (Tex.1983)..................................................................... 31-33

*Rockwall Commons Assocs. Ltd. v. MRC Mortgage Grantor Trust I*,
  331 S.W.3d 500 (Tex. App.—El Paso 2010, no pet.) ......................................39

*Rogers v. RAB Inv. Ltd.*,
  816 S.W.2d 543 (Tex. App.—Dallas 1991, no writ)..........................................16

*Rosell v. Central W. Motor Stages, Inc.*,
  89 S.W.3d 643 (Tex. App.—Dallas 2002, pet. denied).....................................63

*Ross v. Ross*,
  20 Ala. 105 (1852) ........................................................................................32

*Ross v. St. Luke's Episcopal Hosp.*,
  58 Tex. Sup. Ct. J. 766, 2015 WL 2009744 (Tex. May 1, 2015).......................12

*Rumbin v. Utica Mut. Ins. Co.*,
  254 Conn. 259, 757 A.2d 526 (Conn. 2000) ....................................................38

*Ryan v. Morgan Spear Associates Inc.*,
  546 S.W.2d 678
  (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.) ............................. 44-47

*Sanders v. Worthington*,
  382 S.W.2d 910 (Tex.1964)..............................................................................39

*Seaview Hospital, Inc. v. Medicenters of Am., Inc.*,
  570 S.W.2d 35 (Tex. Civ. App.—Corpus Christi 1978, no writ)................. 49-50

*Shoemake v. Fogel, Ltd.*,
  826 S.W.2d 933 (Tex.1992)..............................................................................42

*Simmons v. Bisland*,
No. 03-08-00141-CV, 2009 WL 961522
(Tex. App.—Austin Apr. 9, 2009, pet. denied)(mem. op.) ................................63

*Southwestern Bell Tel. Co. v. DeLanney*,
809 S.W.2d 493 (Tex. 1991) ................................................................45

*St. Anthony's Hosp. v. Whitfield*,
946 S.W.2d 174 (Tex. App.—Amarillo 1997, writ denied).............................47

*State Dep't of Highways & Pub. Transp. v. Payne*,
838 S.W.2d 235 (Tex. 1992) ..........................................................44, 46

*State Farm Fire and Casualty Co. v Gandy*,
925 S.W.2d 696 (Tex. 1996) .................................................................36

*State Farm Life Ins. Co. v. Beaston*,
907 S.W.2d 430 (Tex. 1995) ............................................................ 11-12

*State v. Bristol Hotel Asset Co.*,
293 S.W.3d 170 (Tex. 2009) ...........................................................27, 67

*Stewart Title Guar. Co. v. Sterling*,
822 S.W.2d 1 (Tex. 1991)...............................................................14, 62

*Tex. Lottery Comm'n v. First State Bank of DeQueen*,
325 S.W.3d 628 (Tex. 2010) .................................................................13

*Tex. Pipe Line Co. v. Hunt*,
149 Tex. 33, 228 S.W.2d 151 (Tex. 1950) ...............................................64

*Texarkana Memorial Hospital, Inc. v. Murdock*,
946 S.W.2d 936 (Tex. 1997) ................................................................62

*Texas Alcoholic Beverage Comm'n v. Kings Four, Inc.*,
583 S.W.2d 676 (Tex. Civ. App.—Austin 1979, no writ) ...............................9

*Thomas C. Cook, Inc. v. Rowhanian*,
774 S.W.2d 679 (Tex. App.—El Paso 1989, writ denied) ..............................39

*THPD, Inc. v. Cont'l Imports, Inc.*,
260 S.W.3d 593 (Tex. App.—Austin 2008, no pet.)........................................54

*Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*,
  642 S.W.2d 160 (Tex. 1984) ................................................................57

*Union Carbide Corp. v. Synatzske*,
  438 S.W.3d 39 (Tex. 2014)................................................................13

*University Mews Associates v. Jeanmarie*,
  122 Misc.2d 434, 471 N.Y.S.2d 457 (N.Y. Sup.Ct. 1983)................................38

*Van Zandt v. Fort Worth Press*,
  359 S.W.2d 893 (Tex. 1962) ..............................................................13

*Vance v. My Apartment Steak House of San Antonio, Inc.*,
  677 S.W.2d 480 (Tex.1984)........................................................51, 56

*Vanderburg v. Nocona Gen. Hosp.*,
  No. 7:02-CV-291-KA, 2008 WL 114846
  (N.D. Tex. Jan. 10, 2008) ................................................................27

*Vann v. Bowie Sewerage Co.*,
  127 Tex. 97, 90 S.W.2d 561 (1936) ....................................................31

*Vernooy Architects v. Smith*,
  346 S.W.3d 877 (Tex. App.—Austin 2011, pet. denied) ..............................45

*Welch v. Monroe*,
  No. 10-03-00013-CV, 2004 WL 2474504
  (Tex. App.—Waco Nov. 3, 2004, no pet.) ............................................31

*Westminster Falcon/Trinity L.L.P. v. Chong Shin*,
  No. 07-11-0033-CV, 2012 WL 5231851
  (Tex. App.—Amarillo Oct. 23, 2012, no pet.) ......................................56

*Whirlpool Corp. v. Camacho*,
  298 S.W.3d 631 (Tex. 2009) ............................................................59

*White v. Dennison*,
  752 S.W.2d 714 (Tex. App.—Dallas 1988, writ denied) ............................47

**STATUTES**

Act of April 25, 1977, ch. 76, §1, 1977 TEX. GEN. LAWS 153 ................................9

Act of May 17, 1971, ch. 225, §1, 1971 TEX. GEN. LAWS 1073 .............................9

Act of June 6, 1979, ch. 314, §1, 1979 TEX. GEN. LAWS 718 ...............................17

TEX. OCCUP. CODE §1001.0031(d) ......................................................................50

TEX. BUS. & COMM. CODE §9.110 ........................................................................33

TEX. BUS. & COMM. CODE §17.50(d) ....................................................................14

TEX. BUS. & COM. CODE ANN. § 2.210(b) (West 2011) ........................................36

TEX. CIV. PRAC. & REM. CODE §§32.001, 32.002 .................................................20

TEX. CIV. PRAC. & REM. CODE §33.002 ..............................................15, 17, 20, 23

TEX. CIV. PRAC. & REM. CODE §38.001 ..........................................................8, 15, 17

TEX. CIV. PRAC. & REM. CODE §38.005 ................................................................13, 17

TEX. INS. CODE §541.152 ....................................................................................14

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) ............................................................27

Black's Law Dictionary 117 (6th ed. 1990) ......................................................29

Charles R. "Skip" Watson, Jr., "The Court's Charge to the Jury,"
*Advanced Civil Trial Course* (State Bar of Texas 2003) .................................55

TEX. R. CIV. P. 90 ..............................................................................................42

TEX. R. CIV. P. 93 ......................................................................................39-40, 43

TEX. R. CIV. P. 94 ..............................................................................................49

TEX. R. CIV. P. 274 ............................................................................................55

TEX. R. CIV. P. 278 ............................................................................................42

TEX. R. CIV. P. 279 .................................................................................. 46, 54

TEX. R. EVID. 201(b) ................................................................................ 40

TEX. R. EVID. 901(10) .............................................................................. 41

# I. STATEMENT OF THE CASE

This is a breach of contract case arising out of severe foundation problems at the Courtyard by Marriott Hotel, located on East Ben White Boulevard, near Bergstrom International Airport ("Project"). (CR187)[1]. RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC ("RLJ" collectively), sued, among others, the architect, general contractor and soils engineer for breaching their separate contractual responsibilities related to the Project's construction. (CR184-218). RLJ asserted that claim as assignee of and successor-in-interest to and assignee of the rights under the Architectural Contract and the contract cause of action of White Lodging Services Corp. ("Owner"), original owner of the Project. (CR1124;1063-64). The architect, Elness, Swenson, Graham. Inc. ("Architect"), was the only remaining defendant when the case was submitted to the jury. (CR1121-29). Due to settlements by other parties and the trial court's pre-trial rulings, breach of contract was the only liability theory against the Architect. *Id.*

The jury found that the Architect failed to "comply with the Architectural Contract regarding the structural engineering services required by the contract"

---

[1] The Clerk's Record is cited as "CR"; First Supplemental Clerk's Record, "1SCR"; Second Supplemental Clerk's Record, "2SCR"; Third Supplemental Clerk's Record, "3SCR"). The Reporters Record is cited by "[Volume Number]RR" Exhibits are cited to page or pages of the Reporter's Record on which they or the pertinent parts thereof appear. "4SCR__" refers to the supplemental clerk's record that is being requested, but is not yet available. *See* n.14.

1

("Structural Engineering Question"). (CR1126). The jury's verdict assessed $785,000 in damages for the breach. (CR1125-27).

After trial, the Architect moved for and the trial court allowed credit under the one satisfaction rule for $1.17 million paid by the General Contractor and the Soils Engineer ("Settling Defendants" collectively) in settlement of the contract claims against them. (CR1173-79,1439,1710). The parties agreed to try the attorney's fees claimed under Chapter 38 of the Texas Civil Practice and Remedies Code ("Chapter 38"[2]) to the court instead of the jury. (CR201,1710).

RLJ presented evidence of its reasonable and necessary attorney's fees for asserting the contractual claims against the Architect and the Settling Defendants. (3SCR3-611;2SCR1603-1605). The trial court only awarded fees for the contractual claim against the Architect. For that claim, it determined that RLJ was entitled to recover from the Architect $901,650.96 as reasonable attorney's fees. (CR1711). The trial court rendered judgment for RLJ in the principal sum of $516,650.96. (CR1711). It arrived at this amount by adding the amount of the damages awarded in the jury verdict with the amount of the Chapter 38 attorney's fees award, then subtracting the amounts paid in settlement by the Settling Defendants. (Id.). The judgment also awarded conditional appellate attorney's fees,

---

[2] References to "Chapter 38" also include the 1977 and later versions of its predecessor statute, article 2226.

costs, and post-judgment interest. (Id.). The Architect timely filed its notice of appeal (CR1907-1913) and RLJ timely perfected its cross-appeal (1SCR3-4).

## II.   ISSUES PRESENTED

A.   Whether the trial court correctly allowed RLJ to recover its attorney's fees under Chapter 38 of the Texas Civil Practice & Remedies Code even if it correctly applied the one satisfaction rule to offset the jury's damage award?

B.   Whether the trial court correctly determined that RLJ has standing to sue the Architect under the assignments of rights from RLJ's predecessors-in-interest?

C.   Whether the trial court's determination may be further supported by consideration of the supplemental clarification which the trial court erroneously deemed parol evidence inappropriate for consideration? (Appellees' Reply Point).

D.   Whether the trial court correctly ruled that the Architectural Contract was not inadmissible hearsay and was sufficiently authenticated?

E.   Whether the trial court erred in submitting the contractual liability issue concerning structural engineering services and, in the unlikely event that it did, whether the Architect failed to preserve the complaints it makes in this appeal?

3

**F.**     Whether the evidence was legally sufficient to support the damages for diminution in value awarded by the jury?

## III.   STATEMENT OF FACTS

RLJ is not satisfied with the accuracy of Architect's Statement of Facts and includes the following as a brief statement of the facts relevant to Appellant's issues. The proceedings below are described in the Statement of the Case and as necessary in the argument section of this brief. RLJ also refers the court to the Statement of Facts in Cross-Appellant's Brief at 6-13, and reserves to the argument section further discussion of the facts relevant to those issues.

The Architect contracted with the Owner to design the Project. The Architectural Contract obliged the Architect to provide architectural and structural engineering services. (12RR39,47). Under a separate contract to which the Owner was not a party, the Architect engaged "[o]ur Structural Engineering firm...Marlin Bridges Associates, Inc." ("Structural Engineer") to design the foundation. (12RR17-25,30,35,47,49;App.G).

Before the Project was complete, RLJ contracted to purchase the Project from the Owner, along with numerous other hotels. (CR184-218;606-676;707-709;App.J). Before RLJ closed the purchase of this hotel, the Project experienced some cracking in the laundry room and around the pool area. (3RR122). RLJ was advised that repair costs would be $50,000 (3RR187-88), and it received a credit of

4

the same amount[3] and closed the purchase. (CR626-28). After closing, the Project began to experience cracks in partition walls, shifting door frames, and other issues evident of foundation movement. (3RR118;4RR78-79;7RR47). Investigation revealed the foundation design was inappropriate for the soil conditions at this site. (4RR111). This litigation ensued.

## IV.    SUMMARY OF ARGUMENT

None of the Architect's complaints permit it to elude its liabilities for failing to comply with the Architectural Contract's concerning the provision of structural engineering services.

Its attack on liability for RLJ's attorney's fees is invalid. As the verdict established, it had a valid claim for a just amount owed that was presented and unpaid for years, and which remained unpaid when this case was tried. Nothing in Chapter 38 further requires the claimant to recover those damages in a judgment. The Legislature eliminated that requirement when it amended the statute 38 years ago. Neither it nor the Architect's cited cases require the claimant to obtain a judgment. The Texas Supreme Court has said so. This Court has said so.

The Architect's argument relies on the general patina Chapter 38 acquired during its history that does not address the issue here: whether RLJ satisfied

---

[3] The Architect is incorrect to suggest this adjustment amount was for all of the Project's foundation problems that ultimately manifested themselves. (Appellant's Brief 5-6). It was only for the limited issues then known. (3RR187-88).

5

Chapter 38. The alpha and omega of that inquiry is the statute itself, not the language of cases, other statutes, or general concepts about attorney's fee recovery.

The trial court adhered to the precise language of the statute when it awarded RLJ its attorney's fees. Even if the one satisfaction rule applied so that credit for a settlement during trial could preclude recovery of the jury's damage award, the trial court did not err in allowing RLJ to recover its attorney's after application of that credit.

RLJ also had standing to sue on the Architectural Contract by virtue of an assignment of all intangible assets related to the Project. The Architect's only argument is that a cause of action is not an intangible asset. This court, other jurisdictions, and even the dictionary on which the Architect bases its argument, recognize that a cause of action is an asset that is intangible. A supplement to this assignment made clear that it included all "causes of action" against the Architect. The trial court erroneously ruled that it could consider the supplement, but it may nevertheless support the trial court's standing determination because it was not parol evidence at all. Even if it were, the Architect was not a party to the contract the supplement concerned and, therefore, could not invoke the parol evidence rule.

The Architect's complaint that the Architectural Contract was inadmissible hearsay is baseless. The contract was not offered to prove anything other than the fact that it said what it said. Its complaint about improper authentication is equally

6

flawed. The Architect used the contract as an exhibit and proved that it was a business record.

The Architect waived its complaint that RLJ should have been required to prove its derivative liability for the Structural Engineer's errors by failing to specially except, file a verified plea that it was not liable in the capacity sued, and failing to preserve its complaints at the charge conference. In any event, RLJ was not obliged to establish vicarious liability because the Architect had direct, contractual liability. Its only support to the contrary is a case that was long ago superseded by the Texas Supreme Court.

The Architect finally challenges the sufficiency of the expert testimony to support the jury's diminution-in-value damage award. That testimony employed accepted appraisal methodologies and standards. Indeed, the valuation method used was the one the Texas Supreme Court has deemed appropriate. The valuation date used was the date that was submitted in the court's charge – an appropriate date given what be considered. Criticism of the appraiser for allegedly failing to provide actual performance data is baseless because the appraiser in fact provided it. His testimony did not include "stigma" damages and did not include damages for lost profits. The damages need not have been "segregated" to be legally sufficient. Legally sufficient evidence supported the jury's damage assessment.

## V. ARGUMENT AND AUTHORITIES

### A. The Trial Court Correctly Awarded RLJ Its Attorney's Fees.

The Architect asserts the trial court erred in awarding RLJ Chapter 38 attorney's fees. It argues Chapter 38 required RLJ to "recover damages" without specifying what a "recovery" of damages is. (Appellant's Brief 16,17). The jury found $785,000 in damages.[4] (CR1127;App.B). Apparently, the Architect contends the jury's damage award does not suffice and that Texas Civil Practice & Remedies Code §38.001 ("§38.001") requires a *judgment* awarding damages to recover attorney's fees. The Architect's complaint is moot if this Court rules that the one satisfaction rule is inapplicable.[5] (Cross-Appellants' Brief 13-58).

#### 1. Chapter 38 Does *Not* Require a *Judgment* for Damages.

The Architect's argument is also wrong. Chapter 38 does not now require and has not for nearly 40 years required a *judgment* awarding damages. *McKinley v. Drozd*, 685 S.W.2d 7, 10-11 (Tex. 1985); *Buckner Glass & Mirror Inc. v. T.A. Pritchard Co.*, 697 S.W.2d 712, 714 (Tex. App.—Corpus Christi 1985, no writ); *Enriquez v. K & D Development & Construction, Inc.*, 567 S.W.2d 40, 42 (Tex. Civ. App.—El Paso 1978, writ ref'd n.r.e.).

---

[4] The Architect's assertion that the jury "found" RLJ's damages "greatly exaggerated" (Appellant's Brief 17) is incorrect. There was no such finding.

[5] RLJ's attorney's fees arguments are presented subject to and without waiving its arguments that the one satisfaction rule is inapplicable.

### a.     The "Judgment" Requirement Was Eliminated by the 1977 Amendment to Chapter 38's Predecessor.

In 1977, the Legislature amended the predecessor to Chapter 38 to eliminate "finally obtain judgment" as a condition to recovering attorney's fees. *Compare* Act of May 17, 1971, ch. 225, §1, 1971 TEX. GEN. LAWS 1073 (former article 2226), *with* Act of April 25, 1977, ch. 76, §1, 1977 TEX. GEN. LAWS 153; *McKinley*, 685 S.W.2d at 10-11 (explaining effect of amendment and court's failure to notice it). If the Legislature wishes to re-impose recovery of damages in the judgment to recover attorney's fees, it may do so. Judicial resurrection of this requirement after Legislative elimination would impermissibly transgress the constitutional separation of legislative authority from judicial power. *See Lee v. City of Houston*, 807 S.W.2d 290, 293 (Tex. 1991); *Texas Alcoholic Beverage Comm'n v. Kings Four, Inc.*, 583 S.W.2d 676, 678 (Tex. Civ. App.—Austin 1979, no writ).

### b.     The Texas Supreme Court and This Court Have Rejected Any Such Requirement.

If "obtain[ing] judgment" were still necessary, the Texas Supreme Court could not have allowed recovery of attorney's fees in *McKinley*. There, the claimant received a verdict for contract damages, but did not recover them in the judgment because of an offsetting counterclaim. Nevertheless, the court awarded

9

attorney's fees because the claimant met the statutory requirements without a judgment for damages. 685 S.W.2d at 11.

This court also recognized, under circumstances very similar to those in this case, that a party may recover Chapter 38 attorney's fees without recovering damages in the judgment. In *A.D. Willis Co. v. Metal Bldg. Components, Inc.*, No. 03-99-00574-CV, 2000 WL 1508500 (Tex. App.—Austin Oct. 12, 2000, pet. denied)(not designated for publication), the jury awarded damages for the claimant's breach of contract claim, but found a greater loss caused by the claimant's failure to mitigate. This Court ruled Chapter 38 attorney's fees could not be denied merely for want of damage recovery in the judgment. *Id.* at *5. Like a settlement credit, failure to mitigate reduces recovery because it "tends to rebut the measure of damages under the [plaintiff's] claim of breach." *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 300 (Tex. 1997). This Court noted that the claimant had a "valid claim" for a "just amount" unpaid on the thirtieth day following presentment. Because *McKinley* rejected a "net recovery" requirement, this Court allowed attorney's fees despite no judgment awarding damages.[6] *Id.* at *6.

---

[6] This reasoning is consistent with *Perez v. Baker Packers*, 694 S.W.2d 138, 143 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), in which a claimant whose damages offset by settlement credits was deemed the "successful party" entitled to recover rule 131 costs.

### c. The Architect's Cases Do Not Say Otherwise.

The Architect's attack rests entirely on cases saying recovery of attorney's fees generally requires the claimant "(1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages," *Intercontinental Group P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 653 (Tex. 2009)[7]; *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 664, 666 (Tex. 2009)(no proof); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 434, 437 (Tex. 1995); *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004); *Haubold v. Medical Carbon Research Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008 at *6, *7 (Tex. App.—Austin Mar. 14, 2014, no pet.)(mem. op.).

Closer examination of the facts in these cases reveals that "recovery" does not require a judgment awarding damages. Instead, they hold that one cannot recover attorney's fees when there is no possibility of liability. In each, there was no recovery because: (1) the jury found zero damages; (2) liability was not established; or (3) no legally competent evidence supported awarding damages. *Intercontinental Group*, 295 S.W.3d at 653, 655 (no finding); *MBM Fin. Corp.*, 292 S.W.3d at 664, 666 (Tex. 2009)(no proof); *Mustang Pipeline Co.*, 134 S.W.3d

---

[7] An example of the Architect's superficial analysis is its assertion that this case "hold[s] that, absent recovery of damages, attorney's fees are not recoverable under Chapter 38." (Appellant's Brief 15). The opinion, however, says Chapter 38 "is not controlling." *Intercontinental Group*, 295 S.W.3d at 653.

at 201 (no proof); *Solis*, 951 S.W.2d at 390 (Tex. 1997)(no finding); *Beaston*, 907 S.W.2d at 434, 437 (no proof of damages under DTPA); *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 806 (Tex. App.—Dallas 1988, no writ)(no unpaid damages[8]); *Fire Ins. Exchg. v. Sullivan*, 192 S.W.3d 99, 102, 110-11 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)(same[9]); *Haubold* (claimant sought no recoverable damages). None of them address a situation like *McKinley* or *A.D. Willis Co.* in which the claim is valid but results no recovery under a judgment. They do not, as the Architect suggests, require the recovery of damages by judgment.

2. **Chapter 38 Only Requires a Valid Claim Timely Presented and Unpaid for Thirty Days.**

The foregoing shows Chapter 38 does *not* require the recovery of damages *in a judgment*. The inquiry may now focus on what Chapter 38 *does* require.

a. **The Architect Ignores Proper Statutory Interpretation.**

All statutory interpretation begins with the statute's language. *Ross v. St. Luke's Episcopal Hosp.*, 58 Tex. Sup. Ct. J. 766, 2015 WL 2009744 at *3 (Tex. May 1, 2015); *Lippincott v. Whisenhunt*, 58 Tex. Sup. Ct. J. 705, 2015 WL

---

[8] In both *Beaston* and *Blizzard*, there was no breach of contract at all. The insurers paid more than the policy required. Neither claimant in those cases had a "valid claim." *See Kleas*, 2013 WL 4516120, at *2.

[9] In *Sullivan*, the insurer had also paid more than the damages later found so there was never a "valid claim" for breach of the policy or a DTPA violation that would support recovery of attorney's fees.

12

1967025 at *1(Tex. Apr. 27, 2015)(per curiam). The goal is to ascertain the Legislature's intent from that language alone, *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008), by considering the all statutory language in context, not in isolation. *See Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 51 (Tex. 2014). Under the guise of interpretation, Courts may not add to or remove words from an unambiguous statute. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 631 (Tex. 2008). Undefined, unambiguous words have their ordinary meaning. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Leland*, 257 S.W.3d at 206. Further, the Legislature has rejected narrow construction of Chapter 38 and mandates instead that it "be liberally construed to promote its underlying purposes."[10] TEX. CIV. PRAC. & REM. CODE §38.005. That purpose is to discourage unnecessary litigation over just claims. *McKinley*, 685 S.W.2d at 10-11.

### b. The Architect Attempts to Add Words to Chapter 38 By Misapplication of Cases.

The Architect's argument ignores these well-settled rules and relies on case language interpreting other attorney's fees statutes or previous versions of Chapter

---

[10] Article 2226 was also amended in 1979 to add claims for oral and written contracts and to mandate liberal statutory construction to overturn the previous rule that it should be strictly construed because recovery of attorney's fees was contrary to common law. *See, e.g., Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 995 (Tex. 1962). Without intending to change the statute's meaning, in 1985 the Legislature codified the 1979 version of article 2226 into the Civil Practice and Remedies Code. *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 7 (Tex. 2000).

38 with language different from Chapter 38. *See* V.A.1.c., *supra.* Nothing in Chapter 38 says the claimant must either "prevail" or "recover damages." To "prevail" is only required for recovery of attorney's fees under the DTPA and Insurance Code, not Chapter 38. TEX. BUS. & COMM. CODE §17.50(d); TEX. INS. CODE §541.152. Nevertheless, the Architect relies on cases interpreting these dissimilar or outdated statutes to impermissibly superimpose requirements not supported by Chapter 38's language. Reading words into a statute impermissibly usurps the legislative prerogative. *See Hughes*, 246 S.W.3d at 631. The Texas Supreme Court has ruled that constructions of disparate language in other attorney's fees statutes do not control what Chapter 38 means. *McKinley*, 685 S.W.2d at 9; *Jakab v. Gran Villa Townhouses Homeowners Ass'n, Inc.*, 149 S.W.3d 863, 868 (Tex. App.—Dallas 2004, no pet.).[11]

---

[11] In *Solis*, without acknowledging its holding in *McKinley*, the court included "prevail" as part of its two-part "test" for Chapter 38. 951 S.W.2d at 390. This led some courts to improperly look to federal attorney's fees statutes with a "prevail" requirement. *E.g.,, Intercontinental Group*, 295 S.W.3d at 654. Even under the federal standard, RLJ "prevailed" by procuring a settlement, *Farrar v. Hobby*, 506 U.S. 103, 11-12 (1992); *Intercontinental Group*, 295 S.W.3d at 654, of its claim for damages for which all defendants must have been jointly liable if the one satisfaction rule applies. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991). RLJ also succeeded by establishing liability and receiving a damages verdict. Several Texas Chapter 38 cases permit attorney's fees with no damage award if the claimant recovers "something of value," such as a decree for specific performance. *Jones*, 614 S.W.2d at 96, 100–01; *Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

14

**3.     Chapter 38 Only Requires a Valid Claim Timely Presented and Unpaid for Thirty Days.**

Chapter 38 only requires (1) that the claimant be represented by an attorney; (2) that the claim be for a specified type; (3) that the claim be "valid" and (4) presented; and (5) that the just amount owing not be tendered within 30 days after presentment. TEX. CIV. PRAC. & REM. CODE §§38.001-.002. If these conditions are satisfied, the claimant may recover attorney's fees. TEX. CIV. PRAC. & REM. CODE §38.001. In the present case, the meaning of the statutory requirements for representation of counsel, presentment, and type of claim are not at issue.

**a.     A "Valid Claim" Is Required.**

Under §38.001, "[a] person may recover reasonable attorney's fees … in addition to the amount of a valid claim" for a "written contract." TEX. CIV. PRAC. & REM. CODE §38.001. Chapter 38 further informs that a "valid claim" is one with a "just amount owed." TEX. CIV. PRAC. & REM. CODE §38.002(2). As *McKinley* and *A. D. Willis* illustrate, a "valid claim" authorizing Chapter 38 attorney's fees exists with a verdict of liability and resulting damages, even if award of those damages is ultimately rendered in the judgment.

**1)     "In [A]ddition [T]o" Does Not Imply a "Valid Claim" Requires a Judgment Awarding Damages.**

Yet, the Architect also cites cases suggesting that the phrase "in addition to the amount of a valid claim" implies there must be some damage amount awarded

15

*in the judgment* to recover Chapter 38 attorney's fees. (Appellant's Brief 16). Its reliance on *Solis*, 951 S.W.2d at 390, *MBM Fin. Corp.*, 292 S.W.3d at 666, and *Haubold*, 2014 WL 1018008 at *6, for this interpretation is misplaced. In all three, there was no valid *verdict* awarding damages because the jury found no damages or the damage finding was unsupported by competent evidence. Further, suggesting that Chapter 38 requires either a verdict or judgment for monetary damages ignores that Chapter 38 attorney's fees may be recovered when only non-monetary relief is obtained. *See, e.g., Jones v. Kelley*, 614 S.W.2d 95, 96, 100–01 (Tex.1981); *Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Martini v. Tatum*, 776 S.W.2d 666, 668, 670 (Tex. App.—Amarillo 1989, writ denied)(contractual liability decided but no judgment awarding monetary relief); *De La Rosa v. Kaples*, 812 S.W.2d 432, 433, 435 (Tex. App.—San Antonio 1991, writ denied)(same).

### 2) A Verdict Awarding Damages Is Enough To Have a "Valid Claim."

As *McKinley* and *A. D. Willis* amply demonstrate, recovery of damages in a judgment is *not* necessary. If the existence of a "valid claim" included a requirement that the claimant "recover" as the Architect's cases suggest, it is apparent that a *verdict* of liability and awarding damages is "recovery" enough to have a valid claim. *Rogers v. RAB Inv. Ltd.*, 816 S.W.2d 543, 551 (Tex. App.—Dallas 1991, no writ), observed, "Without a jury finding of damages *or* a recovery

16

of damages, there can be no award of attorney's fees" under §38.001. By negative implication, *Solis* also suggests that a jury verdict is a "recovery" by treating a zero damages verdict as a failure to "recover."

      **b.    Chapter 38 Requires the Valid Claim to Remain Unpaid 30 Days After Presentment.**

Chapter 38 also specifies *when* the valid claim must exist. "Payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." TEX. CIV. PRAC. & REM. CODE §38.002(3). As already discussed, the reason why the Legislature authorized the recovery of attorney's fees was to encourage pre-trial settlement of valid claims and thereby avoid unnecessary litigation over just claims. *McKinley*, 685 S.W.2d at 10-11; *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981); *see also Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 638 (Tex. App—Houston [14th Dist.] 2004, pet. abated); *Manges v. Mustang Oil Tool Co.*, 658 S.W.2d 725, 730 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.). Permitting recovery of Chapter 38 attorney's fees based on the validity of the claim *before* events trial instead of after it commences is "more consistent" with (1) "legislative intent" to discourage unnecessary litigation over just claims, and (2) the statutory liberal construction mandate to "promote its underlying purpose." *McKinley*, 685 at 10-11; TEX. CIV. PRAC. & REM. CODE §38.005; Act of June 6, 1979, 66th Leg., R.S., ch. 314, §1, 1979 TEX. GEN. LAWS 718.

Of course, trial results affect whether there was *ever* a valid claim. A finding of no liability or zero damages, or want of legally sufficient evidence of either establishes no valid claim ever existed. *See* cases cited in V.A.1.c., *supra.* However, allowing a claim's validity to be undermined by credits for settlements that occur *during* trial, which is the situation here, defeats Chapter 38's purpose. Settlements during trial do not avoid the unnecessary expense that Chapter 38 was intended to avoid.

The distinction between pre-trial and during trial settlements was critical to this Court's analysis in *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 75-77 (Tex. App.—Austin 2008, pet. denied). Unlike the present Chapter 38 breach-of-contract case, *Osborne* involved recovery of attorney's fees under the DTPA, under which the issue was whether the plaintiff "prevailed" – something Chapter 38 does not require. *See* V.A.2.a., *supra.* However, the analogy is instructive with respect to when the validity of the claim is measured. In *Osborne*, the plaintiff settled *before* trial commenced with all but one defendant for an amount greater than the damages awarded by the jury against the remaining defendant. *Osborne*, 252 S.W.3d at 73. RLJ, on the other hand, reached the relevant settlement *after* trial commenced.

This Court recognized in *Osborne* that "a net recovery is not necessary for a plaintiff to be considered a prevailing party." *Osborne*, 252 S.W.3d at 76. But it

18

concluded, reasonably enough, that a party does not "prevail" at trial when it received *before* trial more than it recovered at trial for tort damages that all defendants would have jointly and severally liable for under the contribution statute. "It is one thing to allow attorney's fees notwithstanding an opposing party's success on an offsetting claim. However it is another to allow attorney's fees on a claim that, although successful, was paid *before trial*." *Id.* (Emphasis added).

The logic of *Osborne* implicit in the concept of what it means to "prevail" is *explicit* under Chapter 38 which specifically says attorney's fees may be recovered if the claim is valid and unpaid for more than thirty days after presentment. It should be noted that some cases have suggest that fees are recoverable under Chapter 38 if the presented claim is unpaid before trial commences. *Peissel v. Peissel*, 620 S.W.2d 796, 800 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ). Cases can neither add nor subtract from Chapter 38's plain language that the claim need only be valid thirty days after presentment. For reasons discussed below, resolving that discrepancy is unnecessary here.

Chapter 38's concern with whether a valid claim that existed before a trial begins is the basis of the so-called "exception" to *McKinley* disallowing attorney's fees if the claimant's contract damages are fully offset by a "credit" for sums the defendant paid. In these cases, including *Osborne*, the "credit" was due to

19

payments madd worade *before* trial so that there was no "valid claim" for a "just amount owing" remaining when trial commenced. *Blizzard*, 756 S.W.2d at 806[12]; *Osborne*, 252 S.W.3d at 74, 76-77; *Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 7 (Tex. App.—Waco 2007, pet. denied); *Buccaneer Homes of Ala., Inc. v. Pelis*, 43 S.W.3d 586, 591 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Hamra v. Gulden*, 898 S.W.2d 16, 19 (Tex. App.—Dallas 1995, writ dism'd w.o.j.); *Sullivan*, 192 S.W.3d at 109-110.

Assume *arguendo* the one satisfaction rule applies to breach of contract claims at all or that joint liability may be based on common injury alone. Under either assumption, if a claim's validity were determined by whether the claimant received a damage award under a judgment, a defendant in multi-defendant cases would resist reasonable settlements as long as possible in hopes other defendants would settle and allow it to escape scot-free, *despite its joint liability*, if those settlement sums exceed the damages caused. Settling defendants have no contribution claim against the hold-out under either Chapter 32 or common law because the settlors are not judgment debtors.[13] *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987)(Chapter 32); *Austin Road Co. v. Pope*, 147 Tex.

---

[12] *Blizzard* is actually a no-breach, not a "credit," case. *See* n.8, *supra*.

[13] TEX. CIV. PRAC. & REM. CODE §§32.001, 32.002 (contribution allowed only in tort actions for "a person against whom a judgment is rendered"); TEX. CIV. PRAC. & REM. CODE §33.002 (Chapter 33 only applies to tort actions); *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987)(settlor has no right to sue for contribution).

430, 216 S.W.2d 563, 564-65 (1949)(common law); *see* Cross-Appellants' Brief 19-21,48-51. Thus, the Architect's suggested interpretation of Chapter 38 *discourages*, rather than encourages, settlement of valid claims. For these reasons, neither the Architect's authorities nor *Osborne* support a rule barring recovery of Chapter 38 attorney's fees if the settlement exceeding the damage award occurs *during* rather than before trial.

### 4. RLJ Met All the Statutory Requirements for Recovering Its Attorney's Fees.

RLJ met all of Chapter 38's necessary conditions. It had a valid claim that was unpaid more than thirty days after presentment and remained unpaid before trial commenced.

#### a. RLJ Had a Valid Claim.

A "valid" breach of contract claim requires: (1) a valid contract; (2) that the claimant performed or was excused from performing; (3) that the defendant breached which (4) damaged the claimant. *Kleas v. Clark, Thomas & Winters, P.C.*, No. 03-12-00755-CV, 2013 WL 4516120, at *2 (Tex. App.—Austin Aug. 21, 2013, pet. denied); *C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*, 295 S.W.3d 748, 752 (Tex. App.—Austin 2009, no pet.). The jury's verdict removes all doubt that RLJ's claim was valid. (CR1126-27).

21

### b. The Just Amount Owing Was Not Timely Tendered.

RLJ's claim was first presented in August 2009, with further presentments of its claim in August 2010 and by April 6, 2011 letter. (3SCR37-38,4SCR___[14]). The Architect did not respond to these presentments. (3SCR38). Assume *arguendo* that the jury's verdict was – as the Architect contended– for "indivisible" damages for which the Architect and the Settling Defendants were jointly liable, RLJ did not – unlike the claimant in *Osborne* – settle for a total amount greater than the jury's damage award until *during* the 2014 trial, long after the claim was presented. (CR1080-81,1174,1710;7RR105-108). In that hypothetical case, the jury's finding established that the "just amount owing" was $785,000 (CR1127) which was not timely paid. Even if the one satisfaction rule applied, which it does not, that is all that was necessary. "If a plaintiff meets the requirements of [the attorney's fee statute], [t]he [plaintiff] is entitled to attorney's fees. *Karol v. Presido Enterprises, Inc.*, 622 S.W.2d 638, 640 (Tex. App.—Austin 1981, no writ); *see also Buckner Glass & Mirror Inc. v. T.A. Pritchard Co.*, 697 S.W.2d 712, 714 (Tex. App.— Corpus Christi 1985, no writ)(decided under post-1977 amendment to article

---

[14] Exhibits 5 and 6 to Amended Attorney's Fees Affidavit were included in RLJ's request for the accompanying motion to be included in the Clerk's Record, but appear to have been omitted. RLJ is requesting supplementation to include them.

2226). Thus, RLJ satisfied Chapter 38's timing requirement regarding its valid claim. TEX. CIV. PRAC. & REM. CODE §38.002(3).[15]

### 5. The Trial Court's Reasoning Agreed With the Legislature's.

The Architect alleges that the trial court was "creat[ing] its own rule of law" by ruling based on the settlement's timing. (Appellant's Brief 15). To the contrary, the trial court here correctly distinguished settlements *before* trial from those that occur *during* trial. (CR1439-41). The trial court was not legislating or improvising. It simply analyzed the language of Chapter 38 more carefully than the Architect.[16]

The Architect also attacks the trial court's reasoning for treating attorney's fees as damages. This criticism assumes attorney's fees cannot be recovered or considered "part of the amount of the judgment" unless other damages are recovered. (Appellant's Brief 16). The Architect cites *C& H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 325-26 (Tex. 1994), and *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 797n.13 (Tex. 1994), without mentioning they construe "amount of the judgment" in the pre-judgment interest statute, not Chapter 38. Indeed, "amount of the judgment" appears nowhere in Chapter 38.

---

[15] §38.002 also requires presentment and representation by counsel. It is undisputed that RLJ's claim was presented and it was represented by counsel. (3SCR31,37-38).

[16] Unlimited by findings or conclusions, the judgment must be upheld under any theory supported by evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Phillips v. Estate of Poulin*, No. 03-05-00099-CV, 2007 WL 2980180, at *4 (Tex. App.—Austin Oct. 12, 2007, no pet.). The very letter ruling the Architect criticizes states that it does not limit the ruling's bases and incorporates previous admonitions to that effect. (CR1057,1437).

Chapter 38 does not require recovery of damages under a judgment to authorize attorney's fees. Whether attorney's fees are "damages" is beside the point. It is still worth noting, however, the Legislature considered attorney's fees as "damages" when it eliminated the "finally obtain judgment" requirement in 1977. The Committee Report for the 1977 amendment states, "Even in a lawsuit involving a lot of money, the losing party in effect prevents the winner from getting the full amount, because the winner must pay his attorney. Either way, *it's not right for a person to be deprived of his full damages from a wrongdoer*." (emphasis added; available from the Texas Legislative Reference Library at http://www.lrl.state.tx.us/scanned/hroBillAnalyses/65-0/HB452.pdf;App.K).

RLJ was entitled to attorney's fees. It met all of Chapter 38's requirements. Nothing further required RLJ to recover a judgment for damages to recover its attorney's fees. The Architect cites no authority addressing the effect of post-trial settlement credits. Authorities interpreting other statutes have no bearing on Chapter 38. Even if they did, RLJ "prevailed."

## B. RLJ Was Assigned the Contract and the Cause of Action and Had Standing to Sue.

On three separate occasions, the Architect has tried and failed to convince two different trial judges that RLJ could not sue because it did not have the necessary consensual assignment of rights under the Architectural Contract. (CR220,1083-84). The outcome can be no different here.

### 1. RLJ Owned Both the Architectural Contract Rights and Causes of Action of Action for Its Breach.

The Owner and the Architect were the original parties to the Architectural Contract. (CR463;App.G). With the Architect's consent, the Owner assigned to South Ausaircourt, L.P. ("Ausaircourt") "all of [the Owner's] interest … in and to that certain Standard Form Agreement Between Owner and Architect … date[d] … January 1, 2005 …." (CR578;App.L). There is no dispute that the Owner effectively assigned its rights under the Architectural Contract to Ausaircourt. (Appellant's Brief 19). The Architect does not question that Ausaircourt owned the contract cause of action against it. (Appellant's Brief 21). The Architect's first challenge to the trial court's summary judgment is limited to whether Ausaircourt effectively and validly transferred the *cause of action* to RLJ. (Appellant's Brief 19,28).

### a. Ausaircourt Assigned the Contract to RLJ Under the PSA and the Cause of Action By Assignment of "Intangible Assets."

After the Project was substantially completed, many properties, including the Project, were contracted to be sold pursuant to a "New Hotels Purchase and Sale Agreement" ("PSA"). (CR605-676). Under the PSA, the Owner sold Ausaircourt "all contracts, agreements … and warranties covering the design, development, construction, operations, maintenance and repair of the Property…." (CR 613["Assets" defined];615["Contracts" defined]; 619["Property" defined];

25

621[sales agreement]; App.J). At closing, Ausaircourt assigned RLJ "all of [Ausaircourt]'s right, title and interest in and to all licenses, permits and *all other intangible assets* relating to the [Project]…." (CR701; emphasis added; App.M). ("Intangibles Assignment").

RLJ has a clear chain of ownership from Ausaircourt through the PSA and Intangibles Assignment of both the Architectural Contract and the cause of action. Under the PSA's authorization for supplemental documentation effecting the transaction (CR656), a later "Supplemental Clarification of Assignment" ("Supplemental") specified the Intangibles Assignment "intended to assign" Ausaircourt's rights in the Architectural Contract "along with all intangibles, *including but not limited to causes of action or claims* owned by [Ausaircourt] against [the Architect]." (CR602-04; emphasis added; App.N).

### 2. The Intangibles Assignment Transferred the Contract Cause of Action.

The plain language of the Intangibles Assignment conveyed the cause of action to RLJ. Assignments are construed like any contract through rules of construction to ascertain the parties' intent expressed in the written assignment. *Commercial Structures and Interiors, Inc. v. Liberty Educ. Ministries, Inc.*, 192 S.W.3d 827, 832-33 (Tex. 2006). Terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning."

*Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

### a. "Intangible Assets" Included Contract Cause of Action.

The plain, ordinary meaning of an "intangible asset" includes choses in action or causes of action. An "intangible asset" is "[a]ny nonphysical asset or resource that can be amortized or converted to cash, such as patents, goodwill, and computer programs, *or a right to something*, such as services paid for in advance." *Asset*, Black's Law Dictionary (10th ed. 2014). A cause of action is "intangible" because it is an incorporeal personal property right with no physical existence except by a document without intrinsic value. *Lay v. Aetna Ins. Co.*, 599 S.W.2d 683, 686 (Tex. App.—Austin 1980, writ ref'd n.r.e.); *Browne v. King*, 196 S.W. 884, 887 (Tex. Civ. App. 1917) *aff'd*, 111 Tex. 330, 235 S.W. 522 (1921). A cause of action is an "asset" as the right to a judicial proceeding to recover money. *Vanderburg v. Nocona Gen. Hosp.*, No. 7:02-CV-291-KA, 2008 WL 114846, at *4 (N.D. Tex. Jan. 10, 2008); *Adams v. Great American Lloyd's Ins.*, 891 S.W.2d 769, 772 (Tex. App.—Austin 1995, no writ). A non-frivolous claim is an "asset," regardless of its ultimate success. *In re First State Bancorporation*, 498 B.R. 322, 329-30 (Bankr. D.N.M. 2013).

This Court agrees, calling a claim "an *asset* of the receivership estate." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. E Court, Inc.*, No. 03-02-00714-CV, 2003

27

WL 21025030 (Tex. App.—Austin May 8, 2003, no pet.)(emphasis added). It explained in *Am. Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, 2015 WL 1967877, at *5 (Tex. App.—Austin Apr. 30, 2015, no pet. h.), that "Intangible property" includes "incorporeal property (as choses in action) often evidenced by documents (as stocks, bonds, notes, judgments, franchises) having no intrinsic value or by rights of action, easements, goodwill, trade secrets." *Accord*, *In re Malacara*, 223 S.W.3d 600, 602 (Tex. App.—Amarillo 2007, no pet.)(retirement benefits); *In re Fleckenstein*, 589 S.W.2d 788, 789-90 (Tex. Civ. App.—El Paso 1979, no writ)(promissory note). Thus, "intangible asset" and "intangible property" are commonly understood to include causes of action. *Green v. H. E. Butt Found*., 217 F.2d 553, 554 (5th Cir. 1954)(constructive possession of a chose in action); *In re Grotjohn*, No. 03-47055DML, 2005 WL 6441386, at *5 (Bankr. N.D. Tex. July 19, 2005)("Intangible assets such as … causes of action"); *In re Scott*, 157 B.R. 297, 314 (Bankr. W.D. Tex. 1993), *withdrawn per settlement*, 162 B.R. 1004 (Bankr. W.D. Tex. Jan. 21, 1994)(party succeeded to "intangible assets like causes of action").

### b. The Architect's Argument Ignores Context and the Residuary Clause's Purpose.

The Architect's declaration that there is "[n]o authority … causes of action are included within 'intangible assets'" is incorrect. (Appellant's Brief 26). The Architect's only cited support, an old edition of Black's Law Dictionary, defines

"asset" as "[p]roperty of all kinds, real and personal, *tangible and intangible*, including … *causes of action*…." Black's Law Dictionary 117 (6th ed. 1990)(emphasis added). Nevertheless, the Architect argues that omission of "cause of action" from the examples of "intangible asset" means it is not one. Having already described "cause of action" as an "asset," the dictionary's failure to repeat it as an *example* of an "*intangible* asset" does not support the Architect's conclusion. Presumably, the dictionary reasonably assumed readers would understand that a "cause of action" is *in*tangible property and that example lists are not exhaustive. The Architect points to the dictionary's inclusion of "judgment" or "claim" as examples of a "nominal asset" to suggest that they cannot be intangible assets. Nothing indicates that "intangible" and "nominal" assets are mutually exclusive. The parties did not incorporate any such distinction. The Architect may not now urge interpreting the assignments as if they had.

The Architect's narrow definition of "intangible asset" also ignores its context. In construing assignments, the courts consider the surrounding circumstances. *Coffin v. Douglas*, 61 Tex. 406, 409 (1884)(available at 1884 WL 8785). Here, the parties were closing the sale of the Project. They intended RLJ to step into Ausaircourt's shoes. The PSA required the transfer of all Ausaircourt's claims and causes of action concerning the Project. (CR692). The PSA provides specifically that Ausaircourt must cooperate with RLJ to enforce "any rights under

29

the [A]rchitectural [Contract] … respecting the design … and construction of the Hotel." (CR643;App.J). Thus, RLJ "bargained for an assignment of the prior owner's possible causes of action … that occurred before [its] purchase." *Boerschig v. Southwestern Holdings, Inc.*, 322 S.W.3d 752, 767 (Tex. App.—El Paso 2010, no pet.).

Under the Intangibles Assignment, the transfer of "*all* other intangible assets" (CR701;App.M; emphasis added) is a residue or "Mother Hubbard" clause intended to convey any categorical item not otherwise assigned. This Court recognizes such clauses clearly intend to dispose of *all* of one's property. *Petsch v. Slator*, 573 S.W.2d 849, 853 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.). The same is true here.

"The language used [in the Intangibles Assignment] is as broad as it well could be." *Coffin*, 61 Tex. at 409 (effect of assigning "all properties of all kinds owned by us"). "All means all," *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266 (5th Cir. 2014); *Kennedy v. Lynd*, 306 F.2d 222, 230 (5th Cir. 1962), not "all, but" or "all, except." Ausaircourt could not express more definitively that it conveyed *all*, and reserved no, intangible asset. The Architect's narrow and self-serving assignment interpretation cannot be reconciled with surrounding circumstances, the parties' manifest intent, controlling interpretive rules, or its own dictionary's definition of "asset."

### 3. The Intangibles Assignment was "Express."

Notwithstanding the explicit assignment of "all ... intangible assets" (CR701;App.M), the Architect argues that something more "express" – by which the Architect means "more particular" – was required. (Appellant's Brief 22) This argument relies on cases about whether wording in a real property deed also effectively assigns an accrued cause of action for damage to the real estate conveyed. The courts, quite logically, have said "no." The cause of action is not a right that "runs with the land." *Welch v. Monroe*, No. 10-03-00013-CV, 2004 WL 2474504, at *2 (Tex. App.—Waco Nov. 3, 2004, no pet.); *Exxon Corp. v. Pluff*, 94 S.W.3d 22, 27 (Tex. App.—Tyler 2002, pet. denied). Once accrued, the claim is the personal property of the owner at that time. *Exxon Corp. v. Emerald Oil & Gas Co.*, L.C., 331 S.W.3d 419, 424-25 (Tex. 2010); *Vann v. Bowie Sewerage Co.*, 127 Tex. 97, 90 S.W.2d 561, 562 (1936)(permanent nuisance).

Not being a real property right, "mere transfer of the land by deed does not transfer the [accrued] claim for damages." *Emerald Oil*, 331 S.W.3d at 420, 424-25; *Vann,* 90 S.W.2d at 563. Without a more specific reference, *Emerald Oil*, 331 S.W.3d at 424-25, the accrued cause of action is not conveyed by a general warranty deed's grant of the described real estate and all "rights and appurtenances thereto." *Richey v. Stop N Go Markets of Tex*., 654 S.W.2d 430, 431 (Tex.1983). Assignment of the cause of action cannot be *implied* because a general warranty

31

deed contains no language manifesting an intention to convey *personal* property. *See Brooks v. Chevron USA Inc.*, No. 13-05-029-CV, 2006 WL 1431227, at \*8 (Tex. App.—Corpus Christi May 25, 2006, pet. denied)(mem. op.); *Pluff*, 94 S.W.3d at 27; *Cook v. Exxon Corp.*, 145 S.W.3d 776, 781 (Tex. App.—Texarkana 2004, no pet.); *La Tierra de Simmons Familia, Ltd. v. Main Event Entm't, LP*, No. 03-10-00503-CV, 2012 WL 753184 at \* (Tex. App.—Austin Mar. 9, 2012, pet. denied).

Unlike the parties in the Architect's cases, RLJ need not rely on the real property deed for its right to sue. It has express assignments of the seller's personal property and intangible property. *Cf. Ceramic Tile Int'l Inc. v. Balusek*, 137 S.W.3d 722, 724 (Tex. App.—San Antonio 2004, no pet.)(plaintiff's claim for damage to real property failed due because separate assignment not introduced). Yet, the Architect relies on *Richey* to argue that more particularity is necessary for the cause of action's assignment to be "express." "Express" is the opposite of "implied." *Mueller v. All-Temp Refrig., Inc.*, 2014 Ohio 2718, ¶ 45; *Ross v. Ross*, 20 Ala. 105, 111 (1852). RLJ need not resort to implication because the assignment to it was overtly expressed. *Richey* says nothing about particularity. It only holds that a general warranty deed's conveyance of described real property "with all … rights and appurtenances" does not include personal property

32

consisting of an accrued land damage cause of action. 654 S.W.2d at 431-32; *see Emerald Oil*, 331 S.W.3d at 425; *Brooks*, 2006 WL 1431227, at *8.

The *Richey* cases also do not suggest that a categorical description is ineffective to describe everything within that category. General, categorical descriptions are effective for that purpose. *See, e.g., Owen v. Vibrasonic Exploration, Inc.*, 694 S.W.2d 421, 424 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.)("accounts receivable" … "including but not limited to those shown" sufficient to describe unlisted account); *Ian Martin, Inc. v. Greenspoint Bank*, 01-87-00631-CV, 1988 WL 45423 at *3 (Tex. App.—Houston [14th Dist.] May 5, 01-87-00631-CV, 1988 WL 45423 (Tex. App. May 5, 1988)(same; unpublished); *Orix Credit Alliance, Inc. v. Omnibank, N.A.*, 858 S.W.2d 586 (Tex. App. 1993)("property of every kind and nature" satisfied TEX. BUS. & COMM. CODE §9.110's "reasonably identified" requirement for a lien on all tangible property). The Architect cites, and research reveals, no authority invalidating a cause of action's assignment because it conveyed an encompassing class of intangible rights without specifically mentioning "cause of action" or "chose in action." Merely because an accrued cause of action does not automatically pass with a real property conveyance or the underlying contract's assignment does not justify a "magic words" test that ignores that assignments like any other contract must be construed according to its language in light of surrounding circumstances.

33

*Commercial Structures*, 192 S.W.3d at 832-33. RLJ was validly assigned Ausaircourt's ownership of the cause of action against the Architect on the basis of the Intangibles Assignments alone.[17]

4.    **The Supplemental Clarification May Be Considered and Removes Any Doubt That RLJ Was Assigned the Architectural Contract and the Cause of Action For Its Breach.**

The propriety of the trial court's ruling RLJ had standing is confirmed by considering the Supplemental's statement the Intangibles Assignment was intended to include the Architectural Contract and "causes of action or claims … against the [Architect]." (CR603;App.N). The Architect suggests, however, the Supplemental cannot be considered because the trial court sustained its extrinsic parol evidence objection. (Appellant's Brief 27).

The parol evidence rule is a substantive, not evidentiary, so this ruling can be reconsidered *de novo*. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 169, 317 S.W.2d 30, 31 (1958)(parol evidence substantive); *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)(summary judgment reviewed *de novo*). The parol evidence rule only precludes enforcement of *inconsistent* prior or contemporaneous agreements if the parties have a fully *integrated* agreement. *Hubacek*, 317 S.W.2d at 31; *Lewis v. Adams*, 979 S.W.2d 831, 836 (Tex. App.—

---

[17] The Architect devotes considerable discussion to the trial court's April 10, 2014 letter. (Appellant's Brief 22). The trial court did not limit the underpinnings for its ruling to the reasoning in its letter. *See* n. 16, *supra*.

34

Houston [14th Dist.] 1998, no pet)(only excludes prior agreements). The Supplemental was not parol evidence for at least four reasons.

First, assuming *arguendo* that intent was not, as the Architect contends, expressed with sufficient particularity, the Supplemental was consistent with the intent to convey causes of action as a subset of the "intangible assets" expressly conveyed. All the Supplemental did was provide more particularity; it did not alter and was not inconsistent with the intent originally expressed. Second, the Supplemental was not parol evidence because it did not antedate the PSA or the Intangibles Assignment. Third, the assignment was not fully integrated. Indeed, the PSA authorized the execution of any necessary additional instruments and permitted its modification in writing. (CR654,656;App.J).

Finally and ironically, the Architect has no standing to assert the parol evidence rule. The Architect is a stranger to both the Intangibles Assignment and the PSA. The parol evidence rule does not apply to a dispute between a contracting party and a contractual stranger. *Baroid Equipment, Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). The Supplemental was appropriate for consideration despite the trial court's erroneous "evidentiary" ruling and fully supports its decision that RLJ had standing through the Intangibles Assignment.

### 5. Alternatively, The PSA Transferred The Contract Cause of Action When It Transferred the Contract.

If more than the Intangibles Assignment were required to transfer the cause of action, it is found in the PSA. It transferred all of Ausaircourt's "right, title and interest" to "the Assets," which included "all contracts, agreements ... and warranties covering the design, development, construction, operations, maintenance and repair of the Property...." (CR613,615,619;App.J). This clearly intended and effectuated an assignment of the Architectural Contract rights. The PSA's assignment of all "right, title, and interest" in that contract includes the cause of action for its breach. *See D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d. 195, 202-203 (Tex. App.—Dallas 2011, no pet.)(pre-suit assignment of "all of right, title, and interest" left no cause for the assignor to assert); *see also Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.—Dallas 2011, pet. denied) (all interests in assigned judgment, "including the underlying claim," was assigned).

### 6. The Architectural Contract Was Validly Assigned to RLJ.

The Architect next argues that the Architectural Contract's Anti-Assignment Clauses invalidated the transfer of rights under *that contract*. Notably, the Architect does *not* assert these clauses affected assignment of the *cause of action*.[18]

---

[18] The Architect's consent was unnecessary to assign the cause of action. Causes of action are freely alienable, subject to exceptions inapplicable here. *State Farm Fire and Casualty Co. v Gandy*, 925 S.W.2d 696, 707 (Tex. 1996); *see* TEX. BUS. & COM. CODE ANN. § 2.210(b) (West 2011)(contract actions). Anti-assignment clauses do not prevent assignments of causes of action.

Assignment of the *cause of action* was conclusively established under either the Intangibles Assignment or the PSA which makes irrelevant the Architect's arguments about the Architectural Contract's assignment. Nevertheless, the Architect's challenge to the contract assignment is refuted here.

First, the Architect inaccurately asserts that RLJ admitted "alleg[ing] only an assigned *cause of action* … rather than assignment of the [Architectural] Contract itself." (Appellant's Brief 18,n.9). Yet the cited portion of RLJ's pleading states "Ausaircourt assigned the Project, *the contracts*, … intangibles … and causes of action to [an] RLJ [entity].… and then assigned its rights … under the Project contracts to … RLJ." (CR222,329). This is no admission RLJ was not assigned the contract, but simply acknowledges the PSA and Intangibles Assignments were separate instruments.

Additionally, even if contract assignment had been proscribed by the anti-assignment clause, Ausaircourt's transfer of the Architectural Contract to RLJ remained effective. "[T]he obligor a right to damages for breach of the terms forbidding assignment but [its breach] does not render the assignment ineffective."

---

*Pagosa Oil & Gas LLC v. Marrs & Smith Ptnrs.*, 323 S.W.3d 203, 212 (Tex. App.—El Paso 2010, pet. denied); *see also* Restatement (Second) of Contract §§322(1), (2)(a). Other jurisdictions agree that the AIA anti-assignment clause does not require consent to assign a cause of action. *See e.g. Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986 (Wash. 1994); *Ford v. Robertson*, 739 S.W.2d 3, 5 (Tenn. Ct. App. 1987)(post-performance assignment of cause of action); *Folgers Architects Ltd. v. Kerns*, 612 N.W.2d 539, 548 (Neb. App. 2000)(same).

Restatement (Second) of Contract §322(2)(b); *see Reuben H. Donnelley Corp. v. McKinnon*, 688 S.W.2d 612, 615 (Tex. App.—Corpus Christi 1985, writ ref'd); *Gips v. Red Robin Corp.*, 366 S.W.2d 853, 857 (Tex. Civ. App.—Houston 1963, writ ref'd n.r.e); *accord, Cedar Point Apartments v. Cedar Point Inv. Corp.*, 693 F.2d 748, 753, 754 (8th Cir.), *cert. denied*, 461 U.S. 914 (1983); *Rumbin v. Utica Mut. Ins. Co.*, 254 Conn. 259, 757 A.2d 526, 528, 530, 535-537, 541 (Conn. 2000); *University Mews Associates v. Jeanmarie*, 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (N.Y. Sup.Ct. 1983).

Some jurisdictions hold that if the assignor has fully performed, as is the case here, the anti-assignment is unenforceable absent significant resulting harm. *In re Cooper*, 242 B.R. 767, 771 (Bankr. S.D. Ga. 1999); *Gallagher v. Southern Source Packaging, LLC*, 564 F.Supp.2d 503, 506-508, 514, 515 (E.D.N.C. 2008)(assigment not barred if payment only performance due); *Owen v. CNA Insurance/Continental Cas. Co.*, 167 N.J. 450, , 771 A.2d 1208, 1213-14, 1218 (N.J. Super. 2001)(no material increase in risk or burden). In *Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986 (Wash. 1994), the court observed that "[t]he primary purpose of clauses prohibiting the assignment of contract rights without … permission is to protect him [or her] in selecting the persons with whom he [or she] deals." 811 P.2d at 830 (citing *Portland Elec. & Plumbing Co. v. Vancouver*, 627 P.2d 1350 (1981)). Thus, the anti-assignment

clause, if enforceable at all, did not invalidate the PSA's assignment of the Architectural Contract.

## C. The Contract Was Admissible and Authenticated.

The Architect next complains the trial court abused its discretion by admitting the Architectural Contract in evidence because the contract was (1) inadmissible hearsay and (2) not properly authenticated. (Appellant's Brief 31-32). Both complaints are meritless. A contract has legal effect independent of the truth of any statements therein. *Rockwall Commons Assocs. Ltd. v. MRC Mortgage Grantor Trust I*, 331 S.W.3d 500, 511 (Tex. App.—El Paso 2010, no pet.).

> Statements that constitute offer, acceptance or terms of a contract—so-called "operative facts"—are not hearsay[. M]erely making of such statements are in themselves relevant and thus evidence that such statements were made is not barred by the hearsay rule.

*Thomas C. Cook, Inc. v. Rowhanian*, 774 S.W.2d 679, 685 (Tex. App.—El Paso 1989, writ denied); *see also Sanders v. Worthington*, 382 S.W.2d 910, 915–16 (Tex.1964). The Architect is simply wrong when, without supporting authority, it asserts otherwise. The trial court correctly overruled the Architect's hearsay objection. (4RR8-9).

The Architect's complaint about authentication fares no better. Texas Rule of Civil Procedure 93(7) requires a verified denial to contest the execution of any written instrument on which any pleading is wholly or partially founded. RLJ alleged the Architect "contracted for" and "breached the Architectural Contract"

39

(CR189,192), making the Architectural Contract the bedrock for RLJ's pleading. The Architect having not made a sworn denial (CR33-34,47-48), Rule 93(7) mandated its "receipt in evidence as fully proved." TEX. R. CIV. P. 93(7); *see also Associated Press v. Hicks Broad. Corp.*, No. C14-93-00066-CV, 1993 WL 495114, at *2 (Tex. App.—Houston [14th Dist.] Dec. 2, 1993, no writ)(unpublished); *Methodist Hosps. v. Corporate Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex. App.-Dallas 1991, writ denied).

The Architect could hardly deny the authenticity of the Architectural Contract. It defended on the provisions in, and founded its declaratory relief request based on, the Architectural Contract. (CR53,55;App.O). It attached the same contract bearing the same date stamp and its Bates numbers to its live answer and counterclaim. (*Compare* CR59-79;App.O *with* 12RR26-46;App.G). The Architect supported its summary judgment motions with the Architectural Contract (CR90-91,100-120,262-63,265,278-300), calling it an "undisputed fact" that the Architect "performed its services on the Project under" that instrument. (CR91). Its counsel represented during trial that "Plaintiffs' Exhibit 15 … is a copy of the ESG/White Lodging contract for this project." (5RR134). The trial court could and presumably did take judicial notice of this instrument filed in its records. *See* TEX. R. EVID. 201(b); *Office of Pub. Util. Counsel v. P.U.C.*, 878 S.W.2d 598, 600 (Tex.

40

1994). On that basis alone, the contract was sufficiently authenticated. *Associated Press*, 1993 WL 495114, at *3.

The same contract was also proved a business record by the Architect's vice-president. (CR178,316). Such proof also authenticated the contract. TEX. R. EVID. 901(10). For all these reasons, the trial court correctly overruled the hearsay and authentication objections.

## D.     The Trial Court Did Not Err in Submitting the Contractual Liability Issue Concerning Structural Engineering and The Architect's Complaints Have Not Been Preserved For Review.

The Architect complains of the jury submission of its liability for "fail[ure] to comply with the Architectural Contract regarding the structural engineering services" (CR1126) "because RLJ did not plead or prove any theory of respondeat superior or vicarious liability against [it] for the [Structural Engineer's] services." (Appellant's Brief 33). Though the Architect agreed its "services would 'include' structural engineering services" (12RR39,47-50;App.G), it now argues that without pleading and proof of vicarious or *respondeat superior* liability, it has no responsibility for the Structural Engineer's work. (Appellant's Brief 33).

### 1.     The Architect Waived Its Complaint By Failing to Specially Except to the Omission of Vicarious or *Respondeat Superior* Allegations.

Vicarious or *respondeat superior* liability is, as explained below, unnecessary. The Architect assumed in the Architectural Contract direct

41

responsibility to the Owner to provide structural engineering services. (12RR39,47-50;App.G) RLJ did not need to rely on any warranty concerning structural engineering because reasonable performance is implied in every contractual undertaking. *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508, 510 (1947). Even if such derivative liability theories had been necessary, the Architect cannot predicate its current complaint on its non-specific "no evidence" charge objection. The trial court is only required to submit the "questions, instructions and definitions … raised *by the pleadings* and the evidence*."* TEX. R. CIV. P. 278(emphasis added). A party is only required to prove what it pleads. *See Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 452 (Tex. 1995)(no questions permitted regarding unpleaded issues). Unalleged facts essential to liability need not be proved unless the opponent specially excepts to the omission. TEX. R. CIV. P. 90; *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex.1992). RLJ alleged the Architect "agreed to … provide … structural engineering design … for the Project" (CR44) and "breached the Architectural Contract by … failing to produce design plans free from defects." (CR47). The Architect never specially excepted to failure to allege vicarious or respondeat superior liability. Therefore, RLJ was not required to prove either theory.

**2.      The Architect Waived Its Complaint By Failing to File a Verified Denial of Liability in the Capacity Sued.**

The Architect also now denies direct contractual liability, asserting instead that it is only vicariously liable for its Structural Engineer. The Architect alleged generally it did nothing that harmed RLJ, and any of RLJ's damages were caused by "others for whose conduct [the Architect is] not legally responsible." (CR48 ¶¶D.1, 2;App.O). This is a contest to liability in the capacity sued, which the Architect was required, but failed, to plead by verified denial. TEX. R. CIV. P. 93(2). *Leggett v. Brinson*, 817 S.W.2d 154, 158 (Tex. App.—El Paso 1991, no writ)(defendant sued individually for DTPA violations waived defense that he was only acting as agent for another without a verified denial); *Avanti Servs. Inc. v. Questor Drilling, Inc.*, No. 01-86-00741-CV, 1987 WL 8352, at *2 (Tex. App.—Houston [1st Dist.] Mar. 26, 1987, no writ)(unpublished; same for corporate contract signatory sued for direct contract liability with no verified plea that it only signed as agent for another). The Architect's general, unverified denial of causing any of RLJ's damages does not preserve its current complaint about its liability for the Structural Engineer's defective design. *See Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 929-30 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.)(unverified denial of action in individual capacity waived capacity defense). Without a sworn denial, the Architect waived its complaint. *See Horton v. Robinson*, 776 S.W.2d 260, 266–267 (Tex. App.—El Paso 1989, no writ).

43

**3.** **The Architect Failed to Preserve Its Charge Complaint By Objecting On Different Grounds Than Those Now Urged.**

At the charge conference, the Architect's only objection to the structural engineering liability question was "there is no evidence to support [liability for]… failure to comply with the [A]rchitectural [C]ontract regarding structural engineering services." (9RR152). This objects to whether there was probative evidence the *Architect* failed to comply. The Architect's complaint now concerns evidence supporting the Architect's responsibility for the *Structural Engineer's* failure to comply. Objection on one ground preserves no error on another. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 242 (Tex. 1992). The Architect waived its objection to the submission of the structural engineering liability question for this additional reason.

**4.** **Vicarious or *Respondeat Superior* Liability Is Not Required When Responsibility Exists Under a Contract.**

The substance of the Architect's argument is also meritless. The Architect relies on *Ryan v. Morgan Spear Associates Inc.*, 546 S.W.2d 678, 681–82 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.), for its vicarious/*respondeat superior* liability argument. That reliance is misplaced.

**a.** ***Ryan* Decided Tort, Not Contractual, Duty Under a Now-Rejected Liability Theory.**

The Architect acknowledges the *Ryan* plaintiff contended the liability inquiry should have been based on whether the architect "breached its contractual

44

duty to prepare plans and specifications free from defect." (Appellant's Brief 35;emphasis added). It fails to mention, however, that the *Ryan* court never reached *contractual* duty question by ruling "liability … can only be sustained on proof that [the architect] was *negligent*…."[19] *Id.* at 682 (emphasis added). For 24 years since *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991), damages to the contract's subject must be recovered in contract, not tort, actions. *CBI NA-CON, Inc. v. UOP Inc*., 961 S.W.2d 336, 340 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). *Ryan* antedated *DeLanney* and only addresses the architect's tort duty. It does not resolve the situation here: whether *contractual* liability may be imposed for breach of a duty the architect's agreement to provide structural engineering services. (CR68,72-73).

### b.    The Contract Defines Contractual Duties.

As this Court recognized in *Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 882 (Tex. App.—Austin 2011, pet. denied), an architect's duties are contractually defined. *Accord Guirey, Srnka & Arnold, Architects v. Phoenix*, 9 Ariz. App. 70, 449 P.2d 306 (1969); *Moundsview ISD v. Buetow & Assoc*., 253 N.W.2d 836 (Minn.1977); *Getzschman v. Miller Chem. Co.*, 232 Neb. 885, 898-99, 443 N.W.2d 260, 270 (1989); *Kelly v. Northwest Community Hospital*, 66

---

[19] After obtaining summary judgment that RLJ could not recover in negligence pursuant to the doctrine of equitable subrogation (CR1708), the Architect now seeks liability insulation under law only applicable to liability for negligence.

Ill.App.3d 679, 23 Ill.Dec. 466, 384 N.E.2d 102 (1978). Here, the Architect had a direct duty to provide structural engineering services by contracting to do so. Proof of vicarious or *respondeat superior* liability was superfluous.

5.     **The Architect Waived Any Complaint About the Duty Submitted By Failing to Request Any Question, Definition or Instruction.**

Nevertheless, the Architect suggests under *Ryan* it should not be liable for "failure to comply with the Architectural Contract regarding the structural engineering services required" because it neither "guarantee[d]" quality nor promised "a perfect plan or satisfactory result." (Appellant's Brief 33, 34). Even if *Ryan* had so constricted the Architect's *contractual* duty, the Architect's complaint is that the jury question incorrectly stated the liability standard. But the Architect requested no question proposing any liability standard. (CR1119-20). Its own proposed bulk charge, on which it obtained no ruling, included no such liability standard. (CR1108). It requested no definition or instruction submitting such a standard. (CR1119-20). The Architect's complaint was waived through these failures. TEX. R. CIV. P. 279; *Payne*, 838 S.W.2d at 242.

6.     ***Ryan* Only Addressed the Architect's Direct, Not Vicarious, *Tort* Liability.**

The Architect also asserts that *Ryan* means a contract party may later delegate its promised performance to one it unilaterally characterizes an independent contractor and thereby elude liability without proof of *respondeat*

46

*superior*. *Respondeat superior*, however, is only applicable to torts. It is based on the theory the employer is liable for the employee's *negligence* though the employer itself beached no duty. *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 178 (Tex. App.—Amarillo 1997, writ denied); *White v. Dennison*, 752 S.W.2d 714, 716 (Tex. App.—Dallas 1988, writ denied); *Marange v. Marshall*, 402 S.W.2d 236, 241–42 (Tex. Civ. App.—Corpus Christi 1966, writ ref'd n.r.e.). It is unnecessary when the employer breaches a direct duty it *contractually* assumed. *See* V.D.4.b., *supra.*

Because the *Ryan* plaintiff failed to request a charge question whether the engineer was the architect's agent, 546 S.W.2d at 682, the only issue before the court was whether sufficient evidence supported the architect's *direct* tort liability. *Id.* at 681. The Architect's suggestion that *Ryan* defines a *contractual* standard is incorrect. Even in negligence, an architect is not relieved of responsibility simply by hiring a consultant to discharge its professional responsibilities. *Playskool, Inc. v. Elsa Benson, Inc.*, 147 Ill. App. 3d 292, 299, 497 N.E.2d 1199, 1204 (1986).

### 7. Architect's Reasoning Permits It All the Contractual Benefits Free of Burden and Risk.

The Architect further uses *Ryan* to suggest that it is not contractually liable for the Structural Engineer's shortcomings because the contract between the Architect and Structural Engineer provided the latter was an independent contractor. (Appellant's Brief 33). The Owner was not a party to that agreement.

Its rights are unaffected by such a contract. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 554 (Tex. App.—San Antonio 2011, no pet.). The lack of privity between construction subcontractors and owners is why it was necessary to devise the "pass-through" fiction based on the general contractor's privity with the owner to permit subcontractors to sue owners for breaches. *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 615 (Tex. 2004).

The Architect in this case *was*, however, a party to the contract under which it agreed to perform structural engineering services. It was free to contract with the Structural Engineer for indemnity or other protections. No matter how it chose to arrange the Structural Engineer's performance, the Architect was contractually answerable to the Owner and its assigns for the breach. The Architect's vicarious-only argument overlooks the same principle the Architect espouses concerning the assignment: there is no privity; *ergo*, no contractual liability. If the remedy against the Architect were limited to derivative liability, the Architect would be free to contract for services completely free of liability for another's failure to provide the promised performance.

8. **Illegality Is Not an Issue Due to The Architect's Failure to Plead It and Statutory Authorization for Architects Performing Structural Engineering Services.**

The Architect also argues that it cannot be liable for failings of its Structural Engineer because it "literally cannot agree to provide structural engineering

48

services." (Appellant's Brief 36). It quotes *Seaview Hospital, Inc. v. Medicenters of Am., Inc.*, 570 S.W.2d 35, 39 (Tex. Civ. App.—Corpus Christi 1978, no writ), for the proposition that "a contract for engineering services to be performed by a person who is prohibited from practicing engineering in Texas is void and unenforceable." (Appellant's Brief 36).

### a. Any Illegality Was Waived Because It Is Not Apparent And The Architect Did Not Affirmatively Plead It.

Unenforceability due to alleged illegality is an affirmative defense that is waived if not pleaded unless pleaded facts conclusively establish illegality. TEX. R. CIV. P. 94; *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex.1991); *Park v. Escalera Ranch Owners' Ass'n, Inc.*, No. 03-12-00314-CV, 2015 WL 737424, at *16 (Tex. App.—Austin Feb. 13, 2015, no pet. h.). Even if it were a valid defense here, nothing pleaded showed the Architect was not licensed to or could not lawfully provide engineering services. Failure to plead illegality waived any such defense.

There was no illegality defense to waive, however. Even if the contract violated architecture regulations, the Architect could not assert it. Public policy would not prevent contract enforcement against the Architect because of the need to discourage Architect's from regulatory violations. *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 110 (Tex. App.—San Antonio 2011, pet. denied). Further, there is no illegality. The Architect is authorized to prepare "*engineering plans and*

49

*specifications* for … the depiction of the *building systems, including structural,* mechanical, electrical, and plumbing *systems*…." TEX. OCCUP. CODE §1001.0031(d)(emphasis added).

### b. *Seaview Hospital* **Does Not Say An Architect Cannot Provide Structural Engineering Services.**

Finally, the Architect's citation of and quotation ignores that *Seaview Hospital* does not discuss the dividing line between architecture and engineering. It involved a contract under which a general contractor agreed to *provide*, not perform, those services under a turnkey contract. 570 S.W.2d at 38-39. The contractor in fact arranged for those services through licensed professionals. It was the owner-defendant, not the architect, asserting illegality. *Seaview Hospital* held the contract should be interpreted to be enforceable; i.e., that the general contractor only agreed to *arrange* for *others* to provide such services.

The Architect's complaint cannot be sustained. The trial court did not reversibly err in submitting a jury question concerning the Architect's failure to perform structural engineering services.

### E. The Evidence of Diminution in Value Was Legally Sufficient.

The Architect's last complaint is "[t]he evidence at trial was legally insufficient to support the jury's $700,000 award of market value damages." (Appellant's Brief 36). This attack is limited to supporting evidence for the jury's

50

finding of Project value difference "*determined as of August 31, 2010.*" (CR 1127;App.B). The jury's verdict, however, is fully supported.

### 1.  The Evidence Is Legally Sufficient If It Provides More Than a Scintilla of Factual Support.

A finding is unsupported by legally sufficient evidence only if there is a complete absence of probative evidence; such evidence is not enough to cause reasonable, fair-minded people to differ; or its opposite is conclusively established. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). A reviewing court may only consider evidence supporting the verdict, viewing that evidence and inferences therefrom in the light most favorable to the verdict. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990). Even if an expert's valuation lacks supportive market data, the opinion is more than a scintilla and sufficient to present a disputed fact issue.   Alleged data deficiency goes to persuasive, not probative, value. *See Missouri-Kansas-Texas R. Co. v. City of Dallas*, 623 S.W.2d 296, 299 (Tex. 1981). Damages are not denied for want of exactitude "[i]f an injured party has produced the best evidence available… afford[ing] a reasonable basis for determining [the] loss." *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex.1984); *O and B Farms, Inc. v. Black,* 300 S.W.3d 418, 422 (Tex. App.— Houston [14th Dist.] 2009, pet. denied)(evidence sufficient despite loss of documents necessary for precise calculation). Whatever the Architect's quibbles

51

about the appraiser's supporting data, his opinion is not facially conclusory. It has probative value. *See Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 838 (Tex. 2014).

### 2. Hornsby's Testimony Was Well-Founded Based on Well-Accepted Standards and Methodologies.

Real estate appraiser Paul Hornsby appropriately valued the Project on the date the charge specified – August 31, 2010 ("Valuation Date") – using the income approach under two different scenarios. "[T]he income approach … is appropriate when the property would, in the open market, be priced according to the income that it already generates." *City of Harlingen v. Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001). This is how a buyer would value the Project. (7RR128). Hornsby's methodology complied with the Uniform Standards of Professional Appraisal Practice ("USPAP"). (7RR116, 122-23).

Hornsby appraised thousands of Austin-area properties over 34 years (7RR114), including over 100 hotels. (7RR115). Hornsby performed two August 31, 2010 valuations: one for the Project's actual impaired condition after the remediation had been implemented; another had its condition not been impaired. (7RR116,122-23,175-177). As USPAP requires, Hornsby considered three customary valuation methods: cost, comparable sales, and income. (7RR121-22). Hornsby looked primarily to the income approach, with comparable sales as a vouchsafe only. There was insufficient sales data for comparable sales to be

independently reliable. (7RR142-43). Unless a hotel is brand new, the cost method is inappropriate. (7RR128).

To determine the Project's income-based value on the appraisal date were it undamaged ("undamaged value"), Hornsby considered average daily room rate, average occupancy rate, typical expenses, and capitalization rate from published data for five other similar nearby hotels and the Project's actual performance data through the Valuation Date. (7RR130-34). With necessary adjustments, Hornsby estimated that the undamaged Project would have a $100.00 average daily rate and 70% average occupancy. (7RR134-40). He concluded that the income-based undamaged value of the Project was $13,650,000. (7RR141-42,44). Hornsby checked that valuation against comparable sales. (7RR142-44).

Hornsby then used income to value the Project "as-is" as of the appraisal date, assuming all feasible repairs were complete and recognizing their future effectiveness was uncertain ("damaged value"). (7RR144-45). Hornsby adjusted for faster-declining room rates, no-growth occupancy rates, increased operating expenses for the Project as-is compared to undamaged hotels. (7RR145-47). He also adjusted the capitalization rate up from that for undamaged hotels because of the higher return rate necessary to induce a buyer to take on the additional known foundation risks with the Project. (7RR147-48). He concluded that the income-based damaged value of the Project was $7,220,000. (7RR148). He could not test

53

this against comparable sales because there were no area sales of hotels in a similar state. (7RR145). Hornsby's diminution-in-value testimony was more than sufficient to support the jury's verdict.

### 3. The Architect's Complaints Are Meritless.

#### a. The Evidence Supported the Answer to the Question Asked, and the Architect Waived Its Valuation Date Complaint.

Without challenging any evidentiary ruling, the Architect asserts Hornsby's testimony could not support the verdict "because his valuations were determined as of the wrong date." The Architect ignores the charge specifically instructed damages should be determined "*as of August 31, 2010*" – the date of Hornsby's valuations.[20] (CR1127). The evidence need only support the answer to the question asked. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *see THPD, Inc. v. Cont'l Imports, Inc.*, 260 S.W.3d 593, 608 (Tex. App.—Austin 2008, no pet.). It did.

If the Architect wanted an instruction with a different date, it needed to tender such an instruction. TEX. R. CIV. P. 279. It did not. (CR1119). Neither did it object to the question because of the date. (9RR153). Its objection was to "legal[ly] and factually insufficient evidence to support *the damages question tendered*, and we incorporate the motion for directed verdict arguments." (Id.;

---

[20] In *McGinty v. Hennen*, 372 S.W.3d 625, 628 (Tex. 2012), and *Barraza v.Koliba*, 933 S.W.2d 164, 169 (Tex. App.—San Antonio 1996, writ denied), do not apply here. There, the testimony and charge involved *different* valuation dates; here, the testimony and charge involved *the same* valuation dates.

54

emphasis added). The objection to the "question tendered" was invalid because Hornsby's testimony supported the "question tendered" in the charge.

The attempted incorporation of "directed verdict arguments" added nothing. Rule 274 is explicit that "[n]o objection to one part of the charge may be adopted and applied to any other part… by reference only" because "all participants… are entitled to know with certainty the that all objections have been made at the designated point…." Charles R. "Skip" Watson, Jr., "The Court's Charge to the Jury," *Advanced Civil Trial Course* 7–28 (State Bar of Texas 2003). Because this goal is thwarted by incorporating *charge objections* by reference, objections to defects in instructions that incorporate arguments in previous *motions* must also be deemed waived because they are not "*specifically* included in the objections." TEX. R. CIV. P. 274.

In addition, the Valuation Date submitted was appropriate in light of the acknowledged superiority of the "income approach" when the market values properties like the Project according to its income. (7RR128-29). *Sharboneau*, 48 S.W.3d at 183. By the Valuation Date, the Project's operations had stabilized and provided a more reliable income model, much of the possible repair work was complete, and the ramifications of the Project's problems were more fully known. (7RR120,124-25). That date permitted appraisal by analysis, not speculation. An

earlier date would have yielded inaccurate results because of uncertainty over the full consequences of the Project's problems. (7RR125-26).

This carefully tailored approach is precisely what cases involving breaches of design or construction contracts call for because measure of damages is governed by each case's peculiar facts. *Vance*, 677 S.W.2d at 482. "What is a reasonable time is a question of fact, varied by the circumstances of each case." *Barry v. Jackson*, 309 S.W.3d 135, 141 (Tex. App.—Austin 2010, no pet.)[21]. Yet, the Architect offers and research revealed no authority that the Valuation Date is improper for breach of a design contract for an income-producing property. The Architect ignores the *Vance* directive and would superimpose a one-size-fits-all solution by resort to a rigid-date approach used in real estate sales contract breaches.

A date-of-sale valuation is appropriate for the breach of a real estate sales contract because damages are based on a single value fixed at a definite time. *Barry* 309 S.W.3d at 140; *accord Westminster Falcon/Trinity L.L.P. v. Chong Shin*, No. 07-11-0033-CV, 2012 WL 5231851, at *2 (Tex. App.—Amarillo Oct. 23, 2012, no pet.). Damages for the breach of a contract concerning a newly-built building, on the other hand, is based on a difference in two separate values: "the

---

[21] The Architect overlooks that *Barry* involved lay, not expert, opinion and that there was no testimony relating the post-sale valuation to market conditions on the date of sale. *Id.* at 140. This is the problem also addressed in *McGinty, see* n. 20, *supra.*, but is not present here.

value of the building as constructed and its value had it been constructed in accordance with the contract." *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1984); *Gulf Ins. Co. v. Cunningham*, A14-91-00799-CV, 1993 WL 136039, at *3 (Tex. App.—Houston [14th Dist.] Apr. 29, 1993, writ denied).

Unlike breach of a sales contract, the consequences of contractual deviations in construction frequently do not become manifest until after the breach occurrs. That was certainly true here because the damage to the Project resulting from the structural design deficiencies were dynamic, not static, and continued to worsen as time passed. (7RR117,126,144-45;4RR78-79). Thus, a rigid date-of-breach approach would often underestimate the value received in contractual breaches involving new construction.

Further, given the delay involved for latent defects to appear, assessing the hypothetical undamaged value must be postponed so that both it and damaged value are assessed under the *same* market conditions to avoid concerns about rapidly-fluctuating market conditions expressed in *Barry* and *Naylor v. Stiegler*, 613 S.W.2d 546, 547 (Tex. Civ. App.—Fort Worth 1981, no writ). Otherwise, the comparison ceases to be reliable for accurately measuring diminution. Unreliable data is not a permissible basis for expert opinion. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

In addition, the Architect's reliance on this Court's observation in *Barry* about the effect of the passage of time on the real estate market concerned valuation based on *sales*, not income. 309 S.W.3d at 141. Thus, worries about lay testimony that did not attempt to relate a later sale to the valuation date are absent here. The valuation method here was different. The testimony was presented by an expert who related his data to the Valuation Date. Hornsby eschewed the Architect's unreliable approach and used the charge's Valuation Date to determine both the damaged and undamaged value as precisely as circumstances permitted – i.e., after the issues had manifested and the remediation work was complete, even though the Project could not be fully repaired. (7RR123-25,176-77).

### b. The Jury Was Provided With Actual Performance Data.

Having argued that the Valuation Date in the charge was too late, the Architect also argues that it was not late enough. It contends Hornsby's diminished value opinion was undermined because it was based on predicted data as of the valuation date instead of actual performance data that only became available until *after* the court's charge's specified valuation date. In fact, Hornsby testified about the diminution in value based on *both* the actual, post-valuation performance data *and* the projections based on the data available on the valuation date. (7RR149-53.)

Hornsby informed the jury that based on actual performance, the Project's diminution in value was $4.3 million (7RR152); based on the data available as of

the valuation date, its diminution in value was $6.4 million. (7RR153). Thus, even if the Architect were right about the proper underpinnings for calculating value diminution, the Architect's legal sufficiency attack on this basis is meritless because *the jury was given a valuation based on the actual performance data*. Its diminution finding as caused by the Architect's breach was within the range of diminution damages the evidence supports. *See Gulf States Utilities Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).

Nonetheless, the Architect is wrong about using data unavailable on the Valuation Date. USPAP standards disallow consideration of information the hypothetical buyer and seller not then know. (7RR149,152). Hornsby's use of only pre-valuation data was the correct methodology and his analysis was reliable. That is all that was required. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006). The jury gets to resolve the weight to be given his opinion. *See id.* Hornsby's analysis is not unreliable under *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 640 (Tex. 2009), because his opinion based on pre-valuation data did not disregard *relevant* facts as the experts in *Whirlpool* did.

Again, the Architect is complaining that a different date should have been asked without preserving that objection to the charge. For any and all of these reasons, this aspect of the Architect's legal insufficiency argument is specious.

### c. There Was Legally Sufficient Evidence to Support the Jury's Verdict and Any Allocation of Damages.

The Architect apparently argues Hornsby's opinion cannot support the jury's verdict because it was not limited to diminution caused by the Architect alone. This argument is flawed in several of its premises.

### 1) The Architect Erroneously Assumes Jury Must Have Implicitly Found Others Breached.

It erroneously assumes the jury must have found other's breaches caused diminution damages. Such assumption violates the obligation to review evidence in the most favorable light, ignoring all contrary evidence and inferences. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The jury is entitled to disbelieve any or all of expert or lay testimony. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). It could have believed the Architect's breach of its structural design obligation alone caused all the diminution in value.

There evidence supported that conclusion. An expert testified that inadequate foundation design caused foundation movement because it focused on load distribution, not resisting movement from soil expansion. (4RR87,90-92,111-12). The Soils Engineer correctly evaluated the Project site's soil plasticity. (4RR114-117,119-122). The Architect was the center of the design team ultimately responsible to see that the foundation design followed the Soils Engineer's recommendations. (5RR165-67,176,216-18,222-23).

The foundation design utilized was not the one the Soils Engineer recommended (4RR122-23,185), and was not adequate for the Project site. (5RR57-58,96,217-18). The design was inappropriate because it did not properly address resistance to movement from soil expansion. (4RR87-88,128-29). The General Contractor was required to build the type of foundation specified, which it did. (3RR159,157-58). This evidence supported any determination the Architect's failure to provide proper structural engineering alone would have caused value-diminishing Project damage in the amount the jury found. The Architect's segregation complaint is academic.

### 2) Evidence of Unsegregated Damages Is Legally Sufficient Evidence of Segregated Damages.

Complaint about the legal insufficiency of the supporting damages evidence is procedurally and substantively invalid. Procedurally, the architect did not make clear that its objection was to lack of evidence of segregation or allocation. It only generally objected that there was legally insufficient evidence. *See* V.F.3.a., *supra.*; *cf. Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 738 (Tex. 1997)("objection pointed out distinctly the nature of 3M's complaint about the damage question's form" sufficient).

Substantively, the legally insufficient evidence objection being asserted on appeal could not be sustained even had it been sufficiently particular. The Texas

Supreme Court resolved this issue against the Architect in *Nishika*. 953 S.W.2d at 978-79. There, four plaintiffs sued for breach of warranty and recovered lump-sum damages. On appeal, two plaintiffs were disqualified from warranty protection. The court rejected defendant's argument for a take-nothing judgment because damages evidence was not segregated for the remaining plaintiffs. It held that *unsegregated* damages evidence was legally sufficient evidence of *segregated* damages. *Accord*, *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991)(attorney's fees not limited to permissible claims); *Texarkana Memorial Hospital, Inc. v. Murdock*, 946 S.W.2d 936, 840-41 (Tex. 1997)(damages not segregated by liable defendant).

### 3) Testimony Segregating Damages Is Not Required.

The Architect is in effect challenging the jury's ability to apportion responsibility without expert guidance. The percentage responsibility cases, however, confirm that such allocations are routinely entrusted to juries without specific allocation testimony, and that courts will not substitute their judgment for the jury's concerning that allocation. *Bechtel Corp. v. CITGO Products Pipeline Co.*, 271 S.W.3d 898, 920 (Tex. App.—Austin 2008, no pet.); *accord*, *Binion v. Brinkley*, No. 2-09-121-CV, 2010 WL 396385, at *2 (Tex. App.—Houston [14th Dist.] Feb. 4, 2010); *Hagins v. E-Z Mart Stores, Inc.*, 128 S.W.3d 383, 392 (Tex.

App.—Texarkana 2004, no pet.); *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 659–60 (Tex. App.—Dallas 2002, pet. denied).

The jury may decide causation whenever general experience and common sense enable a layperson to fairly determine that relationship between event and result. *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 894 (Tex. App.—Texarkana 2004, pet. denied). When not subject to precise mathematical calculation, it is the peculiar province of the jury to determine the issue. *Simmons v. Bisland*, No. 03-08-00141-CV, 2009 WL 961522, at *8 (Tex. App.—Austin Apr. 9, 2009, pet. denied)(mem. op.). Allocation of damages caused among multiple breaches is not subject to precise calculation.

### d. Comparable Sales Were a Vouchsafe, Not the Basis for Valuations.

The Architect confuses things again with its "comparable sales" method argument. (Appellant's Brief 46). Hornsby did not calculate diminution in value based on comparable sales. (7RR128). He calculated income-based valuations for the "damaged" and hypothetical "undamaged" Project on the Valuation Date (7RR128-142), only using comparable sales to "test" his income-based valuations. (7RR142-43). Even if Hornsby had partially relied on comparable sales, it would not invalidate his opinion.

> [I]f the opinion should be shown to be based *exclusively* upon considerations of incompetent factors, it would have to be disregarded, 'but, all opinion being at best something of a speculation,

63

*it does not cease to have probative force when impropriety attaches only to some, rather than all, of its underlying reasons*. The question of market value is thus peculiarly one for the fact finding body...."

*Tex. Pipe Line Co. v. Hunt*, 149 Tex. 33, 228 S.W.2d 151, 156 (Tex. 1950). Comparable sales were not the sole basis for or only methodology underlying the valuations. Their incidental, confirmatory role did not rob Hornsby's valuations of probative value.

Even when an expert's valuation is based on comparable sales, the trial court has broad discretion whether "a sale is sufficiently similar to be admissible as a circumstance influencing an expert witness in arriving at his opinion of value." *Id.* (quoting *Tex. Elec. Serv. Co. v. Graves*, 488 S.W.2d 135, 139 (Tex. Civ. App.—El Paso 1972, writ ref'd n.r.e.). The Architect has shown no such abuse. Comparable sales are generally admissible unless "reasonable minds cannot differ that the evidence of the other sale lacks probative force because of its dissimilarity...." *Collin Cnty. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 868 (Tex. App.—Dallas 2012, pet. denied) (quoting *Bridges v. Trinity River Auth.*, 570 S.W.2d 50, 56 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.)). Here, Hornsby followed USPAP in utilizing sales comparisons (7RR143) and provided an explanation as to the appropriateness of the comparisons. (7RR142-145).

### e. There Was No Recovery For "Stigma" Damages and No Double Recovery.

The Architect also reasons there was no evidence the Project was incapable of repair, so any diminution valuation necessarily included "stigma" damages. Again, the Architect's premise is flawed. "Stigma" or "fear" damages are those for reductions in property value due to the lingering perception or fear of a harmful condition after it has been repaired or eliminated. *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 389 S.W.3d 583, 594 (Tex. App.—Houston [14th Dist.] 2012), *rev'd on other grounds*, 443 S.W.3d 820 (Tex. 2014). The damage here is concrete reality, not anguished perception.

The factual flaw is that there was probative evidence that the foundation could *not* be repaired. (4RR93,96-97). Thus, the question of diminution in value attributable solely to market risk/uncertainty intolerance for a non-existent condition never arises. The foundation could not be strengthened or altered to avoid ongoing movement. (4RR90-92,96-97). The best that could be accomplished was to control soil expansion and resulting movement by limiting moisture infiltration. (4RR90-97). The foundation problems would continue. The efficacy of the repairs was uncertain. (*Id*.). Thus, market uncertainty was over an *existing*, not imagined, condition likely to cause future damage or deterioration. (*Id*.;7RR117, 124,176-77). On that is required for value diminution. *Precision Homes, Inc. v.*

*Cooper*, 671 S.W.2d 924, 930 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

There is no double recovery when the jury awarded pre-Valuation Date repair costs of repair for repairs plus Valuation Date value diminution. The latter takes into account future repair costs. (7RR123-24,177-78). That is how Hornsby calculated the damaged value. (*Id.*). Indeed, there is no duplication in comparing post-repair value to the hypothetical undamaged value on the same Valuation Date. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 441 (Tex. 1995). The charge's damage question avoided any possibility of double recovery by limiting repair costs to those incurred on or before the Valuation Date (CR1127;App.B), which were not factored in to Hornsby's valuation. Those that might have been incurred after the valuation date were included in the diminished value as of the Valuation Date. There was no double recovery and no recovery for "stigma" damages.

f.     **Lost Profits Were Not a Separate Element of Recovery, But Were Only Used As Necessary for the Texas Supreme Court's Approved Method of Valuing Property Producing Income.**

Hornsby's income-based Project valuation utilized the method the Texas Supreme Court approved for income-producing property. *Sharboneau*, 48 S.W.3d at 183. "[E]stimating … future income and applying a capitalization rate … allows the appraiser to arrive at a present value." *Id.* The income method consists of "estimating the net operating income stream of a property and applying a

capitalization rate to determine the property's present value." *State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 171 (Tex. 2009).

Estimating future income necessarily includes modeling based on historical performance, consultation with published figures available to appraisal professionals and estimates of future occupancy and room rates. (7RR129-30). Hornsby used these resources to arrive at an overall valuation of the Hotel itself. This is not a "lost profits" model and RLJ did not obtain damages for "lost profits," despite the Architect's claims. None of the Architect's evidentiary insufficiency arguments are meritorious.

## VI.    CONCLUSION AND PRAYER

For the foregoing reasons, and the reasons presented in RLJ's Cross-Appellants' Brief, RLJ asks the Court to:

1) Reverse the trial court's the judgment applying the one satisfaction rule and delete the credit for the amount of the Settling Defendants' settlements;

2) In the alternative, if and only if the one satisfaction rule applies, reverse the trial court's judgment concerning the award of attorney's fees and either reform it to award RLJ unsegregated fees for prosecution of all contract claims against the Architect and the Settling Defendants, or remand the case to the trial court solely for a determination of reasonable

67

and necessary attorney's fees for the prosecution of all contract claims against the Architect and the Settling Defendants;

3) Grant any one or more of 1) – 2) above subject to the conditions prescribed; and/or

4) Otherwise affirm or modify the trial court's judgment in favor of RLJ as set forth herein and in RLJ's Cross-Appellants' Brief.

RLJ further requests such other relief to which it is justly entitled, provided such relief requested does not include a retrial on the merits of its claims against the Architect.

Respectfully submitted,

MUNSCH HARDT KOPF & HARR PC

*/s/Michael W. Huddleston*
Michael W. Huddleston
State Bar No. 10148415
J. Stephen Gibson
State Bar No. 07866000
3800 Ross Tower
500 North Akard Street
Dallas, TX 75201
(214) 855-7500 Main Tel.
(214) 855-7584 Main Fax
mhuddleston@munsch.com
sgibson@munsch.com

Benton T. Wheatley
State Bar No. 24015171
Tracy McCreight
State Bar No. 24037064
Munsch Hardt Kopf & Harr, P.C.
401 Congress Avenue, Suite 3050
Austin, TX 78701
(512) 391-6100 Main Tel.
(512) 391-6149 Main Fax
bwheatley@munsch.com
tmccreight@munsch.com

**Attorneys For Appellees and Cross- Appellants.**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Appellees' Brief was prepared using Microsoft Word 2010, which indicated that the total word count (exclusive of those items listed in Tex. R. App. P. 9.4(i)(1)) is 14,965 words.

*/s/ Michael W. Huddleston*
Michael W. Huddleston

**CERTIFICATE OF SERVICE**

I certify that I served a true and correct copy of the foregoing document upon counsel listed below on this 12th day of June, 2015 by e-file:

Weston M. Davis
Gregory N. Ziegler
Steven R. Baggett
Macdonald Devin, P.C.
1201 Elm Street
3800 Renaissance Tower
Dallas, TX 75270

/s/ *Michael W. Huddleston*
Michael W. Huddleston

## APPENDIX

| TAB | DESCRIPTION OF DOCUMENT | CR/RR |
|---|---|---|
| **Appendix documents under Tabs A-I can be located in the Appendix to Cross-Appellants' Brief and are not re-attached to Appellees' Brief.** | | |
| **A** | Plaintiffs' Seventh Amended Original Petition | CR184-218<br>2SCR39-73 (duplicate) |
| **B** | Charge of the Court | CR1121-29<br>2SCR1563-71 (duplicate) |
| **C** | June 13, 2014 Letter from Hon. Judge Yelenosky | CR1437-41<br>2SCR1598-1602 (duplicate) |
| **D** | Final Judgment | CR1708-12<br>CR1905-09 (duplicate) |
| **E** | Contract with Soils Engineer | 12RR6-11 |
| **F** | Contract with General Contractor | 12RR567-651 |
| **G** | Contract with Architect | 12RR26-128 |
| **H** | Architect's Second Amended Answer | CR46-79<br>2SCR5-38 (duplicate) |
| **I** | Report of SB 890 (2005) | n/a |
| **TAB** | **DESCRIPTION OF DOCUMENT** | **CR/RR** |
| **Appendix documents under Tabs J-O are attached hereto.** | | |
| **J** | Purchase and Sale Agreement (PSA) | CR606-676 |
| **K** | Legislative Committee Report for 1977 Amendment to Article 2226 | n/a |
| **L** | Assignment of Contract | CR578 |

| M | Intangibles Assignment | CR701-05 |
|---|---|---|
| N | Supplemental Clarification of Assignment | CR602-604 |
| O | Elness, Swenson Graham Architects, Inc.'s Second Amended Answer and Original Counterclaim for Declaratory Judgment | CR 46-79;44-45 |

# APPENDIX J

NEW HOTELS PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

WHITECO INDUSTRIES, INC.

and each of the parties named on Schedule A hereto

(Sellers)

- and -

--

RLJ LODGING FUND II ACQUISITIONS, LLC

(Purchaser)

and joined by

WHITE LODGING SERVICES CORPORATION,
as Manager and agent for Sellers
(White Lodging)

Dated: March 16, 2006

Exhibit _____1_____
Witness _____McKALIP_____
Date _____9-26-12_____
Melissa Parkhill, CSR

Execution Version

**RLJ Austin Courtyard 018307**

# Exhibit 6

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS

SECTION 2.    PURCHASE-SALE

   2.1    Purchase-Sale

   2.2    Deposit

   2.3    Allocable Price

   2.4    Closing

SECTION 3.    DILIGENCE; INSPECTIONS

   3.1    Inspection Period.

   3.2    Title and Survey Matters

   3.3    Structural and Environmental Reports

   3.4    Taking and Casualty

SECTION 4.    CLOSING CONDITIONS

   4.1    Closing Documents

   4.2    Allocable Price

   4.3    Materials

   4.4    Condition of Applicable Property

   4.5    Other

   4.6    Failure of Conditions

SECTION 5.    TERMINATION OF AGREEMENT

i

**RLJ Austin Courtyard 018308**

**SECTION 6.    REPRESENTATIONS AND WARRANTIES OF SELLER**

6.1     Status of Seller

6.2     Authority of Seller

6.3     Existing Agreements

6.4     Tax Returns

6.5     No Violations of Agreements

6.6     Litigation

6.7     Condemnation

6.8     Not A Foreign Person

6.9     Construction Contracts

6.10    Hazardous Substances

6.11    Intentionally Omitted

6.12    Intentionally Omitted

6.13    FF&E

6.14    No Proffers

6.15    No Violations

6.16    Separate Tax Parcel

6.17    Intentionally Omitted

6.18    Ground Leases

6.19    Labor and ERISA

6.20    No Commitments

6.21    Restatement of Seller Representations and Warranties

6.22    Survival of Seller Representations

**RLJ Austin Courtyard 018309**

608

6.23   Liability for Breach of Seller Representations

6.24   Disclaimer of Express or Implied Representations

6.25   Seller's Knowledge

SECTION 6A.   REPRESENTATIONS AND WARRANTIES OF WHITE
              LODGING

6A.1   Status of White Lodging

6A.2   Authority of White Lodging

6A.3   No Violations of Agreements

6A.4   Litigation

6A.5   Disclaimer of Express or Implied Representations

6A.6   Survival of White Lodging's Representations

6A.7   Liability for Breach of White Lodging's Representations

6A.8   White Lodging's Knowledge

SECTION 7.   REPRESENTATIONS AND WARRANTIES OF PURCHASER

7.1    Status and Authority of Purchaser

7.2    Action of Purchaser

7.3    No Violations of Agreements

7.4    Litigation

7.5    No Reliance

7.6    Purchaser's Independent Investigations

7.7    Restatement of Purchaser Representations and Warranties

7.8    Survival of Purchaser Representations

7.9    Liability for Breach of Purchaser Representations

7.10   Purchaser's Knowledge

RLJ Austin Courtyard 018310

609

7.11    Seller Representations Deemed Waived

SECTION 8.    COVENANTS OF SELLERS, PURCHASER AND WHITE
              LODGING

    8.1    Seller Covenants

    8.2    Purchaser Covenants

    8.3    Cooperation

    8.4    Liquor Permits

SECTION 9.    APPORTIONMENTS

    9.1    Adjustments and Prorations

    9.2    Closing Statement; True-Up

    9.3    Sellers Closing Costs

    9.4    Purchaser's Closing Costs

    9.5    Cancellation Fee

    9.6    Baggage; Safe Deposit Boxes

    9.7    Survival

SECTION 10.    DEFAULT

    10.1    Default by Seller

    10.2    Default by Purchaser

SECTION 11.    MISCELLANEOUS

    11.1    Agreement to Indemnify.

    11.2    Brokerage Commissions

    11.3    Publicity

    11.4    Notices

-iv-

RLJ Austin Courtyard 018311

11.5   Waivers; Modification of Agreement

11.6   Assignment; Successors and Assigns

11.7   Severability

11.8   Counterparts

11.9   Governing Law

11.10  Performance on Business Days

11.11  Attorneys' Fees

11.12  Relationship

11.13  Like-Kind Exchange

11.14  Purchase of One or More Seller Entities

11.15  Further Assurances

11.16  Authority of White Lodging

11.17  Section and Other Headings

11.18  Time of the Essence

-v-

RLJ Austin Courtyard 018312

# NEW HOTELS PURCHASE AND SALE AGREEMENT

THIS NEW HOTELS PURCHASE AND SALE AGREEMENT is made as of the 16th day of March, 2006 ("Effective Date") by and between (i) WHITECO INDUSTRIES, INC., a Nebraska corporation, and each of the parties named on Schedule A hereto (individually, "Seller" and collectively, "Sellers"), and (ii) RLJ LODGING FUND II ACQUISITIONS, LLC, a Delaware limited liability company ("Purchaser"), and joined by (iii) WHITE LODGING SERVICES CORPORATION, an Indiana corporation ("White Lodging") as Manager and agent for the Sellers.

## RECITALS

1.      Sellers are the owners of all of the Properties, with the specific ownership of specific Properties being set forth on Schedule A hereto.

2.      Purchaser desires to purchase all of the Properties and thereby acquire all of Sellers' respective right, title and interest in and to the Properties upon the terms and conditions hereinafter set forth.

3.      Sellers desire to sell to Purchaser all of the Properties and thereby convey all their respective right, title and interest in such Properties, upon the terms and conditions hereinafter set forth.

4.      Upon completion of the Improvements on each Property, White Lodging will be the Manager of all of the Properties.

5.      Purchaser and White Lodging have agreed that White Lodging will manage the operation of all of the Properties after Purchaser acquires the same.

6.      All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Section 1.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Sellers, Purchaser and White Lodging hereby agree as follows:

## SECTION 1

## DEFINITIONS

Capitalized terms used in this Agreement and not defined elsewhere herein shall have the meanings set forth below:

"Act of Bankruptcy" shall mean if a party hereto (or any general partner or member thereof acting on behalf of such party) shall (i) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator

Execution Version

RLJ Austin Courtyard 018313

of itself or all of or a substantial part of its property; (ii) admit in writing its inability to pay its debts as they become due; (iii) make a general assignment for the benefit of its creditors; (iv) file a voluntary petition or commence a voluntary case or proceeding under the Federal Bankruptcy Code (as now or hereafter in effect); (v) be adjudicated a bankrupt or insolvent; (vi) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts; or (vii) fail to controvert within sixty (60) days, or acquiesce in writing to, any petition filed against it in an involuntary case or proceeding under the Federal Bankruptcy Code (as now or hereafter in effect).

"**Affiliate**" shall mean (i) any other Person that is directly or indirectly (through one or more intermediaries) controlled by, under common control with, or controlling a Person, or (ii) any other Person in which a Person has a direct or indirect equity interest constituting at least a majority interest of the total equity of such other Person. For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" shall mean this Purchase and Sale Agreement, together with Schedules A through T and the Disclosure Schedule hereto, as it and they may be amended from time to time.

"**Allocable Price**" shall mean, with respect to each Property, the portion of the Purchase Price allocable to such Property as set forth on the Allocation Schedule attached hereto as Schedule C, it being understood and agreed that the aggregate amount of the Allocable Prices of all Properties shall be equal to the Purchase Price, subject to any adjustments and apportionments made pursuant to the provisions of this Agreement.

"**Allocation Schedule**" shall mean the schedule attached as Schedule C hereto showing the Allocable Price for each Property.

"**Apportionment Time**" shall have the meaning given such term in Section 9.1.

"**Architect**" shall mean an AIA qualified architect who shall have had a significant role in the preparation of the Plans and Specifications.

"**Assets**" shall mean, with respect to each Property, all of the Personal Property, Supply Inventories, Consumable Inventories, Contracts, and Licenses and Permits, now owned or hereafter acquired by each Seller in connection with or relating to its Property, other than any Excluded Assets with respect to such Property.

"**Assignment and Assumption of Contracts**" shall mean an Assignment and Assumption of Contracts in the form of Schedule I hereto.

"**Assignment and Assumption of Lease**" shall mean an Assignment and Assumption of Lease in the form of Schedule J hereto.

-2-

Execution Version

RLJ Austin Courtyard 018314

"**Assignment of Licenses, Permits and Intangibles**" shall mean an Assignment of Licenses and Permits in the form of **Schedule K** hereto.

"**Baggage**" shall have the meaning given such term in Section 9.6.

"**Bill of Sale**" shall mean a bill of sale in the form of **Schedule L** hereto.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions in the State of Maryland are authorized by law or executive action to close.

"**Closing**" and "**Closings**" shall have the meaning given such term in Section 2.4.

"**Closing Conditions**" shall have the meaning given such term in Section 4.

"**Closing Date**" shall have the meaning given such term in Section 2.4.

"**COBRA**" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985.

"**Completed**" shall mean with respect to the Improvements on a specific Property that such Improvements have been constructed and completed (i) in a good and workmanlike manner, (ii) in compliance with all applicable laws, rules and regulations, (iii) in accordance, in all material respects, with the Plans and Specifications, (iv) in compliance with any (a) conditional opening approval letter, (b) authorization of Franchisor or (c) any PIP, and (v) in compliance, in all material respects, with the requirements of the Seller Franchise Agreement, as the same may be modified or amended by agreement between Seller and the Franchisor, provided that any material modification or amendment of the Seller Franchise Agreement shall be subject to Purchaser's approval, which approval shall not be unreasonably withheld.

"**Completion Certificate**" shall mean the certificate of a Seller to be delivered at Closing and certifying to Purchaser that (i) the Improvements have been Completed, and (ii) the Hotel has been fully equipped with the furnishings, fixtures, equipment and supplies necessary for the operation of the Hotel as required pursuant to the Seller Franchise Agreement, to which certificate shall be appended (a) a copy of a current certificate of occupancy or equivalent thereof issued by the jurisdiction in which the Property is located and evidencing the right to occupy the Improvements on such Property and (b) a certificate of the project manager (who may be an employee of White Lodging or an employee of an Affiliate of White Lodging) for the development of the Improvements, certifying to Purchaser that the Improvements have been completed in accordance with the Plans and Specifications.

"**Consultant**" shall have the meaning given such term in the definition of Physical Condition.

"**Consumable Inventories**" shall mean all merchandise, food and beverages held for sale in connection with the operation of each Property to the extent the food and

-3-

RLJ Austin Courtyard 018315

beverage outlets are not operated by third-party tenants under lease agreements, provided that any alcoholic beverages that cannot legally be transferred to Purchaser at Closing shall be and remain the property of Sellers until such time as such beverages may legally be transferred to Purchaser.

"**Contracts**" shall mean, with respect to each Property, (i) all conference, convention and banquet room contracts, guest room reservations; (ii) all leases, concessions and other occupancy agreements, if any, with tenants of the Property; (iii) all leases covering the equipment necessary to operate the Property, if any; and (iv) all contracts, agreements (other than subcontracts) and warranties covering the design, development, construction, operations, maintenance and repair of the Property and/or equipment located in the Property.

"**Deed**" shall mean a special warranty deed in substantially the form attached hereto as **Schedule O** (or such other form as is customary in the applicable jurisdiction to the same substantive effect) whereby each Seller of a Property conveys fee simple title to the real property portion of the Property (other than the real property portions of Properties which are in the form of leasehold interests) to Purchaser.

"**Deposit**" shall mean the deposit in the amount of Ten Million Dollars ($10,000,000.00), together with interest earned thereon.

"**Deposit Escrow Instructions**" shall mean those instructions to the Title Company in the form of **Schedule P** attached hereto pursuant to which the Title Company will hold the Deposit.

"**Effective Date**" shall be the date set forth in the preamble of this Agreement that has been entered by agreement of counsel for Sellers and Purchaser after all counterpart signatures and Schedules have been received and attached.

"**Employee Liabilities**" shall have the meaning given to such term in Section 9.1(n).

"**Entity Purchase Notice**" shall have the meaning given to such term in Section 11.14.

"**ERISA Affiliate**" means any entity which, together with the Seller or Manager (as applicable), is required to be treated as a single employer under Code Section 414 or ERISA Section 4001.

"**Excluded Assets**" shall mean, with respect to each Property, (i) all property owned by the Seller or any of its Affiliates not normally located at such Property and used, but not exclusively, in connection with the operation of such Property, (ii) any working capital, FF&E reserves, or similar reserves set aside by Seller for the maintenance and operation of the Property, (iii) all items, tangible or intangible, containing Proprietary Information, (iv) computer software, except to the extent that such software is used in connection with the operation of the Property and may be assigned upon assignment of a license to Purchaser, which Purchaser agrees to assume, (v) all

-4-

RLJ Austin Courtyard 018316

books, ledger sheets, files and records of Seller or any of its Affiliates, other than those that are exclusive to the Property, (vi) all investment and /or financial data of Seller and its Affiliates except to the extent Seller expressly agrees herein to provide such data to Purchaser, (vii) all cash in vending machines and ATMs at the Property and in cash accounts in Seller's or White Lodging's name, and (viii) such other items as are specifically reserved for, or retained by, Seller and are identified on Schedule O hereto, provided, however that, notwithstanding the foregoing, no data relating to the operations and/or maintenance of the Property shall in any event be deemed to be Excluded Assets.

"Existing Hotel Agreement" shall mean that certain Purchase and Sale Agreement dated February 7, 2006 by and between Purchaser, the Existing Hotel Agreement Sellers and White Lodging Services Corporation for eighty-seven (87) hotel properties and a TGIF Restaurant.

"Existing Hotel Agreement Inspection Period" shall have the meaning given to such term in Section 2.2.

"Existing Hotel Agreement Sellers" shall mean those Persons identified as sellers on Schedule A to the Existing Hotel Agreement.

"Existing Hotel Properties" shall mean those properties identified on Schedule B and Schedule B-1 to the Existing Hotel Agreement.

"FF&E" shall mean, with respect to each Property, all appliances, machinery, devices, fixtures, appurtenances, equipment, furniture, furnishings and articles of tangible personal property of every kind and nature whatsoever owned by the Seller, and located at or used in connection with the ownership, operation or maintenance of such Property, other than any Excluded Assets.

"Franchise" shall mean the brand name specified on Schedule E as being the identified brand name pursuant to which a Hotel shall be operated subject to a Franchise Agreement.

"Franchise Agreement" shall mean, with respect to each Property, the Franchise Agreement to be entered into by Purchaser with Franchisor at or prior to the Closing or, if an existing franchise agreement is being assumed by Purchaser pursuant to the election of Franchisor, then the assumed franchise agreement from and after Closing.

"Franchised Hotel" shall mean a hotel which is franchised to operate as a Franchise under the Seller Franchise Agreement.

"Franchisor" shall mean an entity which has licensed a Franchise to a Seller and/or which will enter into a new Franchise Agreement relating to a Property with Purchaser.

"General Estoppel" shall have the meaning given such term in Section 8.1(i).

-5-

RLJ Austin Courtyard 018317

"**Ground Lease Estoppel**" shall mean an estoppel certificate substantially in the form of **Schedule M** hereto (subject to such reasonable variations as may be requested by Purchaser's lenders and the applicable Landlord).

"**HWE**" shall mean Hodges Ward Elliott.

"**Hotel**" shall mean the Completed operating hotel, franchised by the national Franchisor identified as the franchisor for such Hotel on **Schedule E**, located on a parcel or parcels of real property which is a part of a Property.

"**Immaterial Taking**" shall have the meaning given such term in Section 3.4(a).

"**Improvements**" shall mean, with respect to each Property, all buildings (including the Hotel), fixtures, walls, fences, landscaping and other structures and improvements situated on, affixed or appurtenant to the real property including, without limitation, all pavement, access ways, curb cuts, parking, kitchen and support facilities, meeting and conference rooms, swimming pool facilities, recreational amenities, office facilities, drainage system and facilities, air ventilation and filtering systems and facilities and utility facilities and connections for sanitary sewer, potable water, irrigation, electricity, telephone, cable television and natural gas, to the extent the same form a part of the Property.

"**Inspection Period**" shall have the meaning given such term in Section 3.1(a).

"**Inspection Report**" shall have the meaning given such term in the definition of Physical Condition.

"**Landlord**" shall mean (i) the Finley Company, the fee owner and lessor of the parcel on which both the Courtyard and Residence Inn in Austin, Texas (property numbers 93 and 94) are constructed, and (ii) the City of Bloomington, Indiana Redevelopment Commission, the fee owner and lessor of the parcel on which the Hilton Garden in Bloomington, Indiana (property number 95) is constructed.

"**Landlords**" shall mean, collectively, each and every Landlord.

"**Lease**" shall mean, individually or collectively, any of those ground lease agreements identified on **Schedule D** hereto and "**Leases**" shall mean all of those ground lease agreements.

"**Letter of Credit**" shall have the meaning given such term in Section 2.2(b).

"**Licenses and Permits**" shall mean, with respect to each Property, all permits, licenses and authorizations issued by any state or local authorities and required for the construction, ownership and operation of the Improvements including, without limitation, completion certificates, building permits, signage permits, site use approvals, zoning certificates, and environmental and land use permits, provided that such permits and licenses are transferable or assignable.

-6-

RLJ Austin Courtyard 018318

"**Liens to be Released**" shall have the meaning given to such term in Section 3.2(d).

"**Liquor Permit**" and "**Liquor Permits**" shall have the meaning given to such terms in Section 8.4.

"**Management Agreement**" shall mean, with respect to each Property, the new Management Agreement, substantially in the form of **Schedule N** hereto, to be entered into by White Lodging, as manager, and Purchaser, as owner of the Property, at or prior to Closing.

"**Manager**" shall mean White Lodging.

"**Material Taking**" shall have the meaning given such term in Section 3.4(a).

"**Maximum Physical Conditions Obligation**" shall have the meaning given such term in Section 3.3(b).

"**Opening Date**" shall mean the date on which a Hotel opens to the public for business as a Franchise Hotel in compliance with the Seller Franchise Agreement and all applicable laws, rules and regulations.

"**Person**" or "**Persons**" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so permits.

"**Personal Property**" shall mean all furniture, furnishings, works of art, trade fixtures and equipment located at and/or used in connection with the Property, including the FF&E.

"**Physical Condition**" shall mean a structural or environmental defect identified by an independent and qualified structural or environmental consultant ("**Consultant**") in either a property condition assessment report or an environmental site assessment report issued by such Consultant (either an "**Inspection Report**") that (a) either (x) involves a remediation cost of $25,000.00 or more, or (y) in the reasonable judgment of Purchaser, based on the Inspection Report, has a material impact on the marketability or operations of a Property, and (b) is, in the professional judgment of the Consultant as evidenced by the Inspection Report, an "immediate need."

"**Physical Conditions**" shall mean, collectively, each and every Physical Condition.

"**Physical Conditions Credit**" shall have the meaning given such term in Section 3.3(b).

"**Physical Conditions Cure**" shall have the meaning given such term in Section 3.3(b).

-7-

**RLJ Austin Courtyard 018319**

"**Physical Conditions Escrow**" shall have the meaning given such term in Section 3.3(c).

"**Physical Conditions Notice**" shall have the meaning given such term in Section 3.3(a).

"**Physical Conditions Response**" shall have the meaning given such term in Section 3.3(b).

"**PIP**" shall, to the extent applicable, mean all of the requirements of a Franchisor for improvements to a specific Property, including the establishment of reserves for the making of such improvements at the Property, but only to the extent that such improvements are required to be completed within twelve (12) months after the Closing Date.

"**PIPs**" shall mean, collectively, each and every PIP.

"**Plans and Specifications**" shall mean, with respect to each Property, those certain plans and specifications for construction of the Improvements which: (i) comply with the requirements of all applicable laws, rules and regulations and with the requirements of the Seller Franchise Agreement, and (ii) will be provided by Seller to Purchaser during the Inspection Period, as such plans and specifications may be modified from time to time subsequent thereto so long as such modified plans and specifications (a) continue to comply with all applicable laws, rules and regulations, (b) continue to comply with the requirements of the Seller Franchise Agreement and (c) are consistent with the plans and specifications delivered by Seller to Purchaser during the Inspection Period in accordance with the provisions of Section 3.1(a), or, if not so consistent, have been expressly approved by Purchaser, with such approval not to be unreasonably withheld, conditioned or delayed.

"**Post-Closing Escrow**" shall mean an escrow in the form of **Schedule T**.

"**Post-Closing Undertaking**" shall have the meaning given such term in Section 11.1(c).

"**Properties**" shall mean, collectively, each and every Property.

"**Property**" shall mean the fee simple interest or leasehold interest, as applicable, in a particular parcel of real estate identified by address on **Schedule B**, and by legal description on **Schedule B-1**, together with (i) the Improvements constructed on, or to be constructed on, such real estate; and (ii) the Assets.

"**Property Casualty**" shall have the meaning given to such term in Section 3.4(b).

"**Property Employees**" shall mean all employees of Seller, Manager or any Affiliate of Seller or Manager employed at a Property.

-8-

Execution Version

**RLJ Austin Courtyard 018320**

"**Proprietary Information**" shall mean the White Lodging owned software program known as "Full Service Daily Sales Program".

"**Purchase Price**" shall mean the sum of Two Hundred Fifty-One Million Six Hundred Thirty-Eight Thousand Eight Hundred Seven Dollars ($251,638,807.00), which amount shall equal the aggregate of the Allocable Prices for all Properties being purchased, subject to all adjustments and apportionments made pursuant to the provisions of this Agreement.

"**Purchaser**" shall mean RLJ Lodging Fund II Acquisitions, LLC and its permitted successors and assigns.

"**Recording Charges**" shall have the meaning given to such term in Section 9.3(a).

"**Safe Deposit Boxes**" shall have the meaning given to such term in Section 9.6.

"**Seller**" shall have the meaning given to such term in the Preamble to this Agreement. As sometimes used herein, Seller shall mean the respective owner of a particular Property.

"**Seller Franchise Agreement**" shall mean the franchise agreement entered into by Seller and the Franchisor for the operation of a Franchised Hotel, a copy of which shall be delivered to Purchaser during the Inspection Period.

"**Sellers**" shall mean, collectively, each and every Seller.

"**Standard Endorsements**" shall have meaning given such term in Section 9.3(e).

"**Supply Inventories**" shall mean, with respect to each Property, all china, glassware, silverware, linens, uniforms, materials and supplies used or intended for use and/or for sale in connection with the operation of the Property, all fuel stored on site, and all inventory, if any, held for sale in the gift shops or other retail outlets located in the Property to the extent the retail outlets are not operated by third-party tenants under lease agreements.

"**Termination Notice**" shall have the meaning given such term in Section 5.

"**Third-Party Costs**" shall have the meaning given such term in Section 9.4(i).

"**Third-Party Purchase Rights**" shall have the meaning given to such term in Section 8.1(j).

"**Title Commitments**" shall have the meaning given such term in Section 3.2.

"**Title Company**" shall mean LandAmerica Financial Group, Inc.

-9-

**RLJ Austin Courtyard 018321**

"Title Condition Endorsements" shall have the meaning given such term in Section 9.3(f).

"Title Conditions" shall have the meaning given such term in Section 3.2(a).

"Title Conditions Notice" shall have the meaning given such term in Section 3.2(b).

"Title Policy" shall have the meaning given such term in Section 3.2(c).

"True-Up" shall have the meaning given such term in Section 9.2.

"Unused Claim Checks" shall have the meaning given such term in Section 9.6.

"WARN Act" shall mean the U. S. Worker Adjustment and Retraining Notification Act.

"White Lodging" shall mean White Lodging Services Corporation.

"Whiteco" shall mean Whiteco Industries, Inc.

## SECTION 2

## PURCHASE-SALE

2.1    Purchase-Sale. Purchaser hereby agrees to purchase from each Seller, and each Seller hereby agrees to sell and convey to Purchaser, for the Allocable Price, the Property owned by such Seller, subject, however, to and in accordance with the terms and conditions of this Agreement. None of the Sellers shall have any obligation to convey, and Purchaser shall have no right to receive, the Excluded Assets.

2.2    Deposit.

(a)    Purchaser has deposited into escrow with the Title Company Two Million Dollars ($2,000,000.00) to be held by the Title Company in an interest bearing account in accordance with the terms of the Existing Hotel Agreement and certain deposit escrow instructions delivered to Title Company by White Lodging and Purchaser. Pursuant to the terms of the Existing Hotel Agreement, unless Purchaser elects to terminate the Existing Hotel Agreement prior to the expiration of the Inspection Period, Purchaser shall increase the Deposit to Ten Million Dollars ($10,000,000.00) prior to the expiration of the inspection period set forth in the Existing Hotel Agreement ("Existing Hotel Agreement Inspection Period"). The Deposit shall be fully refundable to Purchaser if Purchaser elects to terminate both (i) the Existing Hotel Agreement prior to the expiration of the Existing Hotel Agreement Inspection Period, and (ii) this Agreement, as herein provided, for any reason prior to the expiration of the Inspection Period. After expiration of the Existing Hotel Agreement Inspection Period and the

-10-

RLJ Austin Courtyard 018322

Inspection Period, except for provisions of the Existing Hotel Agreement and this Agreement that expressly provide for the return of the Deposit to Purchaser, Purchaser acknowledges and agrees that the Deposit shall be non-refundable.

(b) Sellers and Purchaser further agree that after closing under the Existing Hotel Agreement (i) the Deposit shall continue to serve as the Deposit for this Agreement, (ii) Purchaser may elect to post a Letter of Credit in the amount of the Deposit in substitution for the funds held in escrow by the Title Company. If Purchaser elects to replace the funds in escrow with a Letter of Credit, such Letter of Credit shall be issued for the benefit of Seller by a bank or financial institution having a net worth of not less than $1,000,000,000 and shall be substantially similar to the form of letter of credit attached hereto as Exhibit A to Schedule F ("Letter of Credit"). The Letter of Credit shall be held in escrow by the Title Company in accordance with the terms of the Deposit Escrow Instructions. Should the expiry date of the Letter of Credit not be a date that is at least thirty (30) days after the last projected Closing Date, Purchaser shall provide to the Title Company an amendment to the Letter of Credit extending such expiry date to a date not earlier than thirty (30) days after such Closing Date. If Purchaser fails to timely provide such amendment, or if the Title Company has filed an interpleader action, the Title Company shall present the Letter of Credit for payment and shall hold the proceeds in lieu of the Letter of Credit, but otherwise in accordance with the terms of the Deposit Escrow Instructions, or shall pay the proceeds into a court of competent jurisdiction in conjunction with its interpleader action.

(c) To the extent that the Deposit is in the form of cash, the Deposit shall be applied pro rata at each Closing against that percentage that the Allocable Price bears to the Purchase Price; provided, however, in no event shall the Deposit be reduced to a sum that is less than Two Million Five Hundred Thousand Dollars ($2,500,000.00) prior to the final Closing. At Closing on the last Property to be conveyed hereunder, the balance of the Deposit shall be applied against the Allocable Price payable to the Seller of such Property. If, pursuant to Section 2.2(b), Purchaser elects to convert the cash Deposit to a Letter of Credit, then following each Closing, Purchaser shall be entitled to replace the Letter of Credit with a new Letter of Credit in a lesser amount; provided, however, at no time shall such Letter of Credit be in an amount that is less than the amount of the cash Deposit that Purchaser would otherwise be required to maintain hereunder.

2.3 Allocable Price. At Closing on each Property, the Allocable Price, subject to any adjustments and apportionments made pursuant to the provisions of this Agreement, shall be payable by Purchaser, by wire transfer of immediately available funds, to an account or accounts to be designated by White Lodging prior to Closing.

2.4 Closing.

(a) The purchase and sale of the Properties and other transactions contemplated hereby shall be consummated at a series of closings (each, a "Closing" and collectively, "Closings") in escrow with the Title Company at the offices of Arent Fox PLLC, 1050 Connecticut Avenue, N.W., Washington, DC 20036-5339, or at such other

-11-

RLJ Austin Courtyard 018323

location as White Lodging and Purchaser may agree. Counsel for Sellers and Purchaser shall begin assembling the documents described in Section 4.1 and the materials described in Section 4.4 not less than one week before the scheduled Closing Date (hereinafter defined).

(b)     Except for Closing on the Bloomington Hilton Garden (property number 95), Closing on each Property shall occur on (i) the date that is the first Business Day following the date that is thirteen (13) months after the Opening Date or (ii) such other date as the Seller and Purchaser shall agree, but in no event later than the date specified as the Outside Closing Date for such Property on Schedule E. Closing on the Bloomington Hilton Garden (property number 95) shall occur on (i) January 8, 2009 or (ii) such other date as the Seller and Purchaser shall agree, but in no event later than the date specified as the Outside Closing Date for such Property on Schedule E.

(c)     For purposes of this Agreement, Closing shall be deemed consummated on the date ("Closing Date") that the Title Company receives (i) funds from Purchaser and/or its lender sufficient to close the sale with respect to a Property and (ii) instructions to disburse such funds in accordance with the Settlement Statement. The provisions of the preceding sentence notwithstanding, in the event that the Title Company shall receive such funds or the instructions to disburse such funds after 3 p.m. (Washington, D.C. time), the Closing Date shall be the next Business Day.

(d)     Seller shall provide notice to Purchaser of the anticipated Opening Date for a Hotel not later than thirty (30) days prior to such anticipated Opening Date and shall provide a second notice to Purchaser, which second notice shall advise Purchaser of the actual Opening Date, not later than thirty (30) days following the actual Opening Date. The foregoing provisions of this Section notwithstanding, if Closing on any Property has not occurred because of Seller's failure to Complete the Improvements or otherwise convey the Property in accordance with the terms of this Agreement by the date specified on Schedule E as the Outside Closing Date, Purchaser shall have the right, in its sole discretion, to terminate this Agreement with respect to such Property, whereupon the Purchase Price shall be reduced by the amount of the Allocable Purchase Price for such Property and Purchaser shall have the right to reduce the Deposit as provided in Section 2.2(c).

# SECTION 3

## DILIGENCE; INSPECTIONS; CHANGES TO PLANS

3.1     Inspection Period.

(a)     During the period beginning on the Effective Date and ending on May 8, 2006 ("Inspection Period"), Purchaser shall have access to all documents and other materials relating to the Properties in the possession or control of Sellers or White Lodging. The foregoing provisions of this Section 3.1(a) notwithstanding, Purchaser shall have no right to receive and Sellers and White Lodging shall have no obligation to

-12-

RLJ Austin Courtyard 018324

deliver to Purchaser (i) at any time prior to or after Closing, any material that is Proprietary Information, and/or (ii) prior to Closing, any pricing information contained in the architect agreements and the general contracts for the Properties. For purposes of clarifying the immediately preceding sentence, Sellers or White Lodging shall deliver to Purchaser copies of architects agreements and general contracts for the Properties; provided, however, that such agreements shall have the pricing information redacted. At Closing, Sellers or White Lodging shall assign and deliver to Purchaser, pursuant to the terms of Section 4.2(b), true and complete originals or copies of architects agreements and general contracts for the Properties. Sellers and White Lodging shall also deliver copies thereof, or otherwise on a basis reasonably acceptable to Purchaser, make available to Purchaser the Plans and Specifications with respect to each Property (or with respect to those Properties where the Improvements are Completed, final construction documents which shall include any changes to the Plans and Specifications) and such other documents and other materials (other than the Proprietary Information) as Purchaser may request with respect to each Property within five (5) Business Days following White Lodging's receipt of Purchaser's request for such documents and materials. Subject to the terms hereof, Purchaser and its agents shall also have the right to conduct visual and other inspections of the physical condition of the Properties, at all reasonable times upon reasonable prior written or oral notice to White Lodging, it being recognized that such notice may be given forty-eight (48) hours in advance of such inspections. Prior to such inspections, Purchaser and its representatives shall be covered by a policy of insurance (which may be a master or umbrella policy) insuring Purchaser, Purchaser's agents, White Lodging and Sellers, against any and all liability arising out of Purchaser's or Purchaser's agents' entry upon and inspection of the Property including, without limitation, any loss or damage to the Property, with coverage in the amount of not less than Two Million Dollars ($2,000,000) per occurrence. All policies of insurance shall name White Lodging and Sellers as additional insureds and shall be primary, for occurrences related to entry on the Property by Purchaser and its agents. Upon request of White Lodging, Purchaser shall provide a certificate of such insurance coverage to White Lodging.

(b)    While conducting a physical inspection of a Property, Purchaser and Purchaser's agents shall, at Seller's option, be accompanied at all times by a Seller-designated representative.

(c)    To the extent that, in connection with its investigations, Purchaser or its agents, representatives or contractors, damages or disturbs any Property, Purchaser shall be responsible for returning the same to substantially the same condition that existed immediately prior to such damage or disturbance. To the extent that Seller elects, in its sole discretion, to undertake the restoration of a Property damaged by Purchaser or its agents, Purchaser shall reimburse Seller for the reasonable costs of such restoration provided that Seller has notified Purchaser of the actions proposed to be taken by Seller and the anticipated cost thereof prior to Seller commencing such restoration. The preceding sentence notwithstanding, Seller shall have no obligation to notify Purchaser (and Purchaser shall not be relieved of its obligation to reimburse Seller) prior to undertaking restoration of a Property if Seller determines, in its reasonable judgment, that immediate remediation is or may be required to prevent injury to Persons or the Property.

-13-

RLJ Austin Courtyard 018325

In addition, Purchaser shall indemnify, defend and hold harmless Seller and White Lodging from and against any and all expense, loss or damage (including, without limitation, reasonable attorneys' fees) which Seller (as owner of the Property) or White Lodging (as Manager) may incur as a result of any act or omission of Purchaser or its agents in connection with any such inspections. The foregoing indemnification agreement shall, with respect to each Property, survive the termination of this Agreement or the Closing hereunder, as applicable, for a period of one year.

3.2 <u>Title and Survey Matters</u>. Prior to the date hereof, Purchaser and White Lodging directed the Title Company to prepare and deliver to Purchaser and White Lodging preliminary title commitments for ALTA extended owner's policies or leasehold owner's policies, as applicable, with respect to each Property, together with complete and legible copies of all instruments and documents referred to as exceptions to title (collectively, "Title Commitments"). In addition, Purchaser will arrange for the preparation of as-built surveys with respect to each Property, and has instructed the surveyor preparing each such survey to deliver copies to (i) Ann Bowman, White Lodging's General Counsel, (ii) Anne-Therese Bechamps, at Venable LLP, and (iii) Title Company.

(a) If Purchaser does not notify White Lodging of any title or survey conditions that materially and adversely affect title to any Property, including conditions that render any Property unmarketable or unsuitable for commercial financing, ("Title Conditions") prior to the expiration of the Inspection Period, Purchaser shall be deemed to have approved (i) the Title Commitments, and (ii) title for each Property as set forth in such Title Commitment, subject to the representations, warranties, terms and conditions of this Agreement.

(b) If Purchaser determines that any Property has Title Conditions, Purchaser shall, prior to the expiration of the Inspection Period, provide written notice ("Title Conditions Notice") to White Lodging indicating the nature of the Title Conditions, and the Property or Properties so affected by the Title Conditions. Sellers shall in good faith reasonably cooperate with Purchaser to cause the removal of any Title Conditions; provided, however, if, for any reason, a Seller whose Property is identified in a Title Conditions Notice as having Title Conditions is unable or unwilling to take such actions as may be required to cause such Title Conditions to be removed from the Title Commitments or to pay the costs to have the Title Company insure over such Title Conditions, such Seller shall give Purchaser and White Lodging notice thereof; it being understood and agreed that the failure of such Seller to give such notice within fifteen (15) days after Purchaser's delivery of its Title Conditions Notice shall be deemed an election by such Seller not to remedy such Title Conditions.

(c) If a Seller agrees to cure the Title Conditions or agrees to pay the premiums necessary to cause the Title Company to insure over the Title Conditions in a manner reasonably satisfactory to Purchaser, Seller shall effectuate such cure on or before Closing or pay such premiums at Closing so that Title Company shall be unconditionally prepared to issue an ALTA Policy of Title Insurance in the amount of the Allocable Price insuring Purchaser's title to the Property without exception for such Title

-14-

RLJ Austin Courtyard 018326

Conditions and free and clear of the Liens to be Released and otherwise in conformity with the Title Commitment for the Property ("Title Policy") and Purchaser shall close on the Property without adjustment (for Title Conditions) to the Allocable Price for such Property. If a Seller elects to take no action with respect to such Title Conditions, Purchaser shall have the option to (i) terminate this Agreement with respect to the affected Property, in which event the Purchase Price shall be reduced by the amount of the Allocable Price for such Property and this Agreement shall be of no further force and effect with respect to such Property, or (ii) consummate the transactions contemplated hereby, notwithstanding such Title Condition, without any abatement or reduction in the Purchase Price or the Allocable Price. Purchaser shall make such election by written notice to White Lodging given on or before the expiration of the Inspection Period. A failure by Purchaser to give notice of its election in accordance with clause (i) of this Section shall be deemed an election by Purchaser to proceed to Closing in accordance with clause (ii) of this Section.

(d) The foregoing provisions of this Section 3.2 notwithstanding, Sellers shall cause all mortgages, deeds of trust and other monetary liens encumbering any of the Properties to be released or bonded over (to the reasonable satisfaction of Purchaser) at or prior to Closing ("Liens to be Released"). Sellers' obligation to cause the release of all Liens to be Released shall survive Closing.

(e) Except as approved in writing by Purchaser, in no event shall any Seller create any monetary encumbrance with respect to its Property (except for encumbrances that, together with any existing encumbrances do not aggregate to more than eighty percent (80%) of the Allocable Price for the Property and will be released or bonded over (to the reasonable satisfaction of Purchaser) before Closing), nor shall any Seller burden its Property with any obligation, undertaking or restrictive covenant that will survive Closing.

3.3     Structural and Environmental Reports.

(a) If Purchaser or Purchaser's Consultant has determined that a Property has one or more Physical Conditions, Purchaser shall provide written notice to White Lodging (each such notification being a "Physical Conditions Notice") and, together with the Physical Conditions Notice, deliver to White Lodging a copy of the Inspection Report describing the nature of such Physical Conditions prior to the expiration of the Inspection Period. The Physical Conditions Notice shall describe (i) the Physical Condition (together with the appropriate reference to the Inspection Report), (ii) the Property affected by the Physical Conditions, and (iii) the estimated cost required to correct each such Physical Condition (as reasonably determined by Purchaser's Consultant). If Purchaser fails to provide a Physical Conditions Notice, together with the appropriate Inspection Report, with respect to any Property to White Lodging during the Inspection Period, Purchaser shall be deemed to have approved such Property in its "as is, where is" condition as of the later of: (y) the date hereof, or (z) the date the inspection of the Property has been completed, in each case subject to (1) lien-free completion of the Improvements, (2) ordinary wear and tear, and (3) the representations, warranties, terms

-15-

RLJ Austin Courtyard 018327

and conditions of this Agreement, subject, however, to the obligation of Seller to Complete the Improvements as provided herein.

(b) Upon receipt of a Physical Conditions Notice, together with the appropriate Inspection Report from Purchaser, a Seller shall have the option, to be exercised by written notice to Purchaser ("Physical Conditions Response") given within ten (10) days following receipt by White Lodging of the Physical Conditions Notice, together with the Inspection Report: either (i) to agree to cure the Physical Conditions prior to Closing ("Physical Conditions Cure"), and/or (ii) to give Purchaser a credit ("Physical Conditions Credit") against the Allocable Price at Closing in the amount required to cure the Physical Conditions; provided, however, that Sellers hereunder and the Existing Hotel Agreement Sellers collectively, shall not be required to contribute more than Fifteen Million Dollars ($15,000,000.00) in the aggregate towards Physical Conditions Cures and/or Physical Conditions Credits in connection with Physical Conditions affecting the Properties and/or the Existing Hotel Properties ("Maximum Physical Conditions Obligation"), but shall be required to meet the Maximum Physical Conditions Obligations if the Physical Conditions Notices and accompanying Inspection Reports indicate that at least Fifteen Million Dollars ($15,000,000.00) of Physical Conditions exist on the Properties and/or the Existing Hotel Properties. Once Sellers and the Existing Hotel Agreement Sellers have made Physical Conditions Cures or agreed to provide Physical Conditions Credits of Fifteen Million Dollars ($15,000,000.00) toward the cure of Physical Conditions on the Properties and/or the Existing Hotel Properties. neither Sellers nor the Existing Hotel Agreement Sellers shall have any further obligation or liability for curing any remaining Physical Conditions.

(c) If. pursuant to clause (i) of Section 3.3(b), a Seller elects to make a Physical Conditions Cure, completion of such cure by the Closing Date shall be a condition to Purchaser's obligation to close on such Property; provided, however, that Closing on the other Properties shall not be delayed or otherwise impacted. If a Seller that has elected to make a Physical Conditions Cure fails to complete the cure by the Closing Date, Purchaser shall have the option either to (i) defer the Closing on such Property until such Physical Conditions Cure is completed; or (ii) close on such Property, but Purchaser shall either (x) acquire the Property subject to the Physical Conditions and receive a credit equal to the amount required to complete the Physical Conditions Cure, or (y) require the Seller to enter into a Physical Conditions Cure escrow substantially similar to the form of the agreement attached hereto as Schedule G ("Physical Conditions Escrow") in the amount of 105% of the Physical Conditions Cure cost and have Seller complete such Physical Conditions Cure following Closing. To the extent that Purchaser elects to have a Seller establish a Physical Conditions Escrow, and the Physical Conditions Cure is subsequently completed by such Seller for less than the escrowed amount, any funds remaining in the escrow upon completion of the Physical Conditions Cure shall promptly be returned to Seller. If, pursuant to clause (ii) of Section 3.3(b), a Seller elects to give Purchaser a Physical Conditions Credit. Purchaser shall acquire the Property subject to the Physical Conditions. for the amount that is equal to the Allocable Price less the amount of the Physical Conditions Credit.

-16-

RLJ Austin Courtyard 018328

(d) The provisions of Section 3.3(c) notwithstanding, if, after Sellers have given a Physical Conditions Response in which Sellers agree to either (i) make the Physical Conditions Cure, and/or (ii) to give Purchaser a Physical Conditions Credit in an amount equal to the cost to cure the Physical Conditions, additional Physical Conditions remain uncured with respect to any Property, Purchaser shall have the option (x) to terminate this Agreement with respect to such affected Property or Properties, in which event the Purchase Price shall be reduced by the amount of the Allocable Price for such Property or Properties and this Agreement shall be of no further force and effect with respect to such Property or Properties, or (y) to consummate the transactions contemplated hereby with respect to such affected Property or Properties, notwithstanding such Physical Conditions, without any abatement or reduction in the Purchase Price or the Allocable Price. Purchaser shall make such election by written notice to White Lodging before the expiration of the Inspection Period. A failure by Purchaser to give notice of its election in accordance with clause (x) of this Section shall be deemed an election by Purchaser to proceed to Closing in accordance with clause (y) of this Section.

3.4 Taking and Casualty.

(a) If, prior to the Closing, a Property is the subject of a condemnation, White Lodging shall promptly notify Purchaser of the same. If such condemnation, as reasonably determined by Purchaser, does not materially and adversely affect: (i) access to the Property or the Improvements thereon, (ii) compliance with applicable zoning or building requirements, including parking, (iii) the projected net cash flow from the Property, and (iv) the operation of the Improvements as a Hotel or restaurant, as applicable ("Immaterial Taking"), this Agreement will remain in full force and effect with respect to the sale of such Property; provided, however, that Seller shall be entitled to receive and retain any condemnation award on account of such taking, but the Allocable Price for such Property shall be reduced by the amount of such condemnation award. If such condemnation is not an Immaterial Taking ("Material Taking"), Purchaser shall have the right, upon delivery of written notice to White Lodging within ten (10) days of receipt of White Lodging's notice advising of such condemnation, to terminate this Agreement with respect to the affected Property, in which event the Purchase Price shall be reduced by the amount of the Allocable Price for such Property and this Agreement shall be of no further force and effect with respect to such Property.

(b) If, prior to the Closing, a Property, is damaged or destroyed by fire or other casualty, such that it cannot, in the reasonable opinion of Purchaser, be substantially restored within nine (9) months after the casualty ("Property Casualty"), Purchaser shall have the right to terminate this Agreement with respect to the affected Property, by delivering a termination notice to Seller within thirty (30) days of the Property Casualty, in which event the Purchase Price shall be reduced by the amount of the Allocable Price for such Property and this Agreement shall be of no further force and effect with respect to such Property. If Purchaser does not terminate this Agreement pursuant to the preceding sentence, Seller shall undertake and pursue the restoration of such Property in a commercially reasonable fashion, and Closing on such Property shall

-17-

RLJ Austin Courtyard 018329

be extended for such period of time as may be reasonably necessary or appropriate to permit Seller to complete such restoration. The risk of loss to any Property shall remain with Seller until Closing on such Property.

## SECTION 4

## CLOSING CONDITIONS

The obligation of Purchaser to acquire a Property and Seller to convey the Property is subject to the satisfaction, or waiver, of the following conditions ("Closing Conditions") on and as of the Closing Date:

4.1     Closing Documents.  All documents to be filed or recorded in the land records or official records shall be delivered to the Title Company to be held in escrow during the Closing procedures. All of other documents described below in this Section 4.1 shall be delivered to the Arent Fox closing room to be held in escrow during the Closing procedures. Seller and Purchaser (to the extent Purchaser's signature on such document is required) shall have delivered (or caused to be delivered) the following duly executed documents with respect to each Property:

(a)     Deed (or, with respect to any Property in which a Seller possesses a leasehold interest, an Assignment and Assumption of Lease);

(b)     Bill of Sale;

(c)     Assignment and Assumption of Contracts;

(d)     Assignment of Licenses, Permits and Intangibles;

(e)     Management Agreement duly executed by White Lodging, as manager, and Purchaser;

(f)     Copies of resolutions and certificates of incumbency with respect to Seller, Purchaser and such other Persons as Purchaser, Seller or Title Company may reasonably require;

(g)     Certificates of Seller (for the benefit of Purchaser), Certificate of Purchaser (for the benefit of Sellers) and Certificate of White Lodging (for the benefit of Purchaser) reaffirming the truth and accuracy of their respective representations and warranties made in this Agreement (subject to such changes as Seller has given notice of to Purchaser pursuant to Section 6.21);

(h)     Owner's Affidavit executed by Seller in a form reasonably acceptable to Title Company;

(i)     Physical Conditions Escrow, if applicable;

(j)     Ground Lease Estoppel, if applicable;

-18-

Execution Version

RLJ Austin Courtyard 018330

(k)    General Estoppel, if applicable;

(l)    FIRPTA Affidavit;

(m)    Settlement Statement;

(n)    Post-Closing Undertaking, if applicable;

(o)    Post-Closing Escrow, if applicable;

(p)    Completion Certificate;

(q)    Final and complete construction documents which shall include any changes to the Plans and Specifications; and

(r)    Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

4.2    Allocable Price. (a) Purchaser shall have delivered to Title Company, to hold in escrow pending Closing and thereafter to deliver to Seller, the Allocable Price for the Property.

4.3    Materials. Seller shall have delivered, or made arrangements to deliver, to Purchaser (or at Purchaser's option, to Manager) the following materials with respect to a Property:

(a)    Originals (or if not available, copies) of Licenses and Permits;

(b)    Originals (or if not available, copies) of Contracts;

(c)    Originals (or if not available, copies) of any and all warranties and guarantees issued with respect to the Improvements; and

(d)    All information in Seller or Manager's possession or control and relating to bookings and operations at the Property, except to the extent the same is Proprietary Information.

4.4    Condition of Applicable Property.

(a)    The Improvements shall be fully Completed and the Opening Date of the Hotel shall have occurred not less than thirteen (13) months previously, with the Hotel having been open to the public for business during a preponderance of the period since the Opening Date;

-19-

RLJ Austin Courtyard 018331

630

(b)     Other than an Immaterial Taking, no action shall be pending or threatened for the condemnation or taking by power of eminent domain of all or any material portion of the Property; and

(c)     Other than ordinary wear and tear, the Improvements on the Property shall not have suffered any damage since the Opening Date that have not been repaired to substantially the same or better condition than existed prior to such damage.

4.5     Other.

(a)     The representations and warranties of Seller set forth in Section 6, the representations and warranties of Manager set forth in Section 6A, and the representations and warranties of Purchaser set forth in Section 7 of this Agreement shall be true, correct and complete in all material respects on and as of the Closing Date;

(b)     No Act of Bankruptcy on the part of Seller, Purchaser or Manager shall have occurred and remain outstanding as of the Closing Date;

(c)     Seller shall be the sole owner of the Property or, with respect to a Property in which a Seller possesses a leasehold interest, Seller shall be the tenant under the Lease, and to the extent required by the Lease, Landlord shall have (i) approved Seller's assignment and Purchaser's assumption of the Lease, (ii) delivered a completed Ground Lease Estoppel, and (iii) released Seller and any Persons guaranteeing the obligations of Seller from liabilities under the Lease arising after Closing;

(d)     Franchisor shall have entered into a new Franchise Agreement with Purchaser, or at the option of such Franchisor, Purchaser shall assume the obligations of Seller under the existing franchise agreement after Closing, and Franchisor shall have released Seller and any Persons guaranteeing the obligations of Seller from any liabilities under the existing franchise agreement arising after Closing;

(e)     Purchaser shall have funded any working capital reserve or FF&E reserve to the extent required (i) under the Management Agreement, (ii) under the Franchise Agreement, and (iii) by any Purchaser lender;

(f)     The existing property management agreement for each Property shall have been terminated and all costs and expenses in connection with the property management agreements shall have been paid by Seller;

(g)     Any Landlord, Franchisor, Manager or other party having a right of first refusal or first offer in connection with the proposed transfer of any Property shall have waived in writing the exercise of such right of first refusal or first offer, or the time period for the exercise thereof shall have lapsed;

(h)     Title Company shall be unconditionally (subject only to payment of premiums) and irrevocably prepared to issue a Title Policy with respect to each Property; and

-20-

RLJ Austin Courtyard 018332

(i) Purchaser shall have complied, in all material respects, with its obligations under the Existing Hotel Agreement.

4.6 <u>Failure of Conditions</u>. The failure of any Closing Condition with respect to any Property shall only affect the obligation of Sellers to convey and of Purchaser to acquire that Property, and such failure shall not affect the obligations of the parties hereunder with respect to any other Property. Any contrary provisions of this Agreement notwithstanding, a party hereto shall only have the right to invoke or waive a Closing Condition that is for the benefit of such party.

## SECTION 5

## TERMINATION OF AGREEMENT

5.1 Any contrary provisions of this Agreement notwithstanding, to the extent that more than eight (8) Properties are not able to be conveyed (it being understood that such total shall include any Existing Hotel Properties that are not able to be conveyed) because: (i) Sellers or Existing Hotel Agreement Sellers, as applicable, are unwilling or unable to remove any Title Conditions (but Third-Party Purchase Rights shall not be deemed Title Conditions for the purposes of this Section), and/or (ii) Sellers or Existing Hotel Agreement Sellers, as applicable, are unwilling or unable to remove any Physical Conditions (after having agreed to make the Physical Conditions Cure and/or to provide the Physical Conditions Credit in an amount of not less than the Maximum Physical Conditions Obligation), and/or (iii) the Closing Conditions set forth in Section 4 that are for the benefit of Sellers or Existing Hotel Agreement Sellers, as applicable, are not satisfied, White Lodging shall have the right, in its sole discretion, to deliver to Purchaser within ten (10) days after White Lodging has become aware of the matters set forth in subsection (i), (ii) and/or (iii) above, a notice ("Termination Notice") that Sellers intend to (a) terminate this Agreement only as to the Properties for which the above conditions have not been satisfied, in which event the Purchase Price shall be reduced by an amount that is equal to the Allocable Price for each Property that will not be conveyed, or (b) terminate the Agreement as to all Properties; <u>provided, however</u>, that in either such event, within ten (10) days following receipt of such Termination Notice, Purchaser shall have the right by notice to White Lodging to withdraw a sufficient number of its objections so as to limit such objections to a maximum of eight (8) Properties and Existing Hotel Properties, in which event Sellers' only option shall be to terminate this Agreement only as to the Properties for which Purchaser's objections remain and the above conditions have not been satisfied. Upon such termination, Purchaser shall deliver to White Lodging copies of all third-party reports and studies obtained by Purchaser and relating to the Properties for which a termination has occurred. If Purchaser has not modified its objections and Sellers terminate the Agreement as to all Properties, Sellers shall cause the Deposit to be returned to Purchaser and shall reimburse Purchaser for its reasonable and verifiable out-of-pocket expenses relating to this transaction and paid to third-parties; <u>provided, however</u>, in no event shall Sellers be obligated to reimburse Purchaser for more than a total of One Million Dollars ($1,000,000.00) of verifiable out-

-21-

RLJ Austin Courtyard 018333

of-pocket expenses incurred by Purchaser in connection with the transactions described in this Agreement. Contemporaneously with such payment, Purchaser shall deliver to White Lodging copies of all third-party reports and studies obtained by Purchaser and relating to the Properties.

## SECTION 6

## REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Purchaser to enter into this Agreement, each Seller (but solely for itself and its own Property, and not for any other Seller or any other Property) represents and warrants to Purchaser as follows, subject to the matters set forth on the relevant section of the Disclosure Schedule:

6.1     Status of Seller. Seller is formed or organized (as applicable), and validly existing under the laws of its state of organization, and Seller has all requisite power and authority under the laws of such state and its respective charter documents to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby for such Seller. Seller is duly qualified to transact business in the state in which such Seller's Property is located.

6.2     Authority of Seller. Seller has taken all necessary action to authorize the execution, delivery and performance of this Agreement by it, and upon the execution and delivery of any document to be delivered by Seller hereunder, such document shall constitute the valid and binding obligation and agreement of Seller. The Person or Persons executing and delivering this Agreement or any other document to be delivered by Seller on or prior to the Closing Date is duly authorized to execute and deliver such documents on behalf of Seller.

6.3     Existing Agreements. There are no service contracts, maintenance agreements, leasing commissions or brokerage agreements, repair contracts, property management contracts, contracts for the purchase or delivery of labor, services, materials or goods, supplies or equipment, leases, licenses or occupancy agreements, or similar agreements entered into by or on behalf of Seller with respect to its Property which will be obligations of Purchaser after Closing and which are materially different from the agreements in place with respect to those Existing Hotel Properties of comparable size and room count as the Property.

6.4     Tax Returns. All privilege, gross receipts, excise, sales and use, personal property and franchise taxes resulting from operations prior to Closing have been or will be paid by Seller as and when due, and all tax returns for such taxes shall be prepared and duly and timely filed.

6.5     No Violations of Agreements. Neither the execution, delivery or performance of this Agreement by Seller, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with

-22-

**RLJ Austin Courtyard 018334**

or constitute a default under, any indenture, mortgage, deed of trust, note, evidence of indebtedness or any other agreement or instrument by which Seller is bound.

6.6     Litigation. Seller has received no written notice of, and Seller has no knowledge of, any pending or threatened investigation, action or proceeding, which (i) questions the validity of this Agreement or any action taken or to be taken pursuant hereto, or (ii) may result in or subject the Property to a material liability which is not covered by insurance or will not be paid or satisfied by Closing.

6.7     Condemnation. Seller has received no written notice of, and has no knowledge of, any action that involves condemnation or eminent domain proceedings against any material part of the Property.

6.8     Not A Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445 of the United States Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

6.9     Construction Contracts. At Closing, there will be no outstanding contracts made by Seller for the construction or repair of any Improvements relating to any Property which have not been fully paid (to the extent payments are due) or for which funds have not been reserved (and which will be conveyed to Purchaser at Closing) to make payments as and when invoices are received.

6.10    Hazardous Substances. Seller has received no written notice that the Property is in violation of any Federal, State or local laws governing the storage, release or disposal of any hazardous waste, contaminants, oil, radioactive or other hazardous material on the Property, or any portion thereof; and to Seller's actual knowledge, except as otherwise disclosed in the Disclosure Schedule and in the Environmental Reports obtained by Purchaser), the Property is free from any such hazardous waste, contaminants, oil, radioactive and other hazardous materials, except for amounts of any such materials as are reasonably necessary for the maintenance, repair and operation of the Hotel on the Property and which are stored, maintained and used in accordance with applicable law.

6.11    Intentionally Omitted.

6.12    Intentionally Omitted.

6.13    FF&E. Seller has, or will have, good and marketable title to the FF&E located at the Property as of the Closing Date.

6.14    No Proffers. As of the Closing Date, Seller shall have paid (or the provision for the payment of which has been made by Seller) and/or performed, as applicable, all proffers, development fees, tap fees, connection charges, impact fees, improvements (including off-site improvements) and other requirements imposed by applicable law in connection with the construction and development of such Property.

-23-

RLJ Austin Courtyard 018335

6.15  No Violations. Except as otherwise disclosed in the Disclosure Schedule, Seller has received no written notice or order from any governmental authority (i) alleging the existence of any violation of any law, regulation, order or requirement affecting the Property, or (ii) requiring any repairs, maintenance or improvements to the Property which have not been fully performed. Except as otherwise disclosed in the Disclosure Schedule. Seller has received no written notice from any governmental authority or any Person that the Property is not in compliance with the Americans With Disabilities Act or any state statute analogous thereto.

6.16  Separate Tax Parcel. The Property constitutes a separate parcel for purposes of ad valorem real property taxes, and is not subject to a lien for non-payment of real property taxes relating to any other property.

6.17  Intentionally Omitted.

6.18  Ground Leases. The copy of the Ground Lease delivered by Seller to Purchaser and which is described on the Disclosure Schedule is a full, complete and correct copy of the Ground Lease and all amendments, supplements, modifications and addenda thereto. Seller has not received any written notice of default under the Ground Lease that has not been cured. Seller has not assigned any interest in the Ground Lease to any party, other than to a secured lender on a collateral basis. To Seller's knowledge, the Landlord is not in default under the Ground Lease in any material respects.

6.19  Labor and ERISA. There exist no liens on the Property or any other asset to be transferred to the Purchaser under this Agreement as a result of any liability under Title IV of ERISA. (i) There are no employees of Seller at the Property and (ii) none of Seller, Manager or any ERISA Affiliate (a) is subject to a collective bargaining agreement with respect to any of the Property Employees, or (b) either currently or within the past five (5) years has sponsored, contributed to or had an obligation to contribute to any multiemployer plan as defined in Section 3(37) of ERISA or a defined benefit pension plan (as defined in Section 3(35) of ERISA). No portion of any Property constitutes a "plan asset," as defined in Labor Reg. Section 2510.3-101.

6.20  No Commitments. To Seller's knowledge, no material commitments have been made by Seller or Manager to any Governmental Authority, utility company, school board, church or other religious body, or any homeowners' association or any other organization, group or individual relating to its Property which would impose any obligation upon Purchaser or Manager to make any contribution or dedication of money or land or to construct, install or maintain any improvements of a public or private nature on or off such Property.

6.21  Restatement of Seller Representations and Warranties. The representations and warranties made in this Agreement by each Seller are made as of the date hereof and shall be deemed remade by such Seller as of the Closing Date, with the same force and effect as if made on, and as of, such date; provided, however, that a Seller shall have the right, from time to time prior to the Closing Date, to modify the

-24-

RLJ Austin Courtyard 018336

representations and warranties made in Section 6.3 (Existing Agreements), Section 6.5 (No Violations of Agreements), Section 6.6 (Litigation), Section 6.7 (Condemnation), Section 6.10 (Hazardous Substances), Section 6.9 (Contracts), Section 6.15 (No Violations), Section 6.18 (Ground Leases), Section 6.19 (ii)(a) (Labor and ERISA), Section 6.20 (No Commitments) as a result of changes in applicable conditions or if consistent with Seller's covenants herein, by delivery of notice to Purchaser and, in such event, the representations and warranties shall be deemed modified to the extent required by such changes; provided, however, that any such change, if material and adverse, shall give Purchaser the right to terminate this Agreement with respect to the Property in question, without giving Sellers a right to terminate this Agreement with respect to any or all Properties.

6.22    Survival of Seller Representations.  All representations and warranties made in this Agreement by Seller shall survive the applicable Closing Date for a period of one (1) year.  Any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representation or warranty shall be commenced, if at all, on or before the date which is one (1) year after the applicable Closing Date and, if not commenced on or before such date, thereafter shall be void and of no force or effect.

6.23    Liability for Breach of Seller Representations.  Purchaser shall give written notice to a Seller that such Seller has breached any representation or warranty made in this Section 6.  If, as a consequence of such breach, Purchaser shall have suffered a loss or incurred damages, then such Seller shall be liable to Purchaser for payment of damages.  The preceding sentence notwithstanding, in no event shall the liability of any Seller with respect to breaches of any representations or warranties made in this Section 6 exceed, in the aggregate, the sum of five percent (5%) of the Allocable Price for such Property.

6.24    Disclaimer of Express or Implied Representations.  Except as otherwise expressly provided in this Agreement, each Seller disclaims the making of any representations or warranties, express or implied, regarding the Property or matters affecting the Property, whether made by Seller or White Lodging on Seller's behalf.

6.25    Seller's Knowledge.  As used in this Agreement, the phrase "to Seller's knowledge," or words of similar import shall mean the actual (and not constructive or imputed) knowledge of (i) Deno Yiankes, with respect to all of the Properties; and (ii) Mike Wernet, with respect to all of the Properties, and (iii) the manager, managing member or general partner, as applicable, of each Seller with respect to the Property owned by such Seller, none of whom shall have any duty of investigation or inquiry other than to review and comment in good faith on the representations and warranties contained herein.

## SECTION 6A

## REPRESENTATIONS AND WARRANTIES OF WHITE LODGING

-25-

Execution Version

RLJ Austin Courtyard 018337

To induce Purchaser to enter into this Agreement, White Lodging represents and warrants to Purchaser as follows:

6A.1 Status of White Lodging. White Lodging is duly incorporated and validly existing under the laws of its state of incorporation, and has all requisite power and authority under the laws of such state and its respective charter documents to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. White Lodging is duly qualified to transact business in those states where, based upon the nature of White Lodging's business, it is required to be so qualified.

6A.2 Authority of White Lodging. White Lodging has taken all necessary action to authorize the execution, delivery and performance of this Agreement by it, and upon the execution and delivery of any document to be delivered by White Lodging hereunder, such document shall constitute the valid and binding obligation and agreement of White Lodging. The Person or Persons executing and delivering this Agreement or any other document to be delivered by White Lodging on or prior to the Closing Date is duly authorized to execute and deliver such documents on behalf of White Lodging.

6A.3 No Violations of Agreements. Neither the execution, delivery nor performance of this Agreement by White Lodging, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under any agreement or instrument by which White Lodging is bound.

6A.4 Litigation. White Lodging has received no written notice of, and to White Lodging's knowledge there is no pending or threatened investigation, action or proceeding, which questions the validity of this Agreement or any action taken or to be taken by White Lodging pursuant hereto.

6A.5 Disclaimer of Express or Implied Representations. Except as otherwise expressly provided in this Agreement, White Lodging disclaims the making of any representations or warranties, express or implied.

6A.6 Survival of White Lodging's Representations. All representations and warranties made in this Agreement by White Lodging shall survive the Closing Date with respect to each Property for a period of one (1) year. Any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representation or warranty shall be commenced, if at all, on or before the date which is one (1) year after the Closing Date for a given Property and, if not commenced on or before such date, thereafter shall be void and of no force or effect.

6A.7 Liability for Breach of White Lodging's Representations. Purchaser shall give written notice to White Lodging that White Lodging has breached any representation or warranty made in this Section 6A. If, as a consequence of such breach, Purchaser shall have suffered a loss or incurred damages, then White Lodging shall be liable to Purchaser for payment of damages. The preceding sentence notwithstanding, in no event shall the

-26-

RLJ Austin Courtyard 018338

637

liability of White Lodging with respect to breaches of any representations or warranties made in this Section 6A exceed, in the aggregate, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00), provided, however, that such limitation shall not apply to White Lodging's liability pursuant to the provisions of Section 11.1(c).

6A.8   White Lodging's Knowledge. As used in this Agreement, the phrase "to White Lodging's knowledge," or words of similar import shall mean the actual (and not constructive or imputed) knowledge of Bruce White, as Chairman of White Lodging, Deno Yiankes, as President and COO Development and Asset Management Division of White Lodging, and Larry Burnell, as Chief Operating Officer of White Lodging, none of whom shall have any duty of investigation or inquiry other than to review and comment in good faith on the representations and warranties contained herein.

## SECTION 7

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

To induce Sellers to enter into this Agreement, Purchaser represents and warrants to Sellers as follows:

7.1   Status and Authority of Purchaser. Purchaser is duly organized and validly existing under the laws of the jurisdiction in which it was formed, and has all requisite power and authority under the laws of such state and under its charter documents to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. To the extent required by applicable state law, Purchaser is, or will be by the Closing Date, duly qualified and in good standing in each of the states in which the Properties are located.

7.2   Action of Purchaser. Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by Purchaser on or prior to the Closing Date, such document shall constitute the valid and binding obligation and agreement of Purchaser. The Person or Persons executing and delivering this Agreement or any other document to be delivered by Purchaser on or prior to the Closing Date is duly authorized to execute and deliver such documents on behalf of Purchaser.

7.3   No Violations of Agreements. The execution, delivery and performance of this Agreement by Purchaser, and the compliance with the terms and provisions hereof, will not result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under any agreement or instrument by which Purchaser is bound.

7.4   Litigation. Purchaser has received no written notice of and, to Purchaser's knowledge, no investigation, action or proceeding is pending or threatened, which questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

-27-

RLJ Austin Courtyard 018339

7.5     No Reliance. SUBJECT ONLY TO THE EXPRESS COVENANTS, REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN MADE BY EACH SELLER AND WHITE LODGING FOR THE BENEFIT OF PURCHASER: IN ENTERING INTO THIS AGREEMENT, PURCHASER HAS NOT RELIED ON ANY REPRESENTATION, WARRANTY, PROMISE OR STATEMENT, EXPRESS OR IMPLIED, OF SELLERS OR ANYONE (INCLUDING WHITE LODGING) ACTING FOR OR ON BEHALF OF SELLERS; AND THAT, AS A MATERIAL INDUCEMENT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY SELLERS, PURCHASER ACKNOWLEDGES THAT THE PROPERTIES WILL BE ACQUIRED BY PURCHASER IN THEIR "AS IS" CONDITION, WITH ALL FAULTS.

7.6     Purchaser's Independent Investigations. Pursuant to the terms of this Agreement, Sellers have agreed to give Purchaser the opportunity to investigate all physical aspects of the Properties, and to make all such independent inspections and/or investigations of each Property, as Purchaser deems necessary or desirable. Purchaser acknowledges that it has entered into this Agreement with the intention of making and relying upon its own investigation or that of third parties with respect to the physical, environmental, economic and legal condition of each Property.

7.7     Restatement of Purchaser Representations and Warranties. The representations and warranties made in this Agreement by Purchaser are made as of the date hereof and shall be deemed remade by Purchaser as of the Closing Date with the same force and effect as if made on, and as of, such date.

7.8     Survival of Purchaser Representations. All representations and warranties made in this Agreement by Purchaser shall survive the applicable Closing Date for a period of one (1) year. Any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representation or warranty shall be commenced, if at all, on or before the date which is one (1) year after the Closing Date for a given Property and, if not so commenced on or before such date, thereafter shall be void and of no force or effect.

7.9     Liability for Breach of Purchaser Representations. White Lodging shall give written notice to Purchaser that Purchaser has breached any representation or warranty made in this Section 7. If, as a consequence of such breach, any Seller shall have suffered a loss or incurred damages, then Purchaser shall be liable to such Seller for payment of damages. The preceding sentence notwithstanding, in no event shall the liability of Purchaser with respect to breaches of any representations or warranties made in this Section 7 exceed, in the aggregate, the sum of five percent (5%) of the Allocable Price payable to such Seller for the Property with respect to which such loss or damage was incurred.

7.10     Purchaser's Knowledge. As used in this Agreement, the phrase "to Purchaser's knowledge" or words of similar import shall mean the actual (and not constructive or imputed) knowledge, without independent investigation or inquiry, of

-28-

Execution Version

RLJ Austin Courtyard 018340

Thomas J. Baltimore, Jr., as President of Purchaser, and Ross Bierkan, as Executive Vice President of Purchaser.

7.11  Seller Representations Deemed Waived. To the extent that Purchaser has knowledge, or is deemed to have knowledge, prior to Closing, that any of Seller's representations or warranties are inaccurate, untrue, or incorrect and Purchaser proceeds to close hereunder, such misrepresentation or breach of warranty shall be deemed waived by Purchaser. For purposes of this Agreement, Purchaser shall be "deemed to have knowledge" that a representation or warranty is untrue, inaccurate, or incorrect to the extent that any written studies, tests, investigations, reports, or analyses delivered to Purchaser or otherwise received by Purchaser contain information that is inconsistent with any representation or warranty made by Seller.

## SECTION 8

## COVENANTS OF SELLERS, PURCHASER AND WHITE LODGING

8.1  Seller Covenants. Each Seller (but solely for itself and its own Property, and not for any other Seller or any other Property) hereby covenants and agrees as follows:

(a)  Compliance with Laws. From the Effective Date and until the Closing Date, Seller shall use commercially reasonable efforts to comply in all material respects with (i) all laws, regulations and other requirements affecting Seller's Property or the use or occupancy of any Improvements located thereon; and (ii) all terms, covenants and conditions or instruments of record affecting such Property.

(b)  Maintenance and Operation of Hotel. From the Opening Date and until the Closing Date, Seller and White Lodging (as Manager of the Property) shall use commercially reasonable efforts to maintain and operate the Property in a manner consistent, in all material respects, with the standards and practices (i) by which White Lodging operates the Existing Hotel Properties; and (ii) required by the applicable Seller Franchise Agreement. Such maintenance and operation shall include, but not be limited to, hiring and firing employees in the ordinary course, stocking the Property with such inventory as is consistent with the requirements of the first sentence of this subsection, booking rooms in the ordinary course and not modifying any contractual obligations or rights of Seller other than in the ordinary course.

(c)  Employees. Seller shall pay all wages and salaries and all vacation pay, pension and welfare benefits and other fringe benefits accrued with respect to all individuals employed at the Property relating to the period prior to the Closing Date. At no time shall any of the employees at the Property, including employees of any manager thereof, be or be deemed to be the employees of Purchaser. If required, Seller will comply with the notice and other requirements under the WARN Act, COBRA or any similar state or local legislation with respect to such employee matters.

-29-

**RLJ Austin Courtyard 018341**

(d)  Mechanics' Liens. Seller shall discharge and release of record all mechanics' or materialmen's liens, if any, arising from any labor or materials furnished to its Property prior to Closing to the extent any such lien is not insured over by the Title Company or bonded over pursuant to applicable law. If, after Closing, a mechanics' or materialmen's lien is filed in connection with any labor or materials furnished to such Property prior to Closing, Seller shall discharge and have released of record or bonded such lien within thirty (30) days from the date Seller receives notice that the lien was filed.

(e)  Discharge of Loans. Seller agrees to cause to be discharged all loans affecting the Property.

(f)  Ground Lease Estoppels. Seller shall use all commercially reasonable efforts to obtain a Ground Lease Estoppel from each Landlord. To the extent that Seller is unable to obtain such Ground Lease Estoppel from the Landlord, such Seller shall execute and deliver such Ground Lease Estoppel.

(g)  Other Estoppels. Seller shall use all commercially reasonable efforts to obtain estoppel certificates in form and substance reasonably satisfactory to Purchaser from each tenant occupying at least one thousand (1000) square feet of space at a Property (exclusive of any Hotel guests who are deemed to be tenants under the laws of any jurisdiction in which any of the Properties is located) and from any association or other group that may levy assessments or other charges against the Property ("General Estoppels"). To the extent that Seller is unable to obtain any General Estoppel from any such tenant, such Seller shall execute and deliver such General Estoppel. Further, Seller shall use commercially reasonable efforts to provide a Subordination and Non-Disturbance Agreement substantially in the form attached as Schedule R hereto (subject to such reasonable variations as may be requested by Purchaser's lenders and tenants) from any tenant occupying at least one thousand (1000) square feet of space at a Property (exclusive of any Hotel guests who are deemed to be tenants under the laws of any jurisdiction in which any Property is located).

(h)  Completion of PIPs. Seller covenants to perform all PIP work as part of its Completion of the Improvements, in a first-class manner, and in conformity with the requirements of the applicable Franchisor and the applicable Franchise Agreement. All costs and expenses related to the PIP shall be Seller's sole responsibility.

(i)  Rights of First Offer. Certain Properties are subject to rights of first offer or similar purchase rights in favor of a Franchisor or Landlord (the "Third-Party Purchase Rights"). Seller shall use all commercially reasonable and diligent efforts to cause the holder of any such Third-Party Purchase Rights to waive and relinquish such Third-Party Purchase Rights and Seller shall keep Purchaser informed of its progress in obtaining such waivers and relinquishments and shall deliver to Purchaser copies of all relevant notices and responses promptly upon receipt including, without limitation, any notices or communications waiving any Third-Party Purchase Rights. If any third-party has exercised a Third-Party Purchase Right with respect to any Property,

-30-

RLJ Austin Courtyard 018342

BegDoc#:        RLJ Austin Courtyard 018343

EndDoc#:        RLJ Austin Courtyard 018376

Filename:       Courtyard Austin Airport 8.12.08 (PSA part2).pdf

at Purchaser's option, either (i) such Property shall be immediately withdrawn from this Agreement and the Purchase Price shall be reduced by the Allocable Price for such Property, or (ii) such Property shall be immediately withdrawn from this Agreement, provided, however, that in the event the third-party fails to close on its exercise of the Third-Party Purchase Right with respect to such Property, Purchaser shall have a right to purchase such Property in accordance with the terms and schedule for Closing set forth in this Agreement.

(j)    New Contracts and Agreements. From the Effective Date and until the Closing Date, without Purchaser's prior consent, Seller shall not enter into any new contracts or agreements relating to maintenance, repair or operation of its Property which will become an obligation of Purchaser after Closing and (x) are materially different from the contracts and agreements in place with respect to those Existing Hotel Properties of comparable size and room count as the Property or (y) are with any affiliates of Seller or Manager. To the extent that Purchaser's consent is requested by Seller to enable Seller to enter into a contract or agreement, Purchaser agrees that it will not unreasonably withhold, delay or condition its consent.

(k)    Insurance. Seller shall procure and maintain insurance coverage of the types and in the amounts required by its lenders, the management agreement and the franchise agreement and as is usual and customary for similar projects being developed and constructed by Seller or any Affiliate of Seller and shall add Purchaser as an additional insured on the insurance policies providing liability coverage.

(l)    Construction and Furnishing of the Hotel. Seller shall (i) develop and construct the Improvements on the Property (aa) in a good, workmanlike, diligent and efficient manner, (bb) in accordance with the development practices customarily employed by White Lodging for comparable projects, (cc) in the manner required by, and in compliance in all material respects with, the Plans and Specifications, (dd) on a timely basis, and (ee) in compliance with all applicable laws, rules and regulations; and (ii) cause the Hotel to be fully equipped with furniture, fixtures, equipment and supplies necessary for the operation of the Hotel in a manner consistent, in all material respects, with the requirements set forth in the Seller Franchise Agreement.

(m)    Post-Closing Cooperation. Seller and White Lodging shall, and shall cause any of their respective Affiliates to, cooperate with Purchaser in the enforcement of any rights under any architectural, construction or other similar contracts respecting the design, development and construction of the Hotel including, but not limited to, the enforcement, if applicable, of any post-construction obligations and warranties.

(n)    Sale of Interests in Bloomington Hilton Garden. The managing members of Bloomhotel, LLC, the leasehold owner of the real property on which the Bloomington Hilton Garden in Bloomington, Indiana (property number 95) will be constructed, shall either (i) acquire the ownership interests of the investor member in

-31-

RLJ Austin Courtyard 018343

Bloomhotel, LLC; or (ii) obtain the consent of the investor member to assign the Lease and convey the Improvements and other interests of Bloomhotel, LLC to Purchaser.

8.2     Purchaser Covenants.  Purchaser hereby covenants and agrees as follows:

(a)     Franchise Agreements.  Purchaser agrees to enter into new Franchise Agreements with the Franchisor of each Hotel, or at the option of Franchisors, to assume the existing franchise agreements, but only from and after the Closing.

(b)     Management Agreements.  Purchaser agrees to enter into Management Agreements with White Lodging for the operation of the Hotel on each Property.

(c)     Ground Leases.  Purchaser agrees to assume the obligations of Seller, as tenant, under the Leases, but only those accruing from and after the Closing.

(d)     Assumption of Certain Contracts.  Purchaser agrees to assume the obligations of Sellers accruing from and after Closing under and with respect to those Contracts disclosed on the Disclosure Statement being assigned and assumed.

8.3     Cooperation.  Sellers and Purchaser shall each use commercially reasonable efforts to satisfy the conditions set forth in Section 4.  Sellers agree that securing the releases described in Sections 4.5(c) and (d) shall be the responsibility of Sellers; provided, however, if receipt of replacement guarantees is a condition to the release of Seller guarantees (or guarantees of Persons affiliated with Sellers), Purchaser agrees to cooperate with Sellers, Franchisors and Landlords to replace Seller guarantees with guarantees executed by Purchaser and/or its Affiliates.  Additionally, Sellers and Purchaser shall use commercially reasonable efforts and cooperate with each other to obtain any consents or approvals that may be necessary or desirable in order to consummate the purchase of the Properties; provided, however, that, except as otherwise provided herein, Sellers shall pay to secure the approvals or consents that Sellers require and Purchaser shall pay to secure the approvals or consents that Purchaser requires.

8.4     Liquor Permits.  To the extent that a license or permit required for service of alcoholic beverages at a Property (individually, a "Liquor Permit" and collectively, "Liquor Permits") is issued to a Seller, such Seller shall, to the extent permitted by applicable laws, rules or regulations, transfer such Liquor Permit to Purchaser or Manager at Closing.  If a Liquor Permit cannot be transferred to Purchaser or Manager by Seller or otherwise obtained by Purchaser prior to the scheduled Closing, to the extent permitted by applicable law, a Seller shall cooperate with Purchaser by entering, or causing its Affiliate holding the current liquor permit for the Hotel to enter into, an interim alcoholic beverage management agreement with respect to the sale of alcoholic beverages at the Hotel in a form substantially similar to the agreement attached hereto as Schedule F.  Seller shall also assist and cooperate with Purchaser if Purchaser elects to apply for an interim/temporary liquor license so that alcoholic beverages may continue to be served at the Hotel pending issuance of the permanent Liquor Permits.  To the extent

-32-

RLJ Austin Courtyard 018344

that a Liquor Permit is issued to Manager, Manager shall, to the extent permitted by applicable laws, rules or regulations, continue to hold such Liquor Permit after Closing. To the extent that a Seller and/or Manager is not able to transfer a Liquor Permit to Purchaser at Closing, Seller and/or Manager agree to cooperate with Purchaser to facilitate the issuance or transfer of the Liquor Permits. The foregoing provisions of this Section 8.4 notwithstanding, (i) all costs incurred by White Lodging and/or Sellers in connection with obtaining or transferring Liquor Permits for the Properties shall be borne by Purchaser, and (ii) neither Seller nor White Lodging shall have any obligation to transfer an existing liquor permit to Purchaser prior to Closing, and (iii) Purchaser shall not obtain, and Sellers and White Lodging shall have no obligation to pursue, any Liquor Permit for any Property prior to Closing if the issuance of such Liquor Permit would impact the rights of Sellers or White Lodging under any existing liquor permit, and (iv) if this Agreement is terminated in its entirety or with respect to any Property, Purchaser agrees to promptly withdraw any pending application for a Liquor Permit for such Property.

## SECTION 9

## APPORTIONMENTS

9.1    Adjustments and Prorations. The following matters and items pertaining to each Property shall be apportioned between Seller and Purchaser or, where applicable, credited in total to a particular party, as of 12:01 a.m. on the Closing Date ("Apportionment Time"). Net credits in favor of Purchaser shall be deducted from the Allocable Price at Closing and net credits in favor of Seller shall be paid by Purchaser, in addition to the Allocable Price, in cash at Closing. Unless otherwise indicated below, Purchaser shall receive a credit against the Allocable Price for any of the following items to the extent the same are accrued but unpaid as of the Apportionment Time (whether or not due, owing or delinquent as of the Apportionment Time), and Seller shall receive a credit (and thereby be entitled to a payment from Purchaser) with respect to any of the following items which shall have been paid prior to the Closing Date to the extent the payment thereof relates to any period of time after the Apportionment Time:

(a)    Guest Ledger. Guest ledger receivables (i.e., amounts including, without limitation, room charges, and charges for food and beverages, accrued to the accounts of guests and other customers of the Property as of the Apportionment Time) shall be prorated between Purchaser and Seller. Seller shall receive a credit for all guest ledger receivables, net of credit card commissions, for all room nights and other charges up to but not including the room night during which the Apportionment Time occurs. Purchaser shall be entitled to the amounts of guest ledger receivables for the room nights and other charges after the Apportionment Time. Seller and Purchaser shall each receive a credit equal to one-half of the amount of the room revenue included on the guest ledger for the night during which the Apportionment Time occurs. All revenues from restaurants, bars and lounge facilities for the night during which the Apportionment Time occurs shall belong to Seller and Seller shall bear all expenses related to such revenues including, but not limited to, payroll and food and beverage costs.

-33-

Execution Version

**RLJ Austin Courtyard 018345**

(b)  **Taxes and Assessments.** Seller shall be solely responsible for any taxes due in respect of its income, net worth or capital, if any, and any privilege, sales, hotel or resort occupancy tax or transient occupancy tax, due or owing to any governmental entity in connection with the operation of the Property for any period of time prior to the Apportionment Time. Purchaser shall be solely responsible for all such taxes for any period from and after the Apportionment Time. Any income tax arising as a result of the sale and transfer of the Property by Seller to Purchaser shall be the sole responsibility of Seller. All ad valorem taxes, special or general assessments, real property taxes, water and sewer rents, rates and charges, vault charges, and any municipal permit fees shall be prorated as of the Apportionment Time between Purchaser and Seller.

(c)  **Utilities; Telephone.** Telephone and telex charges and charges for the supply of heat, steam, electric power, gas, lighting, cable television and any other utility service shall be prorated as of the Apportionment Time between Purchaser and Seller. Seller shall receive a credit for all deposits, if any, made by Seller as security under any utility service contracts if the same are transferable and provided such deposits remain on deposit for the benefit of Purchaser. If possible, cutoff readings will be secured for all utilities as of the Apportionment Time. To the extent cutoff readings are not available as of the Apportionment Time, the cost of such utilities shall be apportioned between the parties on the basis of the latest actual (not estimated) bill for such service.

(d)  **Contracts and Leases; Trade Payables and Receivables; Security Deposits.** Any amounts prepaid or payable under any Contracts and any other trade payables and receivables shall be prorated as of the Apportionment Time between Purchaser and Seller. All amounts known to be due under Contracts with reference to periods prior to the Closing Date shall be paid by Seller or credited to Purchaser. Any additional amounts not known or not available at Closing will be part of the post closing adjustments contemplated in Section 9.2. Purchaser shall be entitled to a credit for all security and other deposits, if any, held by Seller as of the Apportionment Time with respect to Contracts, to the extent Purchaser assumes such Contracts.

(e)  **Permits.** Fees paid for licenses, permits and other authorizations necessary for the use, occupancy and operation of the Property in the current period shall be prorated as of the Apportionment Time between Purchaser and Seller provided that such licenses, permits and other authorizations are transferred to Purchaser.

(f)  **Bookings.** Purchaser shall receive a credit for advance payments and deposits, if any, under any bookings that relate to a period after the Apportionment Time.

(g)  **Gift Certificates.** Purchaser shall receive a credit for the value of all gift certificates issued by Seller or Manager that have not been redeemed as of the Apportionment Time, net of the historic forfeiture rate applicable at the Property.

-34-

RLJ Austin Courtyard 018346

(h)     Vending Machines; ATMs. To the extent that funds in vending machines and ATMs are the property of Seller, such funds shall be removed by Seller as of the Apportionment Time. Purchaser shall not receive a credit for such monies.

(i)     Cash Accounts. All funds held in any accounts maintained by or for the benefit of Seller at the Apportionment Time will be retained by Seller. Purchaser shall not receive a credit for such funds.

(j)     House Banks. Notwithstanding the provisions of Section 9.1(i), Seller shall receive a credit for the cash held in the Hotel house banks and any petty cash at the Hotel, and the cash in such accounts shall become the property of Purchaser at Closing.

(k)     Prepaid Expenses; Deposits. Seller shall receive a credit for prepaid expenses directly or indirectly allocable to any period from and after the Closing Date including, without limitation, prepaid rents under any equipment lease, annual permit and inspection fees, fees for licenses, trade association dues and trade subscriptions, and all security or other deposits paid by or on behalf of Seller to third parties to the extent the same are transferable and remain on deposit for the benefit of Purchaser. With the exception of prepaid advertising, which has not been published, mailed or aired, Seller will receive no credit for prepaid advertising costs.

(l)     Insurance. Seller shall be paid any refunds for any prepaid premiums for existing insurance policies due to Seller upon receipt of the same by Seller or Purchaser. Purchaser shall not receive a credit for any prepaid premiums.

(m)     Inventories. No adjustment shall be made for any Consumable Inventories, all of which shall be included in the Allocable Price. The preceding sentence notwithstanding, merchandise, food and beverages that are owned by third-party tenants do not convey.

(n)     Employees. Employee Liabilities shall be prorated as of the Apportionment Date. Seller will have liability with respect to any employees or others working at a Property to the extent any liability or obligation accrued in any period before the Apportionment Date. Purchaser will be responsible for all Employee Liabilities accruing from and after the Apportionment Date; provided, however, all such amounts which are payable after the Apportionment Date but arose, accrued, or are attributable to any period prior to the Apportionment Date will be allocated to Seller and credited to Purchaser at Closing. For purposes of this Section, "Employee Liabilities" shall mean all employees' wages, accrued vacation, pay, sick leave, bonuses, pension benefits including, without limitation, any COBRA rights, and other benefits earned and accrued by employees at a Property together with F.I.C.A., unemployment and other taxes and benefits due from an employer of such employee.

(o)     Other Items. Except as otherwise provided for herein, such other items as are normally prorated and adjusted in the sale of real property or of a hotel shall

-35-

RLJ Austin Courtyard 018347

be prorated as of the Apportionment Time in accordance with local custom in the jurisdiction in which the Property is located.

9.2     Closing Statement: True-Up. Sellers and Purchaser shall jointly prepare a proposed closing statement containing the parties' reasonable estimate of the items requiring prorations and adjustments in this Agreement. Subsequent final adjustments and payments ("True-Up") shall be made in cash or other immediately available funds as soon as practicable after the Closing Date. In the event that a Seller and Purchaser have not agreed on the adjustments described in Section 9.1, upon application by either party, a certified public accountant reasonably acceptable to both parties shall determine any such adjustments. The charges of such accountant shall be borne equally by the parties to such disputed adjustment. All adjustments to be made as a result of the final results of the True-Up shall be paid to the party entitled to such adjustment within ninety (90) days after the final determination thereof.

9.3     Sellers Closing Costs. The following costs and charges shall be paid by Sellers:

(a)     fifty percent (50%) of all transfer, sales, use, recordation or other similar taxes, impositions or expenses ("Recording Charges") incurred in connection with the recordation or filing of the instruments required at Closing on any Property, including the transfer of the Assets;

(b)     fifty percent (50%) of all bulk sales taxes and other personal property taxes, if any;

(c)     fifty percent (50%) of the costs of undertaking the title searches and preparing the Title Commitments;

(d)     fifty percent (50%) of the costs of any title premiums charged by the Title Company in connection with the issuance of Title Policies, as well as the costs to obtain the following endorsements to the Title Policies, where applicable and available: (1) comprehensive endorsement, (2) zoning endorsement (ALTA 3.1), (3) survey/legal description endorsement, (4) access to public road endorsement, (5) contiguity endorsement, (6) blanket/non-locatable easements, (7) encroachments onto easements, and (8) separate tax lot endorsement ("Standard Endorsements");

(e)     the cost of any endorsements, other than the Standard Endorsements, issued to remedy Title Conditions ("Title Condition Endorsements");

(f)     fifty percent (50%) of any fees payable to the Title Company in connection with its services as escrow agent;

(g)     any commission due to HWE; and

-36-

Execution Version

RLJ Austin Courtyard 018348

(h)    all fees charged by Sellers' legal counsel and their other consultants in connection with the preparation and negotiation of this Agreement, and all other documents and instruments in connection herewith.

9.4    Purchaser's Closing Costs. The following costs and charges shall be paid by Purchaser:

(a)    the Allocable Price;

(b)    any amounts due in connection with the issuance of new Franchise Agreements (but excluding any amounts required to fund any PIPs, which shall be the sole responsibility of Seller as part of Seller's Hotel construction obligation);

(c)    any amounts to be paid in connection with new Management Agreements, including any reserves and/or working capital required by the terms of the Management Agreements;

(d)    fifty percent (50%) of the costs of undertaking the title searches and preparing the Title Commitments;

(e)    fifty percent (50%) of the costs of any title premiums charged by the Title Company in connection with the issuance of Title Policies and the Standard Endorsements;

(f)    the cost of any endorsements, other than Standard Endorsements and Title Condition Endorsements, that Purchaser and/or its lenders shall request;

(g)    all title re-insurance costs;

(h)    fifty percent (50%) of any fees payable to the Title Company in connection with its services as escrow agent;

(i)    all costs incurred in performing due diligence and securing financing to complete the transaction ("Third-Party Costs") including, without limitation: (i) environmental reports for any Property; (ii) surveys of any Property; (iii) appraisals; (iv) fees and costs paid to any lender in connection with obtaining financing for any Property;

(j)    all fees charged by Purchaser's legal counsel and its other consultants in connection with the preparation and negotiation of this Agreement and all other documents and instruments in connection herewith;

(k)    fifty percent (50%) of all Recording Charges incurred in connection with the recordation or filing of the instruments required at Closing on any Property, including the transfer of the Assets; and

-37-

RLJ Austin Courtyard 018349

(l)  fifty percent (50%) of all bulk sales taxes and other personal property taxes, if any.

9.5  Cancellation Fee. The obligation of Sellers and Purchaser to pay any cancellation fee charged by Title Company shall not be conditioned upon a closing of the transactions described in this Agreement. The parties hereto agree that if this Agreement shall be terminated for any reason whatsoever Sellers and Purchaser shall each pay fifty percent (50%) of any cancellation fee charged by Title Company.

9.6  Baggage; Safe Deposit Boxes. On the Closing Date, representatives of Seller and Purchaser shall take an inventory of, and seal, (i) all safe deposit boxes (other than personal safes located in guest rooms for use by Hotel guests) in the Property ("Safe Deposit Boxes"); (ii) all luggage, valises, trunks, parcels, laundry, valet packages and other property of guests checked or left in the care of the Hotel by guests or retained by Seller as security for any unpaid accounts receivable, and all items contained in the Hotel's lost and found (collectively, "Baggage"); and (iii) all unused baggage claim checks ("Unused Claim Checks"). If Purchaser elects not to take an inventory of the Safe Deposit Boxes, Baggage and Unused Claim Checks, Seller's inventory of such items will be deemed accurate. From and after the making of such inventory and sealing of the Safe Deposit Boxes, Baggage and Unused Claim Checks, Purchaser shall be responsible for all Safe Deposits Boxes, all claims relating to Unused Claim Checks and all Baggage. If and to the extent the seal placed on any Safe Deposit Box or Baggage shall be broken prior to the release thereof to the respective owners, Purchaser shall be responsible for the contents thereof.

9.7  Survival. The provisions of this Section 9 shall survive Closing, or in the case of Section 9.5, a termination of this Agreement.

## SECTION 10

## DEFAULT

10.1  Default by Seller. If any Seller shall fail to perform any of the material covenants and agreements contained herein and such condition or failure continues for a period of ten (10) days (or such additional period as may be reasonably required to effectuate a cure of the same) after written notice thereof from Purchaser, Purchaser may elect to pursue one of the following remedies: (i) pursue the remedy of specific performance against the defaulting Seller, or (ii) terminate this Agreement solely with respect to the affected Property, in which event the Purchase Price shall be reduced by the amount of the Allocable Price for such Property. In the event that Purchaser shall terminate this Agreement pursuant to clause (ii) of the preceding sentence, Purchaser shall name only the Seller or Sellers whose failure to perform gave rise to the default in any legal action, and in no event, shall Purchaser include White Lodging or any other Sellers in such suit or proceeding. In the event that Purchaser shall terminate this Agreement pursuant to clause (ii) of this section, Purchaser shall be entitled to recover its reasonable and verifiable out-of-pocket expenses paid by Purchaser to third-parties and

-38-

RLJ Austin Courtyard 018350

relating to the tests, studies or inspections of the specific Property or Properties of any defaulting Sellers, and with respect to common or shared expenses (such as legal costs) paid to third-parties, Purchaser shall be entitled to recover a pro rata share of such expenses. The foregoing provisions of this Section 10.1 notwithstanding, in no event shall defaulting Sellers be obligated to reimburse Purchaser for more than One Million Dollars ($1,000,000.00) in the aggregate of such expenses.

10.2    Default by Purchaser.  If the sale of any Property, as contemplated hereunder, is not consummated due to Purchaser's failure to perform any material covenants or agreements contained herein (other than Purchaser's failure to pay the Purchase Price and the other amounts to be paid by Purchaser hereunder) and such condition or failure continues for a period of ten (10) days after written notice thereof from Sellers or such additional period as may be reasonably required to effectuate a cure of the same (but in no event longer than thirty (30) days after notice from Sellers), Sellers shall be entitled, as their sole and exclusive remedy for such default, to terminate this Agreement and/or receive the Deposit as liquidated damages. Sellers' right to receive the Deposit is intended not as a penalty, but as full liquidated damages. The right to receive the Deposit as full liquidated damages is Sellers' sole and exclusive remedy in the event of default hereunder by Purchaser, and Sellers hereby waive and release any right to (and hereby covenants that they shall not) sue Purchaser for specific performance of this Agreement or to recover any damages of any nature or description other than the Deposit. Purchaser hereby waives and releases any right to (and hereby covenants that it shall not) sue Sellers or seek or claim a refund of the Deposit (or any part thereof) on the grounds it is unreasonable in amount and exceeds Sellers' actual damages or that its retention by Sellers constitutes a penalty and not agreed upon and reasonable liquidated damages.

## SECTION 11

## MISCELLANEOUS

11.1    Agreement to Indemnify.

(a)    Subject to the express provisions of this Agreement, Sellers shall indemnify, defend and hold harmless Purchaser and its successors and assigns from and against any claims, losses, damages, liabilities, costs, and expenses (including, without limitation, reasonable attorneys' fees and expenses) arising out of events, acts, or omissions of such Seller that occurred in connection with its ownership or operation of its Property prior to the Closing Date, or obligations accruing prior to the Closing Date under any Contract of such Seller (except to the extent of any adjustment made in respect of such Contract at Closing). The indemnity provided for in this Section 11.1(a) shall not extend to consequential damages.

(b)    Whenever it is provided in this Agreement that an obligation will continue after Closing as an obligation of Purchaser or be assumed by Purchaser after Closing, Purchaser shall be deemed to have also agreed to indemnify and hold harmless

-39-

RLJ Austin Courtyard 018351

Sellers and their respective successors and assigns from and against any claims, losses, damages, liabilities, costs, and expenses (including, without limitation, reasonable attorneys' fees and expenses) arising from any failure of Purchaser to perform the obligation so continued or assumed after Closing (but not with respect to any act or omission which occurred prior to Closing). The indemnity provided for in this Section 11.1(b) shall not extend to consequential damages.

(c)     With respect to each Seller, at Closing, either (i) such Seller shall deliver to Purchaser, in a form reasonably acceptable to Purchaser, the agreement (the "Post-Closing Undertaking") of its manager, managing member, general partner or other guarantor (which guarantor must be acceptable to Purchaser in its reasonable discretion) to the effect that, from and after Closing and for a period of six (6) months, Seller shall retain funds in an amount equal to not less than five percent (5%) of the Allocable Price payable to such Seller (provided that such manager, managing member, general partner or guarantor itself has a net worth that is not less than the lesser of (a) ten percent (10%) of the Allocable Price payable to such Seller or (b) Nine Million Dollars ($9,000,000.00) (which amount shall satisfy all of the net worth requirements under this subsection 11.1(c) for any Person who is a manager, managing member, general partner or guarantor)), or at the option of Seller's manager, managing member or general partner, (ii) such Seller shall deposit into a Post-Closing Escrow, the sum of not less than five percent (5%) of the Allocable Price payable to such Seller. From and after the date that is six (6) months after the Closing Date and until the date that is twelve (12) months after the Closing Date, the holdback and net worth requirements set forth in the preceding sentence shall be reduced from five (5) percent of the Allocable Price payable to such Seller to two and one-half percent (2.5%) of the Allocable Price payable to such Seller, and the balance in any escrow shall be released to Seller; provided, however, that to the extent that Purchaser has timely asserted in writing any claim against such Seller, either (i) such Seller shall retain not less than one hundred twenty percent (120%) of the reasonable amount of such claim, or (ii) an amount equal to one hundred twenty percent (120%) of the reasonable amount of such claim shall continue to be held in escrow, as the case may be, until such time as such claim is either resolved or released.

(d)     The provisions of this Section 11.1 shall survive the Closing hereunder.

11.2    Brokerage Commissions. Pursuant to the terms of a separate agreement between Sellers and HWE, Sellers have engaged HWE to serve as the broker for the transactions described herein and have agreed to pay a commission to HWE at Closing. Other than HWE, each of the parties hereto represents that it dealt with no broker, finder or like agent in connection with this Agreement or the transactions contemplated hereby, and that it reasonably believes that there is no basis for any other Person to claim a commission or other compensation for bringing about this Agreement or the transactions contemplated hereby. Sellers shall indemnify and hold harmless Purchaser and its successors and assigns from and against any loss, liability or expense, including reasonable attorneys' fees, arising out of any claim or claims for commissions or other compensation for bringing about this Agreement or the transactions contemplated hereby

-40-

RLJ Austin Courtyard 018352

made by any broker, finder or like agent, if such claim or claims are based in whole or in part on dealings with Sellers. Purchaser shall indemnify and hold harmless Sellers and their respective successors and assigns from and against any loss, liability or expense, including reasonable attorneys' fees, arising out of any claim or claims for commissions or other compensation for bringing about this Agreement or the transactions contemplated hereby made by any broker, finder or like agent, if such claim or claims are based in whole or in part on dealings with Purchaser. Nothing contained in this section shall be deemed to create any rights in any third party. The provisions of this Section 11.2 shall survive the Closing hereunder and any termination of this Agreement.

11.3    Publicity. Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement will be made only in the form approved by Purchaser and White Lodging (as agent for Sellers).

11.4    Notices.

(a)    Any and all notices, demands, consents, approvals, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given if in writing and the same shall be delivered either in hand, by mail, by Federal Express or similar expedited commercial carrier or by fax (with a copy to be sent for next business day delivery by Federal Express or similar carrier on the same day), addressed to the recipient of the notice, postpaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).

(b)    All notices required or permitted to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the earlier of (i) the date of acknowledged receipt, (ii) the date the recipient refuses receipt, or (iii) the next business day after deposit with the carrier if sent by Federal Express or similar carrier.

(c)    All such notices shall be addressed,

if to Sellers to:

> Carol Ann Bowman
> 1000 E. 80th Place
> Suite 700 North
> Merrillville, Indiana  46410

with a copy to:

> Venable LLP
> 8010 Towers Crescent Drive
> Suite 300
> Vienna, Virginia  22182
> Attention:  M. Jay Yurow

-41-

Execution Version

RLJ Austin Courtyard 018353

if to Purchaser, to:

> c/o RLJ Development, LLC
> 6903 Rockledge Drive
> Suite 910
> Bethesda, Maryland 20817
> Attention : Thomas J. Baltimore, Jr.

with a copy to:

> Arent Fox PLLC
> 1050 Connecticut Avenue, NW
> Washington, D.C. 20036
> Attention: Gerard Leval

(d) By notice given as herein provided, the parties hereto shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses effective upon receipt by the other parties of such notice and each shall have the right to specify as its address any other address within the United States of America.

11.5 **Waivers: Modification of Agreement.** Any waiver of any term or condition of this Agreement, or of the breach of any covenant, representation or warranty contained herein, in any one instance, shall not operate as or be deemed to be or construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty. No failure at any time to enforce or require performance of any provision hereof shall operate as a waiver of, or affect in any manner, such party's right at a later time to enforce or require performance of such provision or any other provision hereof. This Agreement may not be amended nor shall any waiver, change, modification, consent or discharge be effected, except by an instrument in writing executed by or on behalf of the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought. This Agreement shall not be binding until such time as all parties hereto have executed this Agreement.

11.6 **Assignment; Successors and Assigns.** This Agreement and all rights and obligations hereunder shall not be assignable by any party without the written consent of the other party, except that Purchaser may assign this Agreement to any one or more Affiliates of Purchaser. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement is not intended and shall not be construed to create any rights in, or to be enforceable in any part by, any other Persons.

-42-

RLJ Austin Courtyard 018354

11.7  Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

11.8  Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and shall supersede and take the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof.

11.9  Governing Law. This Agreement shall be interpreted, construed, applied and enforced in accordance with the laws of the State of Maryland, applicable to contracts made and to be performed in the State of Maryland. To the maximum extent permitted by applicable law, any action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement shall be brought and prosecuted in such court or courts located in the State of Maryland as is provided by law; and the parties consent to the jurisdiction of said court or courts located in the State of Maryland and to service of process by registered mail, return receipt requested, or by any other manner provided by law.

11.10  Performance on Business Days. In the event the date on which performance or payment of any obligation of a party required hereunder is other than a Business Day, the time for payment or performance shall automatically be extended to the first Business Day following such date.

11.11  Attorneys' Fees. If any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to receive, from the other party, the prevailing party's costs and expenses, including reasonable attorneys' fees.

11.12  Relationship. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto, it being understood and agreed that (except as and to the extent specifically provided for herein) no provision contained herein, nor any acts of the parties hereto shall be deemed to create any relationship between the parties hereto other than the relationship of seller and purchaser.

11.13  Like-Kind Exchange. Each Seller (but not individual members or partners of any Seller) shall have the right to structure its transfer of interest in its Property as part of a like-kind exchange to be designated by such Seller (including the ability to have title taken in the name of an entity established in order to effectuate such exchange), by providing Purchaser with notice of such exchange by not later than twenty (20) days prior to the Closing Date (with any documents to be reviewed by Purchaser in connection therewith to be submitted to Purchaser by not later than fifteen (15) days prior to the Closing Date), with the result that the exchange shall qualify for non-recognition of gain

-43-

RLJ Austin Courtyard 018355

or loss under Section 1031 of the Internal Revenue Code of 1986, as amended. Purchaser shall cooperate with a Seller in effecting such exchange (such cooperation to be limited to the review and execution of an assignment to a qualified exchange intermediary and other reasonable requests of Seller and expressly to exclude any arrangement to provide for installment sale treatment), provided that: (i) any costs and expenses incurred by Purchaser as a result of structuring such transaction as an exchange, as opposed to an outright sale, shall be borne by Seller, (ii) Seller shall indemnify and hold harmless Purchaser from and against any and all liabilities, costs, damages, claims or demands arising from the cooperation of Purchaser in effecting the exchange contemplated hereby including, but not limited to, Purchaser's reasonable attorneys' fees; and (iii) such exchange shall not result in any delay in closing the transaction.

11.14  Purchase of One or More Seller Entities. At Purchaser's option, Purchaser may elect, with respect to one or more Properties, to purchase all of the interests in the Seller entity in lieu of purchasing such Property directly. Such option shall be exercised with respect to one or more Properties, if at all, by Purchaser giving White Lodging written notice thereof ("Entity Purchase Notice") not later than thirty (30) days prior to the expiration of the Inspection Period. Upon the delivery of an Entity Purchase Notice, the parties shall negotiate in good faith to enter into one or more appropriate purchase and sale agreements for the purchase and sale of the Seller entity rather than the Property, the terms and provisions of such agreements to be economically as identical to the terms and provisions of this Agreement as possible, with appropriate adjustments to take into account the reasonable requirements for the purchase of entity interests. The foregoing provisions of this Section 11.14 notwithstanding, if Purchaser's election to buy the Seller entity would create less favorable tax treatment for a Seller than a sale of the Property, Purchaser and Seller agree to work together in good faith to structure a sale in a manner that does not create for such Seller the unfavorable tax treatment.

11.15  Further Assurances. Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use its commercially reasonable good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement including, without limitation (i) the obtaining of all necessary actions or non-actions, waivers, consents and approvals from governmental or regulatory entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any governmental authority, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, and (iii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement, but which are not inconsistent with this Agreement.

11.16  Authority of White Lodging. Each Seller hereby expressly and irrevocably designates and appoints White Lodging as its agent with full power and

-44-

RLJ Austin Courtyard 018356

authority to act on its behalf for all purposes of this Agreement including, but not limited to, taking any action of any Seller required or permitted hereunder, delivering or receiving any notice required or which may be given hereunder, granting any consent or approval hereunder or in connection with any transaction contemplated hereby, executing any document, amending this Agreement or any document to be delivered pursuant to this Agreement and compromising or resolving any dispute hereunder. Purchaser shall have the full right to rely upon any act or decision of White Lodging hereunder as being the act or decision of one or more of Sellers and shall not in any manner be required to ascertain whether or not White Lodging has obtained the express authorization of any Seller prior to so acting or deciding. It is expressly agreed by each Seller that the agency, power and authority hereby granted to White Lodging is irrevocable and shall not be modified, altered or revoked in any manner prior to Closing.

11.17 Section and Other Headings. The headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

11.18 Time of the Essence. Time is of the essence with respect to this Agreement.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

-45-

RLJ Austin Courtyard 018357

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Miracourt, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
Manager

By: _____
Lawrence E. Burnell
Chief Operating Officer

-46-

RLJ Austin Courtyard 018358

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Mirures, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
    Manager

By: _____
     Lawrence E. Burnell
     Chief Operating Officer

-46-

RLJ Austin Courtyard 018359

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Loures, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
Manager

By: _____
Lawrence E. Burnell
Chief Operating Officer

-46-

RLJ Austin Courtyard 018360

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Longmont White Etkin Spring, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
Manager

By: _____
Lawrence E. Burnell
Chief Operating Officer

-46-

RLJ Austin Courtyard 018361

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

<u>SELLERS</u>:

Schcourt, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
     Manager

By: _____
     Lawrence E. Barnell
     Chief Operating Officer

**RLJ Austin Courtyard 018362**

662

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Hotel Properties Austin, LP,
an Indiana limited partnership

By: HPA Corp., General Partner

By: _____
    Lawrence E. Burnell
    President

-46-

RLJ Austin Courtyard 018363

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Hotel Properties Austin, LP,
an Indiana limited partnership

By: HPA Corp., General Partner

By: _____
    Lawrence E. Burnell
    President

-46-

RLJ Austin Courtyard 018364

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Bloomhotel, LLC,
an Indiana limited liability company

By: REI Real Estate Services, LLC

By: _____
Jeffrey B. Sponseller,
Chief Financial Officer

By: BW Bloom, LLC

By: White Lodging Services Corporation,
Manager

By: _____
Lawrence E. Burnell,
Chief Operating Officer

[Signature Page to New Hotels Purchase and Sale Agreement]

**RLJ Austin Courtyard 018365**

665

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Grand White Ethis Court, LLC,
an Indiana limited liability company

By: BW Grand LLC, Manager

By:    White Lodging Services Corporation,
      Manager

      By: _____
            Lawrence E. Burnell
            Chief Operating Officer

-46-

RLJ Austin Courtyard 018366

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

<u>SELLERS</u>:

Grand White Etkin Res, LLC,
an Indiana limited liability company

By: White Lodging Services Corporation,
Manager

By: _____
      Lawrence E. Burnell
      Chief Operating Officer

-46-

RLJ Austin Courtyard 018367

667

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

<u>SELLERS</u>:

South Amsaircourt, LP,
an Indiana limited partnership

By:    Southairgen Corp., General Partner

By: _____
      Lawrence E. Burnell
      President

-46-

RLJ Austin Courtyard 018368

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

SELLERS:

Whiteco Industries, Inc.,
a Nebraska corporation

By: _____
Dennis E. Kackos
Financial Vice President

-46-

RLJ Austin Courtyard 018369

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

PURCHASER:

RLJ LODGING FUND II
ACQUISITIONS, LLC

By: _____

Thomas J. Baltimore, Jr.
President

-47-

RLJ Austin Courtyard 018370

670

IN WITNESS WHEREOF, the parties have caused this New Hotels Purchase and Sale Agreement to be executed as a sealed instrument as of the date first above written.

WHITE LODGING:

WHITE LODGING SERVICES CORPORATION

By: _____

Lawrence E. Buroell
Chief Operating Officer

-48-

RLJ Austin Courtyard 018371

## Schedules

| | |
|---|---|
| Schedule A | Identity of Sellers |
| Schedule B | Addresses of Properties |
| Schedule B-1 | Legal Descriptions of Properties |
| Schedule C | Allocable Price for each Property |
| Schedule D | Ground Leases |
| Schedule E | Franchises and Outside Completion and Closing Dates |
| Schedule F | [Intentionally Omitted] |
| Schedule G | Form of Physical Conditions Escrow |
| Schedule H | Form of Liquor License Management Agreement |
| Schedule I | Form of Assignment and Assumption of Contracts |
| Schedule J | Form of Assignment and Assumption of Ground Lease |
| Schedule K | Form of Assignment and Assumption of Licenses, Permits and Intangibles |
| Schedule L | Form of Bill of Sale |
| Schedule M | Form of Ground Lease Estoppel Certificate |
| Schedule N | Form of Management Agreement |
| Schedule O | List of Excluded Assets |
| Schedule P | Form of Deposit Escrow Instructions |
| Schedule Q | Form of Special Warranty Deed |
| Schedule R | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Schedule S | [Intentionally Omitted] |
| Schedule T | Form of Post-Closing Escrow Agreement |
| Disclosure Schedule | |

-49-

Execution Version

**RLJ Austin Courtyard 018372**

## Schedule A

### Identity of Sellers

| PROPERTY NUMBER | PROPERTY | OWNER |
|---|---|---|
| 88. | Courtyard Miramar FL.<br>14500 SW 29th Street<br>Miramar, Florida 33027 | Miracourt, LLC |
| 89. | Residence Inn Miramar FL<br>14700 SW 29th Street<br>Miramar, Florida 33027 | Mirares, LLC |
| 90. | Residence Inn Downtown Louisville Kentucky<br>333 E. Market Street<br>Louisville, Kentucky 40202 | Loures, LLC |
| 91. | Springhill Suites Longmont<br>1470 Dry Creek Drive<br>Longmont, Colorado 80503 | Longmont White Etkin Spring, LLC |
| 92. | Schaumburg Courtyard<br>1311 American Lane<br>Schaumburg, Illinois 60173 | Schcourt, LLC |
| 93. | Courtyard Austin Downtown<br>300 E. 4th Street<br>Austin, Texas 78701 | Hotel Properties Austin, LP |
| 94. | Residence Inn Austin Downtown<br>300 E. 4th Street<br>Austin, Texas 78701 | Hotel Properties Austin, LP |
| 95. | Bloomington Hilton Garden<br>245 N. College Avenue<br>Bloomington, Indiana 47404 | Bloomhotel, LLC |
| 96. | Courtyard Grand Junction<br>765 Horizon Drive<br>Grand Junction, Colorado 81506 | Grand White Etkin Court, LLC |

A-1

Execution Version

**RLJ Austin Courtyard 018373**

| 97. | Residence Inn Grand Junction<br>767 Horizon Drive<br>Grand Junction, Colorado 81506 | Grand White Etkin Res, LLC |
|-----|-----|-----|
| 98. | Courtyard Austin Airport<br>7809 East Ben White Blvd.<br>Austin, Texas 78744 | South Ausaircourt, LP |
| 99. | Homewood Suites Brandon<br>10230 Palm River Road<br>Brandon, Florida 33619 | Whitco Industries, Inc. |

A-2

**RLJ Austin Courtyard 018374**

## Schedule B

### Addresses of Properties

| PROPERTY NUMBER | PROPERTY | OWNER |
|---|---|---|
| 88. | Courtyard Miramar FL<br>14500 SW 29th Street<br>Miramar, Florida 33027 | Miracourt, LLC |
| 89. | Residence Inn Miramar FL<br>14700 SW 29th Street<br>Miramar, Florida 33027 | Mirares, LLC |
| 90. | Residence Inn Downtown Louisville Kentucky<br>333 E. Market Street<br>Louisville, Kentucky 40202 | Loures, LLC |
| 91. | Springhill Suites Longmont<br>1470 Dry Creek Drive<br>Longmont, Colorado 80503 | Longmont White Etkin Spring, LLC |
| 92. | Schaumburg Courtyard<br>1311 American Lane<br>Schaumburg, Illinois 60173 | Schcourt, LLC |
| 93. | Courtyard Austin Downtown<br>300 E. 4th Street<br>Austin, Texas 78701 | Hotel Properties Austin, LP |
| 94. | Residence Inn Austin Downtown<br>300 E. 4th Street<br>Austin, Texas 78701 | Hotel Properties Austin, LP |
| 95. | Bloomington Hilton Garden<br>245 N. College Avenue<br>Bloomington, Indiana 47404 | Bloomhotel, LLC |
| 96. | Courtyard Grand Junction<br>765 Horizon Drive<br>Grand Junction, Colorado 81506 | Grand White Etkin Court, LLC |

B-1

RLJ Austin Courtyard 018375

| 97. | Residence Inn Grand Junction<br>767 Horizon Drive<br>Grand Junction, Colorado 81506 | Grand White Etkin Res, LLC |
|---|---|---|
| 98. | Courtyard Austin Airport<br>7809 East Ben White Blvd.<br>Austin, Texas 78744 | South Ausaircourt, LP |
| 99. | Homewood Suites Brandon<br>10230 Palm River Road<br>Brandon, Florida 33619 | Whiteco Industries, Inc. |

B-2

RLJ Austin Courtyard 018376

# APPENDIX K

SUBJECT:  Recovery of attorney's fees in suits founded on oral or written contracts

COMMITTEE:  Judiciary recommended that it do pass, without amendment

VOTE:  9 ayes--Grant*, Hale, Moreno*, M. Garcia*, Cain*, Ezzell, D. Hill*, Ribak*, Rudd

0 nays--

2 absent--Maloney, Jackson

WITNESSES:  None

DIGEST:  Article 2226, Revised Civil Statutes, allows recovery of attorney's fees (in addition to the basic claim) for certain limited kinds of lawsuits.  HB 452 expands Article 2226 so that reasonable attorney's fees may be recovered in all suits founded on oral or written contracts.  The bill also exempts certain insurance contracts and certain insurers from all provisions of the article.

PRO:  Expanding the recovery of attorney's fees would serve the ends of justice.  Generally, the winner in a lawsuit cannot make the loser pay attorney's fees, unless there is a specific authorization in the law or a contract with that provision. Many times a person with a valid, but small, claim will not bother to go to court because the lawyer's fees are almost as much as the possible proceeds of the suit, sometimes more.
   Even in a lawsuit involving a lot of money, the losing party in effect prevents the winner from getting the full amount, because the winner must pay his attorney.
   Either way, it's not right for a person to be deprived of his full damages from a wrongdoer.
   HB 452 is a minor extension of Article 2226, which already allows attorney's fees for valid claims against a person or corporation for services rendered, labor done and several other causes.  Further, many written contracts already contain provisions for attorney's fees.  And several other Texas laws permit recovery of fees.
   In some foreign countries, the winner in every lawsuit receives attorney's fees from the loser.  These laws have proved workable.
   This bill excludes certain insurance contracts and certain insurers to prevent overlapping coverage of other statutes relating to attorney's fees.

CON:  This bill is a broad extension of the kinds of lawsuits in which attorney's fees can be recovered.  It will cause more litigation and more crowded courts.  Oral contracts, in particular, should not involve attorney's fees.  Suits on these contracts often degenerate into swearing matches.  It's enough for the basic claim to rest on the outcome without putting attorney's fees in the balance, too.

(more)

In contract suits, defendants frequently countersue. Wealthier parties will be in good position to run up the costs and the potential liability far beyond the means of a poor plaintiff. This may scare poor claimants away from ever filing a lawsuit.

The proposal to exclude certain insurance contracts and insurers from Article 2226 is an unwarranted grant of immunity from liability for attorney's fees. They should pay, like everyone else, when they lose.

COMMENTARY: 1) The potential advantages and disadvantages of the proposed extension are hard to assess with much certainty. More lawsuits are likely to be filed and the courts will be busier. But that's one thing courts are for. Lawyers will probably make more money. More contracts might be put into writing to avoid the uncertainties and extra liability of oral contracts. And perhaps this would reduce the number of disputes and suits.

2) Texas courts may have to decide how the proposed legislation is to apply to actions arising before the effective date of the act and whether statutory provisions for attorney's fees are always to control over contract provisions.

3) An alternative approach to help settle small lawsuits is to increase the current $150-to-$200 limit for small claims courts in Texas. Some state permit people to sue for much larger claims and prohibit either party from retaining an attorney.

4) HB 452 excludes from coverage those contracts issued by insurers subject to the Unfair Claim Settlement Practices Act. In general, this includes such lines as accident and sickness, motor vehicles, casualty, prepaid legal services, fire, lightning, wind storms, hail, inland marine, rain, home warranty, and fidelity, surety and guaranty bonds.

5) It is worth noting that the Uniform Claim Settlement Practices Act does not give individual policyholders any remedy for delayed or inadequate settlement of claims, much less attorney's fees. Instead, the Act gives the State Board of Insurance authority to deal with insurers which frequently engage in certain practices. Thus, under HB 452, persons will not be able to recover Article 2226 attorney's fees against this large class of insurers. (Under Insurance Code §3.62 and §3.62-1, a policyholder can recover attorney's fees in a case involving a life, health or accident policy.)

6) As written, the bill also excludes entirely from the provisions of 2226 various companies issuing life, health or accident policies. Presumably, then, such companies could not take advantage of the provisions of 2226 for recovering attorney's fees in their own lawsuits.

#

# APPENDIX L

## Assignment of Contract

White Lodging Services Corporation, an Indiana corporation, hereby assigns and transfers to South Ausaircourt, L.P., an Indiana limited partnership, all of the interest of White Lodging Services Corporation, Inc. (sic), in and to that certain Standard Form Agreement Between Owner and Architect having a date of January 1, 2005, between White Lodging Services Corporation, Inc. (sic) and Elness Swenson Graham Architects, Inc.

Dated: September 19, 2005.

White Lodging Services Corporation

By: _____
              Lawrence E. Burnell
              Chief Operating Officer

Approved and Consented to:

Elness Swenson Graham Architects, Inc.

By: _____
              Paul Mittendorf, AIA
              Principal and Vice President

3516:102:091905

SCANNED

SEP 2 2 2007

ESG001952

# APPENDIX M

CONFIDENTIAL

## ASSIGNMENT AND ASSUMPTION OF
## LICENSES, PERMITS AND INTANGIBLES

THIS ASSIGNMENT AND ASSUMPTION OF LICENSES, PERMITS AND INTANGIBLES ("Assignment") is made and entered into as of the ⌒ day of December, 2007, by and between SOUTH AUSAIRCOURT, LP, an Indiana limited partnership ("Assignor"), and RLJ II – C AUSTIN AIR LESSEE, LP, a Delaware limited partnership ("Assignee").

### RECITALS

A.      Reference is made to that certain New Hotels Purchase and Sale Agreement dated March 16, 2006, by and among (i) Whiteco Industries, Inc. and each of the parties named on Schedule A of the New Hotels Purchase and Sale Agreement, (ii) RLJ Lodging Fund II Acquisitions, LLC, and joined by (iii) White Lodging Services Corporation (for itself and as agent for Seller and each of the other sellers named on Schedule A of the New Hotels Purchase and Sale Agreement), as amended (as so amended, "Purchase Agreement");

B.      Simultaneously herewith, Assignor is conveying to RLJ II – C AUSTIN AIR, LP its interest in that certain real property more fully described on **Exhibit A** attached hereto and made a part hereof ("Property") pursuant to the Purchase Agreement; and

C.      In connection with the conveyance of the Property, and as contemplated under the Purchase Agreement, Assignor and Assignee desire to execute this Assignment.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Recitals.  The foregoing recitals are hereby incorporated into this Assignment as if fully rewritten and restated in the body of this Assignment.

2. .      Assignment of Licenses, Permits and Intangibles.  Assignor hereby sells, transfers, conveys and assigns to Assignee all of Assignor's right, title and interest in and to all licenses, permits and all other intangible assets relating to the Property (collectively, "Licenses"), subject, however, to the terms and covenants of the Licenses and this Assignment.

3.      Assumption of Obligations.  Assignee hereby accepts the assignment of the Licenses subject to the terms and conditions hereof, and from and after the date hereof, Assignee hereby assumes and shall be responsible for and shall perform, discharge and fulfill all of the obligations imposed on Assignee, as successor-in-interest to Assignor, under the Licenses that accrue on or after the date hereof.



RLJ Austin Courtyard 006011

CONFIDENTIAL

4.    **Assignee's Indemnification.** Assignee hereby agrees to indemnify, protect, defend and hold Assignor, Assignor's members or partners, and all of their respective successors and assigns harmless from any and all claims, damages, losses, suits, proceedings, costs and expenses including, without limitation, reasonable attorneys' fees ("Losses"), both known or unknown, arising out of or by virtue of the breach by Assignee of (or Assignee's failure to timely perform) any or all of the obligations imposed on Assignee under the Licenses, as successor-in-interest to Assignor, that accrue on or after the date hereof.

5.    **Assignor's Indemnification.** Assignor hereby agrees to indemnify, protect, defend and hold Assignee, Assignee's members or partners, and all of their respective successors and assigns harmless from any and all Losses, both known and unknown, arising out of or by virtue of the breach by Assignor of (or Assignor's failure to timely perform) any or all of the obligations imposed upon Assignor under the Licenses that accrued prior to the date hereof.

6.    **Defined Terms; Construction.** All capitalized terms used herein without definition shall have the meanings given them in the Purchase Agreement. This Assignment is subject in its entirety to the terms and conditions of the Purchase Agreement. To the extent the terms and conditions herein and in the Purchase Agreement are inconsistent, the terms and conditions of the Purchase Agreement shall control.

7.    **Counterparts.** This Assignment may be executed in one or more counterparts, all of which, when taken together shall constitute one and the same instrument.

8.    **Governing Law.** This Assignment shall be governed by and construed in accordance with the laws of the State in which the Property is located.

9.    **Partial Invalidity.** The provisions hereof shall be deemed independent and severable, and the invalidity or enforceability of any one provision shall not affect the validity or enforceability of any other provision hereof.

10.    **Successors and Assigns.** This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and each of their successors and assigns.

11.    **Amendments.** Neither this Assignment nor any term, provision or condition hereof may be changed, amended or modified, except in a writing signed by Assignor and Assignee.

[Signature Pages to Follow]

RLJ Austin Courtyard 006012

CONFIDENTIAL

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment to be effective as of the date first above written.

ASSIGNOR:

South Ansaircourt, LP,
an Indiana limited partnership

By:   Southairgen Corp., an Indiana corporation,
     General Partner

By:   _____
      Lawrence E. Burnell
      President

-3-

RLJ Austin Courtyard 006013

CONFIDENTIAL

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment to be effective as of the date first above written.

ASSIGNEE:

RLJ II – C AUSTIN AIR LESSEE, LP
a Delaware limited partnership

By:    RLJ II – C Austin Air Lessee General Partner, LLC;
       a Delaware limited liability company, General Partner

By: _____
      Thomas J. Baltimore, Jr.
      President

-4-

RLJ Austin Courtyard 006014

CONFIDENTIAL

EXHIBIT A

Legal Description

Lot 5-D, Block C, THE RESUBDIVISION OF LOTS 4 AND 5, BLOCK C, METRO CENTER SECTION 5, a subdivision in TRAVIS County, Texas, according to the plat thereof recorded under Document Number 199900265 of the Official Public Records of TRAVIS County, Texas.

Being also described by metes and bounds description prepared by Robert C. Watts, Jr., Registered Professional Land Surveyor, State of Texas No. 4995, of Chaparral Professional Land Surveying, Inc., and dated November 15, 2007, as follows:

BEGINNING at a 1/2" rebar with cap found for the southeast corner of said Lot 5-D, being the northeast corner of Lot 6, Block C, Metro Center Section 5, a subdivision of record in Volume 102, Page 177 of the Plat Records of Travis County, Texas and also being in the west right-of-way line of Palma Verde Drive (75 foot right-of-way width);

THENCE South 68°50'09" West, with the south line of Lot 5-D and the north line of said Lot 6, a distance of 479.89 feet to a 1/2" rebar with cap found in the north line of Lot 6, being the southwest corner of Lot 5-D and also being the southeast corner of Lot 5-C, of the said Resubdivision of Lots 4 and 5, Block C, Metro Center, Section 5:

THENCE with the west line of Lot 5-D and the east line of said Lot 5-C, the following three (3) courses:

1. North 21°09'32" West, a distance of 166.37 feet to a 1/2" rebar with cap found;

2. North 68°54'26" East, a distance of 39.43 feet to a 1/2" rebar with cap found;

3. North 21°08'04" West, a distance of 233.64 feet to a mag nail found for the northwest corner of Lot 5-D, being the northeast corner of Lot 5-C and also being in the south line of Lot 3, Block C, of said Metro Center Section 5;

THENCE North 68°49'12" East, with the north line of Lot 5-D and the south line of said Lot 3, a distance of 240.57 feet to a mag nail found in the west right-of-way line of Palma Verde Drive, being the northeast corner of Lot 5-D and also being the southeast corner of Lot 3;

THENCE South 47°41'57" East, with the east line of Lot 5-D and the west right-of-way line of Palma Verde Drive, a distance of 447.12 feet to the POINT OF BEGINNING.

A-1

# APPENDIX N

# SUPPLEMENTAL CLARIFICATION OF ASSIGNMENT

1.      Whiteco Industries, Inc., ("Seller") joined by White Lodging Services Corporation ("White Lodging") and other identified Sellers, including South Ausaircourt, L.P., entered into a New Hotels Purchase and Sale Agreement ("PSA") with RLJ Lodging Fund II Acquisitions, LLC ("Purchaser") dated March 16, 2006. Subsequent to the execution of the PSA, Seller, White Lodging, South Ausaircourt, LP and Purchaser entered into a Ninth Amendment to New Hotels Purchase and Sales Agreement ("Ninth Amendment") dated December 20, 2007.

2.      Both the PSA and the Ninth Amendment reference and pertain to, among other things, "Property 98", which is described as "Courtyard Austin Airport, 7809 East Ben White Blvd., Austin, TX 78744."

3.      The definition of "Contracts" in the PSA "shall mean, with respect to each Property... (iv) all contracts, agreements (other than subcontracts) and warranties covering the design, development, construction, operations, maintenance and repair of the Property..."

4.      Paragraph 3.1(a) of the PSA contemplates that "[a]t Closing, Sellers or White Lodging shall assign and deliver to Purchaser, pursuant to the terms of Section 4.2(b), true and complete originals or copies of architects agreements and general contracts for the Properties..."

5.      The language "pursuant to the terms of Section 4.2(b)" as contained in Paragraph 3.1(a) of the PSA, and referenced in paragraph 4 above, is a Scrivener's Error and should likely be to "Section 4.1(c), as there is no "Section 4.2(b)" in the PSA.

6.      Paragraph 11.15 of the PSA contemplates that:

> "Further Assurances: Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use its commercially reasonable good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement including, without limitation...(iii)the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement, but which are not inconsistent with this Agreement."

7.      In order to clarify the (a) Assignment and Assumption of Licenses, Permits and Intangibles, and the (b) Assignment and Assumption of Contracts and Leases, each dated December 20, 2007, from South Ausaircourt, LP as Assignor to RLJ II - C Austin Air Lessee, LP as Assignee, Assignor intended to assign to Assignee the Assignor's interest in the following:

a.      The Agreement for Consulting Services between HBC Engineers, Inc. and White Lodging Services Corporation, dated 10/31/00.

b.      The Assignor's tangible and intangible rights with respect to the Agreement for Consulting Services between HBC Engineers, Inc. and White Lodging Services Corporation, dated 10/3/00, along with all other contracts, work orders or amendments thereto between HBC Engineers, Inc. and White Loding Services Corporation relating to Property 98, along with all intangibles, including but not limited to causes of actions or claims owned by Assignor against HBC Engineering, Inc.

c.      All contracts, oral or written, between White Lodging Services Corporation, and Terracon Consultants, Inc. relating to the Project.

d.      The Assignor's tangible and intangible rights with respect to the all contracts, oral or written, between it and Terracon Consultants, Inc. relating to the Project, along with all other contracts, work orders or amendments thereto and with all intangibles, including but not limited to causes of actions or claims owned by Assignor against Terracon.

e.      The Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997 Edition, Parts 1 and 2, between White Lodging Services Corporation, Inc.(sic)and Elness Swenson Graham Architects, Inc., dated January 1, 2005.

f.      The Assignor's tangible and intangible rights with respect to the Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997 Edition, Parts 1 and 2, between White Lodging Services Corporation, Inc. (sic) and Elness Swenson Graham Architects, Inc., dated January 1, 2005, along with all other contracts, work orders or amendments thereto between Elness Swenson Graham Architects, Inc., and White Lodging Services Corporation, Inc. relating to Property 98, along with all intangibles, including but not limited to causes of actions or claims owned by Assignor against Elness Swenson Graham Architects, Inc.

g.      The Standard Form of Agreement between Owner and General Contractor, dated August 17, 2005, between EBCO General Contractor, Ltd., and White Lodging Services (sic), as assigned by White Lodging to Assignor pursuant to that certain Assignment of Contract dated September 19, 2005 by White Lodging with the approval and consent of EBCO General Contractor, Ltd.

h.      The Assignor's tangible and intangible rights with respect to the Standard Form of Agreement between Owner and General Contractor, dated August 17, 2005, between EBCO General Contractor, Ltd., and White Lodging Services (sic), as assigned by White Lodging to Assignor pursuant to that certain Assignment of Contract dated September 19, 2005 by White Lodging with the approval and consent of EBCO General Contractor, Ltd., along with all other contracts, work orders or amendments thereto between EBCO General Contractor, Ltd., and White Lodging relating to Property 98, along with all intangibles, including but not limited to causes of actions, fiduciary duties or claims owned by Assignor against EBCO General Contractor, Ltd.

8.    Assignor executes this document pursuant to Paragraph 11.15 of the PSA in order to fully carry out the purposes of the PSA in a manner which is consistent with the PSA.

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: January 16, 2014.

SOUTH AUSAIRCOURT, LP

By:  Southairgen Corp., General Partner

By: _____
        Carol Ann Bowman, Vice President


## Notary

STATE OF INDIANA§
                         §
COUNTY OF LAKE §

This instrument was acknowledged before me this 16th day of January 2014, by Carol Ann Bowman, an individual residing in the county of Porter, as Vice President of Southairgen Corp., General Partner of South Ausaircourt, LP.

_____
Notary Public State of Indiana

Marguerite E.  Drake
Printed Name of Notary Public

MARGUERITE E. DRAKE
Porter County
My Commission Expires
February 26, 2017

# APPENDIX O

Filed
12 October 1 P4:20
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-002325

CAUSE NO. D-1-GN-10-002325

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; AND RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs/Counter-Defendants,* | § § § | |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| EBCO GENERAL CONTRACTOR, LTD; EBCO ADVANCED BUILDING SYSTEM, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.; MARK G. SWENSON, INDIVIDUALLY, TERRACON CONSULTANTS, INC.; TODD E. SWOBODA, P.E., INDIVIDUALLY; MBA STRUCTURAL ENGINEERS AND ANDREW T. MARLIN, P.E. INDIVIDUALLY, | § § § § § § § § § § § § § § | |
| *Defendants/Counter-Claimants.* | § § | 200 TH JUDICIAL DISTRICT |

---

**ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S
SECOND AMENDED ANSWER AND ORIGINAL COUNTERCLAIM
FOR DECLARATORY JUDGMENT**

---

TO THE HONORABLE COURT:

COME NOW, Defendants and Counter-Claimants Elness, Swenson, Graham Architects, Inc. ("ESG") and Mark G. Swenson ("Swenson" and, together with ESG, collectively, "Defendants" or "Counter-Claimants") and file and serve this Second Amended Answer and Original Counterclaim for Declaratory Judgment in response to Plaintiffs' Sixth Amended Original Petition and, in support thereof, would respectfully show the Court as follows:

---

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 1
599603.1  402/122

46

## I.

## SECOND AMENDED ANSWER

**A.     GENERAL DENIAL**

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every, all and singular, the assertions alleged in Plaintiffs' Sixth Amended Original Petition and any amendments thereto and request that Plaintiffs be required to prove the charges and allegations against these Defendants by a preponderance of the evidence and/or by clear and convincing evidence, as required by the Constitution and the Laws of the State of Texas.

**B.     SPECIFIC DENIAL**

Pursuant to Rule 54 of the Texas Rules of Civil Procedure, Defendants specifically deny that all conditions precedent to the Plaintiffs' right to recover have been performed, have occurred, or have been waived or excused.  In particular, Defendants specifically deny that Plaintiffs have presented their claims for payment to Defendants or Defendants' duly authorized agents as required by Section 38.002(2) of the Texas Civil Practice & Remedies Code.

**C.     VERIFIED DENIALS**

Pursuant to Rule 93 of the Texas Rules of Civil Procedure, Defendants make the following verified denials:

1.     Defendants deny the assignment of the contract upon which Plaintiffs' claims against Defendants are founded.  Specifically, Defendants deny that Defendants or Defendants' authorized representative(s) provided consent to assign the contract at issue to Plaintiffs. Therefore, any alleged assignment violates the anti-assignment clause of the contract and is null and void.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 2
599603.1  402/122

47

2.    Defendants deny that Plaintiffs are entitled to recover in the capacity in which they sue.  Defendants did not provide consent to assign the contract upon which Plaintiffs' claims are founded, and any such assignment is, therefore, made in violation of the anti-assignment.  As such, Plaintiffs are not parties to the contract and lack standing to bring contract claims against Defendants.

3.    Defendants deny that Swenson is liable in the capacity in which he has been sued.  In particular, Swenson is not a signatory or a party to the contract upon which Plaintiffs' claims against Defendants are founded.

4.    Defendants incorporate by reference herein the sworn verification of Paul Mittendorff, a Principal and Vice President of Elness, Swenson, Graham Architects, Inc., which is attached to Defendants' First Amended Answer and Original Counterclaim for Declaratory Judgment filed with the Court on or about December 30, 2011.

**D.    AFFIRMATIVE DEFENSES**

Pleading in the affirmative, if such is necessary, Defendants would further show as follows:

1.    Plaintiffs' alleged injuries and damages, if any, resulted, if at all, from conditions unrelated to any act, omission or conduct of Defendants.

2.    Plaintiffs' alleged injuries and damages, if any, were caused, if at all, in whole or in part by the acts or omissions of others for whose conduct Defendants are not legally responsible.

3.    At all times material to Plaintiffs' allegations, Defendants' conduct conformed to the applicable standard of care.

4.    Plaintiffs' tort claims are barred in whole or in part, by the economic loss rule.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 3**
599603.1  402/122

48

5.      Alternatively, if the economic loss rule does not completely bar all of Plaintiffs' tort claims, then, pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code, Defendants are entitled to a credit for any settlement Plaintiffs receive from any other person or entity.  If Plaintiffs settle with any other person or entity, then Defendants reserve the right to make a written election of credit for settlement under §33.014 of the Texas Civil Practice and Remedies Code.

6.      Alternatively, if the economic loss rule does not completely bar all of Plaintiffs' tort claims, then, Plaintiffs' alleged injuries and damages, if any, were caused, if at all, in whole or in part, by Plaintiffs' own negligence.  Plaintiffs are wholly barred from recovery to the extent the finder-of-fact determines Plaintiffs' comparative responsibility is 50% or greater, and, if Plaintiffs' comparative responsibility is less than 50%, any recovery must be reduced by Plaintiffs' percentage of responsibility determined by the finder-of-fact, in accordance with Chapter 33 of the Texas Civil Practice & Remedies Code.

7.      Plaintiffs cannot recover for any amount that could have been avoided by their exercise of reasonable care.

8.      Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate any alleged damages.

9.      Plaintiffs' alleged injuries and damages, if any, resulted, if at all, from independent, unforeseeable, intervening and/or superseding causes.  Any alleged action or omission on the part of Defendants was not the proximate cause, producing cause, or cause-in-fact of Plaintiffs' alleged injuries or damages, if any.

**ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 4**
599603.1  402/122

49

10. Defendants assert any and all defenses and seek any and all relief to which Defendants may be entitled in accordance with and pursuant to Chapter 150 of the Texas Civil Practice and Remedies Code.

11. Plaintiffs lack standing to sue on and are not parties to the contract on which Plaintiffs' claims against Defendants are founded. Assignment of the contract to Plaintiffs was made without consent of Defendants, in violation of the anti-assignment clause of the contract.

12. Plaintiffs' non-contract claims are barred by the appropriate statute of limitations.

13. Plaintiffs' non-contract claims, including claims for equitable subrogation, are barred by the economic loss doctrine.

14. Plaintiffs' recovery, if any, is limited to direct contract damages, if any, pursuant to the waiver of consequential damages clause in the contract upon which Plaintiffs' claims against Defendants are founded. More specifically, Plaintiffs' claims for current and future lost revenue, profits and diminution in value are barred by the consequential damages clause of the contract.

15. Plaintiffs' claims are barred against Defendants because Plaintiffs purchased the building in question "as is."

16. Defendants reserve the right to amend or supplement with any additional affirmative defenses or pleas of avoidance to which Defendants may be entitled.

## II.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

### A. INTRODUCTION

1. Now as Counter-Claimants, ESG and Swenson bring this action pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001, *et. seq.*, the Uniform Declaratory Judgments Act, and seek a

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 5**
599603.1  402/122

50

declaration from the Court that RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC (collectively, "Counter-Defendants") may not recover contract damages under the contract at issue in this case.

2.      As provided for by Chapter 37 of the Texas Civil Practice and Remedies Code, Counter-Claimants seek the following declarations from the Court:

a.      That the "Anti-Assignment" clause of the contract is valid, enforceable and applies to Counter-Plaintiffs, making any ostensible assignment of the contract, in violation of the Anti-Assignment clause, null and void and of no effect;

b.      That the "Statute of Limitations Accrual" clause of the contract is valid and enforceable and, to the effect that a party could enforce the contract against Counter-Claimants, such Statute of Limitations Accrual clause establishes the date upon which any cause of action against Counter-Claimants accrues, i.e., the date that Counter-Claimants' services were substantially completed, which such date time-bars all of Counter-Defendants' causes of action with a two-year limitations period;

c.      That the "Waiver of Consequential Damages" clause of the Contract is valid and enforceable and, to the effect that a party could enforce the contract against Counter-Claimants, such Waiver of Consequential Damages clause bars Counter-Defendants from recovering any consequential damages from Counter-Claimants; and

d.      That Swenson was not a signatory or a party to the contract at issue here and, as such, cannot be liable to the Counter-Defendants under the contract.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 6
599603.1   402/122

51

**B.      DISCOVERY CONTROL PLAN**

Discovery in this action is intended to be conducted under a Level 3 Discovery Control Order pursuant to Texas Rule of Civil Procedure 190.3.

**C.      PARTIES**

1.      ESG is a Minnesota corporation that is authorized to do business in Texas. ESG has made an appearance in this matter.

2.      Swenson is an individual who is a citizen of Minnesota and who has already appeared in this lawsuit.

3.      RLJ II-C Austin Air, LP ("RLJ II-C Austin Air") is a Delaware Limited Liability Company that is authorized to do business in Texas. RLJ II-C Austin Air has already appeared in this matter.

4.      RLJ II-C Austin Air Lessee, LP ("RLJ II-C Austin Air Lessee") is a Delaware Limited Partnership that is authorized to do business in Texas. RLJ II-C Austin Air Lessee has already made an appearance in this matter.

5.      RLJ Lodging Fund II Acquisitions, LLC ("RLJ Lodging") is a Delaware Limited Liability Company that is, upon information and belief, authorized to do business in Texas. RLJ Lodging has already appeared in this matter.

**D.      JURISDICTION AND VENUE**

1.      The subject matter of this declaratory judgment action is within the jurisdiction of this Court and is authorized pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003.

2.      Pursuant to section 15.062(a) of the Texas Civil Practice and Remedies Code, venue is proper in Travis County, Texas.

E.  **FACTUAL BACKGROUND**

1.  On or about January 1, 2005, White Lodging Services Corporation, Inc. ("White Lodging") and ESG entered into an agreement for architect services, as set forth in the following contracts: (i) AIA Document B141 – 1997 Part 1: Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services (the "Contract – 1997 Part 1"), attached hereto as **Exhibit "1;"** and (ii) AIA Document B141 – 1997 Part 2: Standard Form of Architect's Services: Design and Contract Administration (the "Contract – 1997 Part 2"), attached hereto as **Exhibit "2."**

2.  The Contract – 1997 Part 1 and the Contract – 1997 Part 2 (collectively, the "Contract") were both executed on March 30, 2005. The Contract was not signed by Swenson in either his individual or representative capacity.

3.  Section 1.3.7.9 of the Contract contains an Anti-Assignment clause, wherein "[n]either [White Lodging] nor [ESG] shall assign this Agreement without the written consent of the other, except that [White Lodging] may assign this Agreement to an institutional lender providing financing on the Project."

4.  Section 1.3.6 of the Contract contains a Waiver of Consequential Damages clause, under which both ESG and White Lodging "waive consequential damages for claims, disputes, or other matters in question arising out of or relating to this [Contract]."

5.  Section 1.3.7.3 of the Contract contains a clause commonly known as a "Statute of Limitations Accrual" clause, which provides the method to determine when a cause of action accrues for the purpose of starting the statute of limitations. Specifically, section 1.3.7.3 reads as follows:

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 8**
599603.1  402/122

53

Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statute of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. ***In no event shall such statute of limitations commence to run any later than the date when the Architect's services are substantially completed***.

(Emphasis added).

6.  On or about March 16, 2006 White Lodging, *et al.* and Counter-Defendants entered into an agreement entitled *New Hotels Purchase and Sale Agreement by and between Whiteco Industries, Inc. and RLJ Lodging Fund II Acquisitions, LLC*, (the "New Hotels Purchase and Sale Agreement"), through which Counter-Defendants claim that the Contract was assigned to them.

7.  ESG did not consent to an assignment of the Contract from White Lodging to Counter-Defendants, allegedly effectuated through the New Hotels Purchase and Sale Agreement.

8.  ESG's services were substantially complete before the date the Certificate of Occupancy was issued for the Project, which was on October 12, 2006. Therefore, any causes of action against Counter-Claimants accrued, if at all, no later than October 12, 2006.

9.  Counter-Defendants initiated this lawsuit and filed Plaintiffs' Original Petition and Request for Disclosure on July 7, 2010. Therefore, the negligence, negligent misrepresentation and equitable subrogation causes of action asserted by Counter-Defendants, each of which are governed by a two-year limitations period, are time-barred by the statute of limitations.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 9**
599603.1  402/122

54

10.     Counter-Defendants seek recovery from Counter-Claimants for, among other things, diminution in the Project's value, lost revenue and other consequential damages, which such recovery is barred by the Waiver of Consequential Damages clause in the Contract.

F.      **CAUSE OF ACTION: APPLICATION FOR DECLARATORY RELIEF.**

1.     Counter-Claimants incorporate by reference paragraphs II.A.1 through and including II.E.10 above as if fully set forth verbatim herein.

2.     There exists an actual and justiciable controversy between Counter-Claimants and Counter-Defendants herein, within the jurisdiction of this Court, and involving rights, duties, legal obligations and relations of the parties under the Contract at issue.

3.     Counter-Claimants petition this Court, pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, to declare that:

a.     the Anti-Assignment clause of the Contract is valid, enforceable and applies to Counter-Plaintiffs, making the assignment of the Contract, which was in violation of the Anti-Assignment clause, null and void and of no effect;

b.     the Statute of Limitations Accrual clause of the Contract is valid and enforceable and establishes the date upon which any cause of action against ESG accrued was on or before October 12, 2006, which is the latest date by which ESGs' services were substantially completed;

c.     that all of Counter-Defendants' causes of action against ESG with a two-year limitations period are time-barred;

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 10
599603.1  402/122

55

d. the Waiver of Consequential Damages clause of the Contract is valid and enforceable and bars Counter-Defendants from recovering any consequential damages from Counter-Claimants; and

e. Swenson was not a signatory or a party to the Contract and cannot be liable to the Counter-Defendants under such Contract.

## G. COSTS AND ATTORNEYS' FEES

Counter-Claimants have retained the undersigned law firm to represent them in this action and have agreed to pay the firm all costs and reasonable and necessary attorneys' fees incurred in this matter. An award of costs and reasonable and necessary attorney's fees to Counter-Claimants is equitable and just and, therefore, authorized by Chapter 37 of the Texas Civil Practice and Remedies Code.

## III.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants and Counter-Claimants Elness, Swenson, Graham Architects, Inc. and Mark G. Swenson respectfully request that Plaintiffs and Counter-Defendants RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC be cited to appear and answer herein and that, on final hearing, the Court enter an Order as follows:

a. That Plaintiffs and Counter-Defendants take nothing by their claims;

b. A declaration that the assignment of the Contract to Plaintiffs and Counter-Defendants was made in violation of the Anti-Assignment clause, is null and void

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 11
599603.1 402/122

56

and of no effect, and Defendants and Counter-Claimants are not liable to Plaintiffs and Counter-Defendants under such Contract;

c. A declaration that Plaintiffs and Counter-Defendants' claims against ESG are time-barred, pursuant to the Statute of Limitations Accrual clause of the Contract;

d. A declaration that Swenson was not a signatory or party to the Contract and cannot be liable to Plaintiffs and Counter-Defendants under the Contract;

e. That Counter-Claimants be awarded their costs and all reasonable and necessary attorneys' fees; and

f. All such other and further relief, both general and special, at law or in equity, to which Defendants and Counter-Claimants have shown themselves to be justly entitled.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 12**
599603.1  402/122

57

Respectfully submitted,

**MACDONALD DEVIN, P.C.**

By: _____
      **Gregory N. Ziegler**
      State Bar No. 00791985
      gziegler@macdonalddevin.com
      **Russell E. Clinage**
      State Bar No. 00790473
      rclinage@macdonalddevin.com

3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2130
(214) 744-3300 Telephone
(214) 747-0942 Facsimile

**ATTORNEYS FOR DEFENDANTS AND COUNTER-CLAIMANTS ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served upon all counsel of record in accordance with the Texas Rules of Civil Procedure, on this 1st day of October 2012.

_____
Gregory N. Ziegler

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 13
599603.1 402/122

58

*Handwritten top right:* 205302.00    15.1

# **AIA** Document B141™ – 1997 Part 1

## Standard Form of Agreement Between Owner and Architect
## with Standard Form of Architect's Services

### TABLE OF ARTICLES

1.1    INITIAL INFORMATION

1.2    RESPONSIBILITIES OF THE PARTIES

1.3    TERMS AND CONDITIONS

1.4    SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

1.5    COMPENSATION

AGREEMENT made as of the First day of January in the year Two Thousand Five.
*(In words, indicate day, month and year)*

BETWEEN the Architect's client identified as the Owner:
*(Name, address and other information)*

White Lodging Services Corporation, Inc.
1000 East 80th Place, Suite 500 North
Merrilville, IN 46410-5666

and the Architect:
*(Name, address and other information)*

Elness Swenson Graham Architects, Inc.
500 Washington Avenue South
Minneapolis, MN 55415

For the following Project:
*(Include detailed description of Project)*

Design, documentation and limited contract administration for the construction of a Courtyard by Marriott in Austin, Texas.

The Owner and Architect agree as follows:

- RCVD 3/28/05
- REVISED FROM ORIG CONT. 2/1/05
- REVISIONS PER EMAILS DATED 2/22/05 3/01/05 3/25/05

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:

1

SCANNED

SFP 22 2007



EXHIBIT
A

ESG001454

ARTICLE 1.1 INITIAL INFORMATION

§ 1.1.1 This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

§ 1.1.2 PROJECT PARAMETERS
§ 1.1.2.1 The objective or use is:
*(Identify or describe, if appropriate, proposed use or goals.)*

A Courtyard by Marriott - a limited-service, prototypical hotel.

§ 1.1.2.2 The physical parameters are:
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)*

§ 1.1.2.3 The Owner's Program is:
*(Identify documentation or state the manner in which the program will be developed.)*

The hotel program calls for a five-story building. The project will contain 148 guestrooms and the other prototypical Courtyard Hotel functions - a lobby/lounge, dining, kitchen, a reception desk with sundries display area and offices, meeting space, swimming pool and whirlpool, exercise room, back-of-house storage, laundry, mechanical and electrical spaces and a guest laundry floor. Further definition of the Project Program is contained in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A" with further clarification contained in Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

§ 1.1.2.4 The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*

Legal Description of Property:
Lot 5-D, Block C, RESUBDIVISION OF LOTS 4 AND 5, BLOCK C, METRO CENTRE SECTION 5, a subdivision in Austin, Travis County, Texas, according to the map or plat thereof recorded as Document 199900265 in the Plats Records of Travis County, Texas.

§ 1.1.2.5 The financial parameters are as follows.
.1      Amount of the Owner's overall budget for the Project, including the Architect's compensation, is:  $48,000 per room or $7,000,000.
.2      Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is: unknown at time of execution of this Agreement

§ 1.1.2.6 The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*

The following Milestone Dates are the same as those listed in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A," and herein reproduced:

January 28, 2005         -        30% Design Documents Check Set
March 11, 2005   -        75% Design Documents Check Set
April 25, 2005           -        99% Contract Documents; Foundation Building Permit

§ 1.1.2.7 The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:18 on 08/29/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                                          (3868894002)

2

SCANNED

SEP 22 2007

ESG001455

Negotiated Contract.

**§ 1.1.2.8 Other parameters are:**
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*

**§ 1.1.3 PROJECT TEAM**
**§ 1.1.3.1 The Owner's Designated Representative is:**
*(List name, address and other information.)*

Trent Barber
White Lodging Services Corporation, Inc,
1000 East 80th Place, Suite 500 North
Merrilville, IN 46410-5666

**§ 1.1.3.2 The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:**
*(List name, address and other information.)*

Marriott International
Marriott Drive
Washington, D.C. 20058

**§ 1.1.3.3 The Owner's other consultants and contractors are:**
*(List discipline and, if known, identify them by name and address.)*

CIVIL ENGINEER:
Griffin Engineering Group, Inc.
11711 North Lamar Boulevard
Austin, TX 78753

**§ 1.1.3.4 The Architect's Designated Representative is:**
*(List name, address and other information.)*

Mark Swenson, AIA
Paul Mittendorff, AIA
James Timm, AIA
Elness Swenson Graham Architects, Inc,
500 Washington Avenue South
Minneapolis, MN 55415

**§ 1.1.3.5 The consultants retained at the Architect's expense are:**
*(List discipline and, if known, identify them by name and address.)*

STRUCTURAL ENGINEERING:
Keith Owens, P.E.
Marlin, Bridges & Associates, Inc.
3620 Eighth Avenue South, Suite 110
Birmingham, AL 35222

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3858894002)

SCANNED

SEP 22 2007

3

ESG001456

MECHANICAL, ELECTRICAL ENGINEERING:
Larry Lindsey, P.E.
Lindsey Engineers, Inc.
7703 Brodie Lane
Austin, TX 78745

§ 1.1.4 Other important initial information is:

§ 1.1.5 When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:

§ 1.1.6 The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Section 1.3.3.

## ARTICLE 1.2 RESPONSIBILITIES OF THE PARTIES

§ 1.2.1 The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### § 1.2.2 OWNER

§ 1.2.2.1 Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

§ 1.2.2.2 The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

§ 1.2.2.3 The Owner's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

§ 1.2.2.4 The Owner shall furnish the services of consultants other than those designated in Section 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project.

§ 1.2.2.5 Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

§ 1.2.2.6 The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

§ 1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156209_2 which expires on 2/16/2006, and is not for resale.
User Notes: (3858894002)

4

SCANNED

SEP 22 2007

ESG001457

## § 1.2.3 ARCHITECT

§ 1.2.3.1 The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4.

§ 1.2.3.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Section 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

§ 1.2.3.3 The Architect's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

§ 1.2.3.4 The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

§ 1.2.3.5 Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

§ 1.2.3.6 The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

§ 1.2.3.7 The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3 TERMS AND CONDITIONS
### § 1.3.1 COST OF THE WORK

§ 1.3.1.1 The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

§ 1.3.1.2 The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

§ 1.3.1.3 The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner.

### § 1.3.2 INSTRUMENTS OF SERVICE

§ 1.3.2.1 Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

§ 1.3.2.2 Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2006 under Order No.1000158203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                (3555394002)

5

SCANNED

SEP 22 2007

ESG001458

with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.

§ 1.3.2.3 Except for the licenses granted in Section 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Section 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

§ 1.3.2.4 Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement, attached as "Exhibit C.".

1.3.2.4.1 The Architect will make drawings or specifications in electronic form available to the Contractor, subcontractors, and material suppliers for a charge to compensate for their preparation. The electronic files are specifically for use in preparing shop drawings or other required submittals and for no other reason. The charge for each release of electronic documents for this use shall be $500. Each recipient shall sign the Architect's normal Electronic Media Release form prior to release of the documents. Each recipient is prohibited from sharing these documents.

1.3.2.4.2 The separate agreement governing the use of electronic Instruments of Service by those other than the Owner is attached as "Exhibit D."

§ 1.3.3 CHANGE IN SERVICES
§ 1.3.3.1 Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Section 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Section 1.5.2, and to any Reimbursable Expenses described in Section 1.9.2 and Section 1.5.5.

§ 1.3.3.2 If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation:

.1 change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;

.2 enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;

.3 decisions of the Owner not rendered in a timely manner;

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2006 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                                                            6

SCANNED (3556894002)

SEP 22 2007

ESG001459

.4    significant change in the Project including, but not limited to, size, quality, complexity, the Owner's schedule or budget, or procurement method;

.5    failure of performance on the part of the Owner or the Owner's consultants or contractors;

.6    preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto;

.7    change in the information contained in Article 1.1.

### § 1.3.4 MEDIATION

**§ 1.3.4.1** Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

**§ 1.3.4.2** The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**§ 1.3.4.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 1.3.5 ARBITRATION

**§ 1.3.5.1** Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Section 1.3.4.

**§ 1.3.5.2** Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

**§ 1.3.5.3** A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

**§ 1.3.5.4** No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**§ 1.3.5.5** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.** Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                  (3868894002)

7

SCANNED

SEP 22 2007

ESG001460

**§ 1.3.6 CLAIMS FOR CONSEQUENTIAL DAMAGES**
The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Section 1.3.8.

**§ 1.3.7 MISCELLANEOUS PROVISIONS**
§ 1.3.7.1 This Agreement shall be governed by the law of the principal place of business of the Architect, unless otherwise provided in Section 1.4.2.

§ 1.3.7.2 Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

§ 1.3.7.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

§ 1.3.7.4 To the extent damages are covered by property insurance during construction, the Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

§ 1.3.7.5 Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

§ 1.3.7.6 Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

§ 1.3.7.7 The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.

§ 1.3.7.8 If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

§ 1.3.7.9 The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

**§ 1.3.8 TERMINATION OR SUSPENSION**
§ 1.3.8.1 If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                          (3888694002)

8

SCANNED

SEP 22 2007

ESG001461

suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.2 If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.3 If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

§ 1.3.8.4 This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

§ 1.3.8.5 This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

§ 1.3.8.6 In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Section 1.3.8.7.

§ 1.3.8.7 Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.

§ 1.3.9 PAYMENTS TO THE ARCHITECT
§ 1.3.9.1 Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

§ 1.3.9.2 Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

   .1   transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;
   .2   fees paid for securing approval of authorities having jurisdiction over the Project;
   .3   reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;
   .4   expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;
   .5   renderings, models and mock-ups requested by the Owner;
   .6   expense of professional liability insurance dedicated exclusively to this Project or the expense of additional insurance coverage or limits requested by the Owner in excess of that normally carried by the Architect and the Architect's consultants;
   .7   reimbursable expenses as designated in Section 1.5.5;
   .8   other similar direct Project-related expenditures.

§ 1.3.9.3 Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/16/2006, and is not for resale.
User Notes:

SCANNED (3868894002)

SEP 22 2007

ESG001462

§ 1.3.9.4 Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

## ARTICLE 1.4  SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS
§ 1.4.1 Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

§ 1.4.1.1 Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

§ 1.4.1.2 Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*

Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A."

§ 1.4.1.3 Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

§ 1.4.2 Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

## ARTICLE 1.5  COMPENSATION
§ 1.5.1 For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

Fixed fee for Architecture, Structural, Mechanical and Electrical Engineering = $112,500.  See schedule for Phases of work:

| Discipline | M.P./S.D. | D.D. | C.D. | C.O. | Total Fees |
|---|---|---|---|---|---|
| Architecture | 10,800 | 18,000 | 28,800 | 14,400 | 72,000 |
| MEP Eng. | 3,750 | 4,550 | 7,200 | 0 | 15,500 |
| Struct. Eng. | 2,500 | 3,750 | 15,000 | 3,750 | 25,000 |
| Total Fees | 17,050 | 26,300 | 51,000 | 18,150 | $112,500 |

§ 1.5.2 If the services of the Architect are changed as described in Section 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Section 1.5.2, in an equitable manner.
*(Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply.)*

See schedule of hourly rates attached as "Exhibit B."

§ 1.5.3 For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of One ( 1.00 ) times the amounts billed to the Architect for such services.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                     (3868894002)

**10**

SCANNED

SEP 2 2 2007

ESG001463

§ 1.5.4 For Reimbursable Expenses as described in Section 1.3.9.2, and any other items included in Section 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of One ( 1.00 ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

§ 1.5.5 Other Reimbursable Expenses, if any, are as follows:

§ 1.5.6 The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

§ 1.5.7 An initial payment of Zero Dollars and Zero Cents ($ 0.00 ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

§ 1.5.8 Payments are due and payable immediately zero    ( 0.00 ) days from the date of the Architect's invoice. Amounts unpaid sixty    ( 60 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect. *(Insert rate of interest agreed upon.)*

U.S. Federal Reserve Prime Rate plus 2%.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 1.5.9 If the services covered by this Agreement have not been completed within Three ( 3 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Section 1.5.2.

This Agreement entered into as of the day and year first written above.

| OWNER | ARCHITECT |
|---|---|
| 3/30/05 | |
| *(Signature)* | *(Signature)* |
| TRENT BARBER | Paul Mittendorff, AIA |
|  | Principal and Vice President |
| *(Printed name and title)* | *(Printed name and title)* |

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                      (3668694002)

SCANNED

SEP 22 2007

11

ESG001464

69

# ▓**AIA**° Document B141™ – 1997 Part 2

## *Standard Form of Architect's Services:*
*Design and Contract Administration*

**TABLE OF ARTICLES**

2.1     PROJECT ADMINISTRATION SERVICES

2.2     SUPPORTING SERVICES

2.3     EVALUATION AND PLANNING SERVICES

2.4     DESIGN SERVICES

2.5     CONSTRUCTION PROCUREMENT SERVICES

2.6     CONTRACT ADMINISTRATION SERVICES

2.7     FACILITY OPERATION SERVICES

2.8     SCHEDULE OF SERVICES

2.9     MODIFICATIONS

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**ARTICLE 2.1  PROJECT ADMINISTRATION SERVICES**

§ 2.1.1 The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

§ 2.1.2 When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the ~~Work.~~Work, subject to the limitations indicated in Fitness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A."    OK #

~~§ 2.1.3 The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.~~    OK #

§.

~~§ 2.1.4 Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.~~

§

§ 2.1.5 The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                     (12094700)

**1**

SCANNED

SEP 22 2007

**EXHIBIT**

**B**

ESG001465

70

shall be entitled to rely on approvals received from the Owner in the further development of the design.

§ 2.1.6 The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.Project, subject to the following limitations:

2.1.6.1 Site layout, submittals and approvals will be by others. The Architect will perform one set of revisions to the scope building drawings included by reference as "Exhibit B" and one set of revisions to the documents submitted for permit from input received from the Owner pursuant to requirements of the municipal authorities having jurisdiction over the Project. Beyond those revisions, the Architect will not create any special drawings or exhibits. Documents or other work efforts required for planning submittals or governmental agency review after the initial submission will be identified immediately by the Owner and may result in a revision to our schedule and compensation.



§ 2.1.7 EVALUATION OF BUDGET AND COST OF THE WORK
§ 2.1.7.1 When the Project requirements have been sufficiently identified, the Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.

§

§ 2.1.7.2 Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.

§ 2.1.7.3 In preparing estimates of the Cost of the Work, the Architect shall be permitted to include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.

§ 2.1.7.4 If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the construction industry.

§ 2.1.7.5 If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:
.1    give written approval of an increase in the budget for the Cost of the Work;
.2    authorize rebidding or renegotiating of the Project within a reasonable time;
.3    terminate in accordance with Section 1.3.8.5; or
.4    cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

SCANNED (12094700)

SEP 22 2007

ESG001466

2

§ 2.1.7.6 If the Owner chooses to proceed under Section 2.1.7.5.4, the Architect, without additional compensation, shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work. The modification of such documents shall be the limit of the Architect's responsibility under this Section 2.1.7. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.

## ARTICLE 2.2 SUPPORTING SERVICES

§ 2.2.1 Unless specifically designated in Section 2.8.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

§ 2.2.1.1 The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.

§ 2.2.1.2 The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ 2.2.1.3 The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

ARTICLE 2.3 EVALUATION AND PLANNING SERVICES
§ 2.3.1 The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

§ 2.3.2 The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

§ 2.3.3 The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the scope of the Project.

*OK*
*#β*

*OK*
*#β*

## ARTICLE 2.4 DESIGN SERVICES

§ 2.4.1 The Architect's design services shall include normal structural, mechanical and electrical engineering services.

### § 2.4.2 SCHEMATIC DESIGN DOCUMENTS

§ 2.4.2.1 The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

3

SCANNED (120094700)

SEP 22 2007

ESG001467

## § 2.4.3 DESIGN DEVELOPMENT DOCUMENTS

§ 2.4.3.1 The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

## § 2.4.4 CONSTRUCTION DOCUMENTS

§ 2.4.4.1 The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

§ 2.4.4.2 During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms.

## ARTICLE 2.5 CONSTRUCTION PROCUREMENT SERVICES

§ 2.5.1 The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

§ 2.5.2 The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

§ ..

§ 2.5.3 The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

## § 2.5.4 COMPETITIVE BIDDING

§ 2.5.4.1 Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.4.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.4.3 If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.

§ 2.5.4.4 The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

§ 2.5.4.5 The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.

§ 2.5.4.6 The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

§ 2.5.4.7 The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/18/2006, and is not for resale.
User Notes:                                                                                    (12094700)

4

SCANNED

SEP 22 2007

ESG001468

§ 2.5.5 NEGOTIATED PROPOSALS
§ 2.5.5.1 Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.5.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.5.3 If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective contractors.

§ 2.5.5.4 The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.

§ 2.5.5.5 If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.

## ARTICLE 2.6 CONTRACT ADMINISTRATION SERVICES
### § 2.6.1 GENERAL ADMINISTRATION
§ 2.6.1.1 The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect. Site visits by the Architect will be limited to the number of meetings indicated in Bjness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004, attached as "Exhibit A."

§ 2.6.1.2 The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Section 2.8.2 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

§ 2.6.1.3 The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

§ 2.6.1.4 Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

§ 2.6.1.5 The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

§ 2.6.1.6 If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

§ 2.6.1.7 The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

SCANNED (12094700)

SEP 22 2007

ESG001469

**§ 2.6.1.8** Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

**§ 2.6.1.9** The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

**§ 2.6.2 EVALUATIONS OF THE WORK**

**§ 2.6.2.1** The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**§ 2.6.2.2** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

**§ 2.6.2.3** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**§ 2.6.2.4** Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

**§ 2.6.2.5** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

~~**§ 2.6.3 CERTIFICATION OF PAYMENTS TO CONTRACTOR**~~ OK ~~

~~**§ 2.6.3.1** The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Section 2.6.2 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.~~

§

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                                          (12094700)

6

SCANNED

SEP 22 2007

ESG001470

§ 2.6.3.2 ~~The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.~~

§ 2.6.3.3 ~~The Architect shall maintain a record of the Contractor's Applications for Payment.~~

## § 2.6.4 SUBMITTALS

§ 2.6.4.1 The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be .taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 2.6.4.2 The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

§ 2.6.4.3 If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

## § 2.6.5 CHANGES IN THE WORK

§ 2.6.5.1 ~~The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Section 2.8.2.~~

OK
HB

§

§ 2.6.5.2 The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

§ 2.6.5.3 If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes: (12094700)

7

SCANNED

SEP 22 2007

ESG001471

§ 2.6.5.4 The Architect shall maintain records relative to changes in the Work.

~~§ 2.6.6 PROJECT COMPLETION~~
~~§ 2.6.6.1 The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.~~

~~§ 2.6.6.2 The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.~~

~~§ 2.6.6.3 When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.~~

~~§ 2.6.6.4 The Architect shall receive from the Contractor and forward to the Owner: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or bonds indemnifying the Owner against liens.~~

~~ARTICLE 2.7 FACILITY OPERATION SERVICES~~
~~§ 2.7.1 The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.~~

~~§ 2.7.2 Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.~~

ARTICLE 2.8 SCHEDULE OF SERVICES
§ 2.8.1 Design and Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:
  .1 up to One ( 1 ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor. OK
  .2 up to Two ( 2 ) visits to the site by the Architect over the duration of the Project during construction. OK
  .3 up to Zero ( 0 ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents. OK
  .4 up to Zero ( 0 ) inspections for any portion of the Work to determine final completion. OK

§ 2.8.2 The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:
  .1 review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;
  .2 responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;
  .3 Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;
  .4 providing consultation concerning replacement of Work resulting from fire or other cause during construction;
  .5 evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2006 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes: (12094700)

8

SCANNED

SEP 22 2007

ESG001472

.6    evaluation of substitutions proposed by the Owner's consultants or contractors and making
subsequent revisions to Instruments of Service resulting therefrom;

.7    preparation of design and documentation for alternate bid or proposal requests proposed by the
Owner; or

.8    Contract Administration Services provided 60 days after the date of Substantial Completion of the
Work.

§ 2.8.3 The Architect shall furnish or provide the following services only if specifically designated:

| Services | | Responsibility (Architect, Owner or Not Provided) | Location of Service Description |
|---|---|---|---|
| .1 | Programming | O | |
| .2 | Land Survey Services | O | |
| .3 | Geotechnical Services | O | |
| .4 | Space Schematics/Flow Diagrams | NP | |
| .5 | Existing Facilities Surveys | NP | |
| .6 | Economic Feasibility Studies | NP | |
| .7 | Site Analysis and Selection | NP | |
| .8 | Environmental Studies and Reports | O | |
| .9 | Owner-Supplied Data Coordination | O | |
| .10 | Schedule Development and Monitoring | O | |
| .11 | Civil Design | O | |
| .12 | Landscape Design | O | |
| .13 | Interior Design | O | |
| .14 | Special Bidding or Negotiation | O | |
| .15 | Value Analysis | O | |
| .16 | Detailed Cost Estimating | O | |
| .17 | On-Site Project Representation | O | |
| .18 | Construction Management | O | |
| .19 | Start-up Assistance | O | |
| .20 | Record Drawings | NP | |
| .21 | Post-Contract Evaluation | NP | |
| .22 | Tenant-Related Services | NP | |
| .23 | | | |
| .24 | | | |
| .25 | | | |

Description of Services.
*(Insert descriptions of the services designated.)*

ARTICLE 2.9  MODIFICATIONS
§ 2.9.1 Modifications to this Standard Form of Architect's Services: Design and Contract Administration, if any, are
as follows:

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The
American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.
Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be
prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order
No.1000156209_1 which expires on 2/15/2006, and is not for resale.
User Notes:

9

SCANNED   (12094700)

SEP 2 2 2007

ESG001473

By its execution, this Standard Form of Architect's Services: Design and Contract Administration and modifications hereto are incorporated into the Standard Form of Agreement Between the Owner and Architect, AIA Document B141-1997, that was entered into by the parties as of the date:

OWNER _____ 3/30/05
*(Signature)*

_TRENT BARTEK_
*(Printed name and title)*

ARCHITECT _____
*(Signature)*
Paul Mittendorff, AIA
Principal and Vice President
*(Printed name and title)*

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156209_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                                    10

SCANNED (12094700)

SEP 22 2007

ESG001474

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; AND RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § | |
| vs. | § § § | |
| EBCO GENERAL CONTRACTOR, LTD; EBCO ADVANCED BUILDING SYSTEM, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.; MARK G. SWENSON, INDIVIDUALLY, TERRACON CONSULTANTS, INC.; TODD E. SWOBODA, P.E., INDIVIDUALLY; MBA STRUCTURAL ENGINEERS AND ANDREW T. MARLIN, P.E. INDIVIDUALLY, | § § § § § § § § § § § § § | 200TH JUDICIAL DISTRICT |
| *Defendants.* | § § | TRAVIS COUNTY, TEXAS |

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Paul Mittendorff, who, after being duly sworn, stated under oath that he is a Principal and Vice President of Elness, Swenson, Graham Architects, Inc., a named party in this action; that he has read the above and foregoing Defendants and Counter-Claimants Elness, Swenson, Graham Architects, Inc. and Mark G. Swenson's First Amended Answer and Original Counterclaim for Declaratory Judgment; and that every denial and statement contained in Sub-Section C, Verified

Denials, of Section I, First Amended Answer are within his personal knowledge and are true and correct.



ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.
by PAUL MITTENDORFF

SUBSCRIBED AND SWORN TO BEFORE ME on this the ___30___ day of December, 2011.

NOTARY PUBLIC, STATE OF MINNESOTA

PAMELA J. STENZEL
Notary Public-Minnesota
My Commission Expires Jan 31, 2015

45